**Case No. 22-40559**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

Amber Ford; Regan Kimbrough; Donald Newsome,

Plaintiffs - Appellants

v.

Anderson County, Texas; Taket Holdings, L.L.C.; Adam Corley;
Timothy Green; Greg Taylor; Robin Jones; Jonathan Strong;
Jessica Carpenter; Alicia Wilson; Matthew Wickersham; Travis
Wesson; Dakota Hughes; Todd Choate,

Defendants – Appellees

On Appeal from
United States District Court for the Eastern District of Texas
6:19-cv-00384-JDK

**Brief of Appellants**

Bruce K. Thomas
Law Office of Bruce K. Thomas
Texas State Bar No. 19844300
bthomas@bthomaslaw.com
12900 Preston Rd, Ste 590
Dallas, Texas 75230
Phone/Fax: (214) 296-9650

Charles W. Nichols
Texas Bar No 14994200
cnichols@charleswnicholslaw.com
Donald J. Larkin
Texas Bar No 24057702
donald@charleswnicholslaw.com
617 E. Lacy St.
Palestine, TX 75801
Tel. (903) 729-5104
Fax. (903) 729-0347
ATTORNEYS FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellants: | Counsel for Plaintiff-Appellants: |
| --- | --- |
| Amber Ford<br>Regan Kimbrough<br>Donald Newsome | Charles Nichols of Law Office of Charles W. Nichols, P.C. Palestine, TX<br><br>Donald Larkin of Law Office of Charles W. Nichols, P.C. Palestine, TX<br><br>Daniel R. Scarbrough of Law Office of Charles W. Nichols, P.C. Palestine, TX<br><br>Bruce Thomas of Law Office of Bruce K. Thomas Dallas, TX |

| Defendants – Appellees: | Counsel for Appellees: |
| --- | --- |
| Anderson County, Texas<br>Greg Taylor<br>Robin Jones<br>Jonathan Strong<br>Jessica Carpenter<br>Alicia Wilson<br>Matthew Wickersham<br>Travis Wesson<br>Dakota Hughes<br>Todd Choate | Robert Davis of Flowers Davis, P.L.L.C. Tyler, TX<br><br>Lee Correa of Flowers Davis, P.L.L.C. Tyler, TX |
| Adam Corley<br>Taket Holdings, L.L.C. | Douglas Markham Houston, TX<br><br>Joel Sprott of Sprott Newsom Quattlebaum & Messenger, P.C. Houston, TX |

| | |
|---|---|
| | Diana Navarro of Sprott Newsom Quattlebaum & Messenger, P.C. Houston, TX |
| Timothy Green | David Iglesias of Iglesias Law Firm, P.L.L.C. Tyler, TX<br><br>James Evans of Iglesias Law Firm, P.L.L.C. Tyler, TX |

/s/ Bruce K. Thomas
Attorney of record for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument. This appeal presents important issues concerning the responsibilities of counties to provide safe detention and timely medical care for ill detainees in Texas jails, and not to shirk their constitutional duty to provide for serious medical needs by releasing critically ill detainees in need of immediate hospitalization in order to avoid treatment expense. These issues deserve the full vetting of oral argument.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**.....................................................**2**

**STATEMENT REGARDING ORAL ARGUMENT** ...........................................**4**

**TABLE OF CONTENTS** ....................................................................................**5**

**TABLE OF AUTHORITIES** ..............................................................................**8**

**JURISDICTIONAL STATEMENT**....................................................................**10**

**STATEMENT OF ISSUES** .................................................................................**11**

**STATEMENT OF THE CASE**.............................................................................**12**

**SUMMARY OF THE ARGUMENT** ....................................................................**27**

**ARGUMENT** ........................................................................................................**30**

**ISSUE 1: The district court erred in granting summary judgment for each individual Defendant asserting qualified immunity because Plaintiffs raised fact issues whether each Defendant, in violation of clearly established law, was deliberately indifferent to Newsome's serious medical needs.** ..........................**30**

A.     Legal Standards ........................................................................................**30**

    1.     *Summary judgment and standard of review.*................................**30**

    2.     *Serious medical needs.* ................................................................**30**

    3.     *Qualified immunity.* .....................................................................**33**

4. *Video evidence.* .........................................................................33

B.     The Medical-Defendants were deliberately indifferent to Newsome's serious

medical needs. ...........................................................................................34

1. *Nurse Green.* ......................................................................................34

2. *Dr. Corley.* .........................................................................................40

3. Medical-Defendants are not entitled to qualified immunity. ..................46

C.     Each Jailer-Defendant was deliberately indifferent to Newsome's serious

medical needs. ...........................................................................................47

1. Captain Todd Choate ............................................................................47

2. Jailer Alicia Wilson ..............................................................................52

3. Jailer Jonathan Strong...........................................................................52

4. Sergeant Robin Jones ............................................................................53

4. Jailers Matthew Wickersham, Jessica Carpenter, and Dakota Hughes....53

5. Travis Wesson .......................................................................................56

6. Sheriff Greg Taylor ...............................................................................58

D.     Defendants' spoliation of electronic data creates fact issues. ......................60

**ISSUE 2: The district court erred in granting summary judgment for Anderson County because Plaintiffs raised fact issues on Plaintiffs' *Monell* claim. ................................................................................................63**

A.      Legal standards and standard of review**.** .......................................................63

B.      Anderson County's policies were a moving force in causing the constitutional violations which led to Newsome's critical illness and death. .........64

**ISSUE 3: The district court erred in denying Plaintiffs leave to file their third amended complaint. ...............................................................................67**

**CONCLUSION.......................................................................................68**

**CERTIFICATE OF SERVICE .........................................................69**

**CERTIFICATE OF COMPLIANCE .............................................71**

# TABLE OF AUTHORITIES

## Cases

*Adkisson v. Paxton*, 459 S.W.3d 761, 773-75 (Tex. App.—Austin 2015, no pet.).61

*Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017)32

*Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020) ........................................ 30, 63

*Bell v. Wolfish*, 441 U.S. 520, 535, (1979) ....................................................... 30, 67

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).................................................67

*Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350 (2011).............................63

*Cope v. Cogdill*, 3 F.4th 198, 207, n. 7 (5th Cir. 2021) ), *cert. denied*, 142 S. Ct. 2573 (2022) .................................................................................................. 31, 32

*Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018), *cert. denied, __ U.S. __*, 139 S. Ct. 69 (2018) ..............................................................33

*Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) ........................................30

*Doe v. Dallas I.S.D.*, 153 F.3d 211, 217 (5th Cir. 1998).........................................67

*Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). 31, 44

*E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc) ..33

*Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006)........................................ 32, 58

*Emory v. Texas State Bd. of Med. Examiners*, 748 F.2d 1023, 1027 (5th Cir. 1984) ................................................................................................................................67

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ............................................... 32, 44, 46

*Fairchild v. Coryell Cty.*, 40 F.4th 359, 363 (5th Cir. 2022)................. 30, 33, 47, 64

*Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994)................................................31

*Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ...........................65

*Hare v. City of Corinth*, 74 F.3d, 633, 643 (5th Cir. 1996) (en banc).............. 30, 31

*Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994).............................32

*Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).................................. 32, 46

*Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 339-40 (5th Cir. 2020) .......................................................................................................................... 33, 65

*Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)........................................32

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978)........63

*Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 & n.56 (5th Cir. 2022)....63

*Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021).........................63

*Pena v. City of Rio Grande City, Texas*, 816 F. App'x 966, 974 n.11 (5th Cir. 2020) ................................................................................................................................30

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001)...................................64

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155-51 (2000)............30

*Sanchez v. Young Cnty., Texas*, 866 F.3d 274, 279 n.3 (5th Cir. 2017) .................67

*Sanchez v. Young County, Tex.*, 866 F.3d 274, 279 (5th Cir. 2017)...... 30, 64, 65, 66

*Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2022)..................................... 31, 58, 60

*Taylor v. Riojas*, 141 S.Ct. 52, 53-54 (2020) (per curiam)........................ 33, 46, 58

*Tyson v. Sabine*, 42 F.4th 508 (5th Cir. 2022) ........................................................33

*Valderrama v. Rousseau*, 780 F.3d 1108, 1120 (11th Cir. 2015)..........................32

*Wade v. Daniels*, 36 F.4th 1318, 1327-28 (11th Cir. 2022) ...................................32

**Statutes**

28 U.S.C. §1291 ......................................................................................................10

**Rules**

Fed. R. Civ. P. 37(e)................................................................................................61

**Other Authorities**

Federal Pattern Jury Instructions, Civil Rights - 42 U.S.C. §1983, No. 10.4,
   "Liability of a Supervisor."...................................................................................59

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment following entry of two summary judgment orders. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

**STATEMENT OF ISSUES**

ISSUE 1:    The district court erred in granting summary judgment for each individual Defendant asserting qualified immunity because Plaintiffs raised fact issues whether each Defendant, in violation of clearly established law, was deliberately indifferent to Newsome's serious medical needs.

ISSUE 2:    The district court erred in granting summary judgment for Anderson County because Plaintiffs raised fact issues on Plaintiffs' *Monell* claim.

ISSUE 3: The district court erred in denying Plaintiffs leave to file their third amended complaint.

## STATEMENT OF THE CASE

This Section 1983 case involves the death of pretrial detainee Rhonda Newsome in the Anderson County, Texas, jail; Plaintiffs assert that Defendants were deliberately indifferent to Newsome's serious medical needs. (ROA.406-446) Plaintiffs appeal the grant of separate summary judgment motions filed by (1) Dr. Corley (ROA.1622-1813) and (2) Nurse Green (ROA.1814-3223) (collectively "Medical-Defendants"); (3) Sheriff Taylor and eight jailers (ROA.2383-2688) (collectively "Jailer-Defendants"); and (4) Anderson County (ROA.4218-4520). The district court entered separate orders for the County and all other Defendants. (ROA.4760-4767, 4155-4206) Many exhibits are duplicated across four sets of summary judgment filings. (ROA.1622-4768)

Newsome, age 50, was arrested March 9, 2018, following a domestic disturbance where she allegedly chased her adult daughter (Amber Ford) with scissors. (ROA.2417) Newsome was charged with a first degree felony (Aggravated Assault with a Deadly Weapon), assessed a $20,000 bond, and following treatment at Palestine Regional Medical Center (PRMC) for back strain, detained at the Anderson County Jail for 97 days, from March 10 until her death June 15. (ROA.2414, 2422, 2769-2781, 3176, 3615[1]) Newsome's jail intake file includes her

---

[1] Plaintiffs' Expert Dr. Linda M. Osborne (ROA.3609-3631 [Response to Corley MSJ]); repeated at ROA.3178-3200 [Response to Green MSJ]).

history of several chronic conditions, including Addison's disease. (ROA.2423-2424, 3615) Addison's if not treated will develop into a life-threatening "Addisonian crisis" requiring emergency hospital intervention. (ROA.3615-16) Early indications of an Addisonian crisis include swelling in the extremities, gas, and hypotension (i.e., low blood pressure). (ROA.3615) Addison's, however, is treatable and a properly managed patient can have a normal life expectancy. (ROA.3641)[2] Addison's is managed through frequent blood tests to monitor electrolytes, potassium and sodium and hormones balances (adrenal gland functions), and renal function, and is treated with steroid medications. (ROA.3642) Blood draws to monitor and manage Newsome's Addison's disease should have been obtained "early and often" during her detention. (ROA.3642-43)

Anderson County contracted with Adam Corley, a private physician who to work part-time to provide medical care for nearly 200 detainees. (ROA.3620, 2960) Corley splits time living in Tyler in Smith County about an hour from the Anderson County jail in Palestine, as well as Georgetown approximately 3 hours away. [3] (ROA.2862-2863) The County also employed Timothy Green, a registered nurse, part-time. (ROA.2977) Green held full-time employment at PRMC and also worked

---

[2] Plaintiffs' Expert Dr. Michael Sands (ROA.3632-3650 [Response to Corley MSJ]); repeated at ROA.3202-3219 [Response to Green MSJ]).

[3] Distances obtained from https://www.google.com/maps.

part-time via contract at the Houston County jail, 40 minutes away. (ROA.2861, 2864, 2882, 2915, 3493-3494) Corley and Green subsequently formed TAKET Holdings to provide medical services to detention facilities, and thereafter Anderson County contracted with TAKET, notwithstanding Newsome's death. (ROA 1640, 1789)

Anderson County's Health Services Plan (HSP), adopted as a requirement of the new Sandra Bland Act, provides that medical care to detainees is to be provided 24/7 (ROA.2853-2854) Nonetheless, Medical-Defendants did not do so, but instead left it to jailers to monitor ill detainees, including taking blood pressure readings and dispensing medication. (ROA.3615, 3620, 3224 [3, 6]) Notwithstanding the requirements of the HSP, Corley claimed only to play a minor role in detainee care, but nonetheless admitted he held the title "medical director." (ROA.3003, 3661-3662, 4109) Corley abdicated much of his responsibility to Green, who used Corley's medical license to dispense narcotics and other prescription drugs, and to order lab tests without written orders. (ROA.3620) Plaintiffs' experts conclude that in so acting Green was practicing medicine without a license. (ROA.3615, 3643) Noting that the two have jointly provided jail services since 2016, they opine that Corley undoubtedly knew Green used Corley's medical license to illegally dispense narcotics and prescription drugs. (ROA.3616, 3620, 3643) Green's license was later suspended. (ROA.3165-3174)

Both Corley and Green were aware of Newsome's Addison's disorder and other chronic conditions. (ROA.3597-98, 3600, 3619) According to Corley any treatment plan should be contained in Newsome's individual records held by the jail, but none exists in Newsome's jail records. (ROA.2804-2809) Jail Captain Choate further confirms that "[a]ll medical files are kept in medical." (ROA.2927) Nonetheless, there exists no record that Medical-Defendants ever developed a treatment plan and managed Newsome's Addison disease, as required by Anderson County's HSP. (ROA.2804-2808, 2853-2854, 3606) Corley testified that he lacked a good understand of Newsome's chronic conditions, and suggested that the absence of Newsome's prior medical records justified his failure to treat them: "I didn't know what her chronic conditions exactly were or how they were treated, treated, so I asked for those records. I . . . would have been happy to have constructed that in follow-up, but I did not have her records." (ROA.3871) Developing and following a treatment plan would have prevented this death. (ROA.3619, 3640-3643)

Although Corley and Green recognized they should obtain her records, and knew of her many ER visits and the name of her doctor, they never obtained her records and failed even to have Newsome sign a HIPPA release. (ROA.2704, 3597-98, 3600, 3620, 3641, 3871) The lack of a signed HIPPA authorization indicates that Medical-Defendants made no attempt to obtain Newsome's records, notwithstanding their assertions that they requested them. (ROA.3641, 1824, 2808)

Their failure to request records is corroborated by Corley and Green's contemporaneous notes, which make no reference to any inability to obtain Newsome's records, but refer to obtaining them only as something they need to do in the future, rather than something they actually did. (ROA.2814-2808, 3597-3598)

Additionally, because Green and Corley worked in the PRMC ER department, either could have accessed her hospital records. (ROA.2862, 2745) Newsome had visited hospital ERs regularly over many years to control her Addison's. (ROA.3780, 3826-3827) As Green told Texas Ranger Baggett during his criminal investigation, ". . . I know her. Everybody knows her that works in [the] emergency room." (ROA.2865)[4] Nonetheless Medical-Defendants never obtained Newsome's medical records. (ROA.2704, 2769-2811, 3871)

Corley saw Newsome only on May 11, over two months after she was detained. (ROA.3597-98) Plaintiffs' expert describes this delay as "incompetent." (ROA.3620) Corley's notes confirm that he had obtained no medical records even after two months, despite recognizing they were needed and that he should follow up. (ROA.3598) But he did not. (ROA.2804-2808) Corley's May 11 notes also record that Newsome "has Addison disease," "longstanding psychiatric issues," and other chronic conditions. (ROA.3597) He further records that Newsome

---

[4] Transcripts of Baggett's recorded interviews transcribed from audio recordings are attached as Ex. C to Plaintiffs' response to Green's MSJ (ROA.2855-2974), which Appellants cite throughout. The audio tapes are marked as Exhibit L (ROA.3082) and were delivered to the court (ROA.3224).

continuously complained of flatulence since incarcerated, and also records (without comment) blood pressure of 99/51. (ROA.3597) Flatulence and low blood pressure are early symptoms of an Addisonian crisis, and 99/51 is dangerously low for an Addison's patient, and indicate the patient is not being treated. (ROA.3615) Corley nonetheless claimed Newsome was "in no distress" and advised simethicone (i.e., Gas-X) for flatulence. (ROA.3598)

Prior to detention, Newsome was very familiar with her Addison's symptoms and drove herself to the hospital whenever her condition required. (ROA.3780, 3826-3827) Her Addison's was controlled when she was detained. (ROA.3640) Prior to Corley seeing Newsome on May 11, Nurse Green saw Newsome a few times, but like Corley did nothing to prevent her Addison's disease from progressing to a crisis. (ROA.3599-60, 3615-3622, 3639-3643)

During Newsome's 97-day detention, the only prescription drug purchased for her was Metolazone, a diuretic. (ROA.3642) At times Newsome was allowed medication brought to her by family, but her Master Medication List showing all medications administered to her in jail shows she was never proscribed or systematically treated with any steroid medication for Addison's. (ROA.2809, 3620) Nor did Corley and Green conduct frequent blood tests. (ROA.2804-2808) Only on the morning of her death (i.e., June 15) did Green finally obtain a blood draw. (ROA.2800-2801) Previously, on April 20 Green indicated he intended to obtain a

blood draw and report lab results to Corley, but he never did. (ROA.2804-2808, 3615, 3620) Had Green drawn blood during jail visits, results would have shown Newsome needed treatment to avoid an Addisonian crisis. (ROA.3621) As did Corley on May 11, Green noted on April 20 that Newsome was experiencing periodic low blood pressure and swelling in both legs, which like persistent flatulence, are indicators of a developing, Addisonian crisis from lack of treatment. (ROA.2807, 3597, 3615, 3620)

On May 24, three weeks before her death, Newsome requested medical assistance because she believed she was having a heart attack. (ROA.3495) Jailers expressed disbelief and failed to contact medical. (ROA.3495) On June 12, Newsome verbally requested to Jailer Wilson to see a doctor because of severe stomach pain. (ROA.3495) Again her request was ignored and medical was not notified. (ROA.3495) On June 13 and 14, Newsome vomited blood and cellmates reported it to jailers. (ROA.3495, 3615) Newsome was then moved in and out of her cell, and near midnight on June 14 she was moved by wheelchair into Holding Cell 2 outside the intake/control center/processing area for medical watch every 15-30 minutes. (ROA.2807, 3495, 3651, 3653, 3654, 3477) Watch records nonetheless show stretches of 1 to 2 hours when Newsome was left unwatched. (ROA 3242)



(ROA.3224 [1])[5] Newsome died in the cell 17 hours later, without hospitalization or seeing a doctor. (ROA.2804-2808)

Detainees in cells near Newsome report that throughout these critical 17 hours, when Newsome was suffering from symptoms of a life-threatening Addisonian crisis, she obviously was in grave distress, and her cries for help were ignored by jailers in the processing area. (ROA.3651-3654, 3616) Edward Jimenez was moved into Holding Cell 1 adjacent to Newsome after dark on June 14, and heard Newsome screaming and crying to the point that it kept him from sleeping. (ROA.3651) Newsome kept repeating loudly "help-help," "I'm hurting bad," "please help," "Lord help me," "take me to a hospital," "I need a doctor," and "please – somebody help me." (ROA.3651) Jimenez witnessed jailers in the control

---

[5] The highly curated jail video produced by Defendants is limited to a view of the processing/intake area outside Holding Cell 2. Excepting many gaps and jumps in the video, the six files run from 11:58 p.m. June 14 to 9:49 p.m. June 15. The jail video is cited as Plaintiffs' Ex. A in Response to the Defendant-Jailers' MSJ and Ex. M in response to Green's MSJ, and was delivered to the court for both motions. (ROA.3224, 3580) For convenience Appellants cite the video throughout as ROA.3224 and parenthetically reference the applicable file(s).

center/processing area outside the holding cells ignoring Newsome's pleas. (ROA.3651-3652).

Detainee Ashley Lyons stated that about 11:00 a.m. of June 15 she was placed into a cell adjacent to Newsome. (ROA.3652) Lyons could hear Newsome moaning and groaning in pain both while Lyons was in her cell and earlier while Lyons was being booked in the processing area. (ROA.3652) Lyons stated that Newsome's moans and groans got louder as time progressed and went on for several hours. (ROA.3652) Her cries for help were loud enough to wake up Lyons several times. (ROA.3652)

Detainee Charles Patrick Sweet observed the same. (ROA.3654) From his cell he saw Jailer Jonathon Strong wheel Newsome into Holding Cell 2 at about 11:30 p.m. June 14. (ROA.3654). Thereafter, for a period of almost two hours Newsome repeatedly cried out that she needed a doctor and needed to go to a hospital. (ROA.3654)

The Jailer-Defendants deny that Newsome cried out as Plaintiffs' witnesses testified, but admit she could be heard in the processing area by jailers when she called out from her cell. (*E.g.*, ROA.2498)

Detainee Kelli Schuckers was a trustee during Newsome's detention and worked in the processing area where the holding cells are located. (ROA.3653) On the night of June 14 and early morning hours of June 15, Schuckers worked the 10:00

p.m. to 6:00 a.m. shift and was assigned to help care for Newsome. (ROA.3653) Newsome complained her stomach was hurting. (ROA.3653) Around 1:30 a.m., Schuckers assisted in removing Newsome from Cell 2 for a shower, and observed that Newsome was unable to walk on her own. (ROA.3653) Jail video shows Newsome unable to take more than a few short steps, and heavily supported by the trustee and a jailer on either side:



(ROA.3224 [3]) Schuckers also states that Newsome had been throwing up a "black substance." (ROA.3653) After Newsome was returned to Holding Cell 2 around 2:00 a.m., Schuckers observed that Sgt. Jones took Newsome's blood pressure and "hollered out" 80/40. (ROA.3653) Although Nurse Green claims he visited Newsome around midnight, and claims Newsome told him she did not want to go to the hospital (ROA.1891), Schuckers positively stated she never saw Green during her entire 10:00 p.m. to 6:00 a.m. shift. (ROA.3653) Likewise Jones testified she did not

see Green that night. (ROA.3406 [Jones Depo. P. 17, ll. 23-25]) No video shows

Green before the next morning. (ROA.3224 [1-5])

Green saw Newsome at 7:40 a.m. on June 15 for less than 5 minutes, and

again claims Newsome told him she did not want to go to a hospital. (ROA.3224[5],

1910-1911) Green did not document any refusal of care as required by paragraph F

of the HSP. (ROA.2804-2808, 2854) He did document, however, that Newsome had

thrown up "brown colored fluid." (ROA.2804) Although no prescription exists,

Green provided Newsome with a narcotic, Tylenol 4, along with an antihistamine,

Phenergan. (ROA.2804) These drugs are powerful sedatives that can suppress

respiration and induce death in critically ill and non-ambulatory patients, and also

interfere with differential diagnosis by masking symptoms. (ROA.3642) They are

therefore contra-indicated for either an Addisonian crisis or a person experiencing

abdominal pain. (ROA.3620, 3642) A registered nurse would know to question any

medication order providing these drugs to a patient in Newsome's condition.

(ROA.3620)

Green took the blood draw to a lab around 8:00 a.m., and the results were

reported to him at 10:39 a.m. (ROA.2800-01) The results showed a critically low

level of potassium of 2.2 mmol/l and a critically high Blood Urea Nitrogen (BUN)

level of 53. (ROA.2800, 3620) Laboratory Technician Wesley Wood noted in his

report that he did a "readback" call to Green for these "critical values." (ROA.2800)

This is standard of practice to verify that critical results are provided to a person who can address them. (ROA.3618) The term "critical value" indicates an emergency that needs immediate attention. (ROA.3618) Wood explained to Ranger Baggett that he made considerable effort to locate Green, and he had no doubt he reported critical values that Green read back to him at the time noted on the lab record, which is automatically recorded. (ROA.2939-2947) Although Green professes not to remember receiving the critical values that morning, during questioning by Ranger Baggett, Green admitted that Wood could have given him the critical values at 10:39 a.m., twice adding that he did not want to go to jail. (ROA.2748, 2962, 2964, 2972-73 ["[T]hat could have happened. . . . He very well could probably [have given me] some partial results about that time."]) Green also recognized the importance of these results, admitting that it would have been improper to "sit" on such important information, and further claiming (falsely) that he reported them to Corley as soon as he had them. (ROA.2869, 2898, 2911, 2947, 2898) Nonetheless, Newsome's critical condition went unaddressed by Defendants for over six hours. (ROA.3620, ROA.3224 [6]) Instead, the Jailer-Defendants sought to have Newsome released on personal recognizance, with Green cooperating by not sending Newsome to the hospital. (ROA.2923, 3091)

According to phone records,[6] immediately after receiving the lab results at 10:39 a.m., Green called Jail Captain Todd Choate, the first of seven calls/texts between the two from 10:40 a.m. to 4:33 p.m. concerning Newsome. (ROA.3093, 2926, 2930) As Choate explained to Ranger Baggett, Choate personally called the district attorney's office to request that Newsome be released on a personal recognizance bond because "I always call them anytime we have somebody that's going to be in the hospital for a long stay, or it could be possibly a long stay . . . ." (ROA.2923) Choate reiterated this during deposition: "Anytime that we believe someone is going to go to the hospital, we will call the DA's office, see if they will entertain a PR bond." (ROA.3042) Choate attributed this policy to jail staffing shortages that inhibit providing hospital security. (ROA.3042) Sheriff Taylor also discussed releasing Newsome on a PR bond with Choate and/or Chief Black, and presumably agreed. (ROA.3021) Nurse Green later confided to Jacob Mobley, then an Anderson County jailer, that the reason Green did not send Newsome to a hospital was because of Sheriff Taylor's policy restricting hospitalizations. (ROA.3091 ["Mr. Green stated that Greg Taylor was limiting him on how he was able to send people to the hospital because of the billing cost of the ambulance and how much it

---

[6] For convenience Appellants cite throughout to Ex. T in Plaintiffs' response to Green's MJS (also filed as Ex. R in response to the Jailers' MSJ [ROA.3539]), which is a summary prepared from detailed cell phone records included at ROA.3540-3572 [Ex. S - Response to Jailers' MSJ] Telephone numbers were verified by Ranger Baggett. (ROA.3577-3578 [Ex. V—Response to Jailers' MSJ])

would cost so Greg Taylor was restricting him on not wanting to send Ms. Newsome to the hospital."]).

About a half hour before Newsome was found unresponsive, Jailers Carpenter, Wickersham, and Hughes attempted to assist Newsome to the toilet. (ROA.3429, 3432) Upon being pulled up, Newsome was unable to walk, grabbed the wall, fell, and vomited. (ROA.3429, 3432) Notwithstanding that Newsome was on medical watch, could not stand, had been vomiting blood for two days, and continued to vomit, no jailer called EMS until Newsome was found unresponsive. (ROA.2806, 3224 [6]) After wheeling Newsome to the toilet, all jailers left the cell and no one checked on Newsome for a half hour. (ROA.2499, 3224 [6])

Finally, Carpenter peered in Newsome's cell at 4:59 p.m.:



(ROA.3224 [6]) She goes back and forth looking in the cell, apparently alarmed, then talks with Lt. Pierson who also looks in the cell. (ROA.3224 [6]) Neither, however, bothered to enter the cell. (ROA.3224 [6]) Wickersham finally entered the

cell over five minutes later, and found Newsome unresponsive, with no pulse and not breathing, and informed at least Carpenter and Hughes. (ROA.2429, 3060-3061, 3224 [6]) Nonetheless, none of them attempted resuscitation. (ROA.3224 [6]) Instead Wickersham called Nurse Green, explaining he "wasn't sure on the lines of the medical situation that was going on." (*See* ROA.2499, 3061, 3224 [6]) Wickersham did not explain why this justified delaying resuscitation or calling EMS. (ROA.3061) Eventually other jailers (non-defendants Cate and Sparkman) attempted resuscitation eight minutes after Wickersham, Carpenter, Hughes, and Pierson all knew that Newsome had stopped breathing and had no pulse. (ROA.3224 [6])

Plaintiffs' medical experts concluded that the 50-year old died a preventable death from an untreated Addisonian crisis. (ROA.3619, 3640-3643)

In the jail's medical activity log, Green wrote that he had just reported the critical value labs to Corley, then pulled over to call the jail to have Newsome sent to the hospital for a CT scan for a possible bowel obstruction, when just at that moment he received the call that Newsome was found unresponsive. (ROA.2806) Phone records, however, prove this to be false because they show Wickersham called Green *before* Green called Corley. (ROA.3093)

According to Plaintiffs' medical experts, it is "blatantly obvious" that the medical activity log was modified after Newsome's death, as indicated by out-of-

order entries. (ROA.3621, 3641) They describe the short log as a "jumble" of records which is profoundly inadequate for the management and treatment of Newsome's Addison's disease. (ROA.3641) According to Plaintiffs' expert Dr. Sands, the log "appears to be an intentional effort to try to create a record to mischaracterize the actual lack of treatment of Ms. Newsome and offer some hope to Dr. Corley and Nurse Green to fool those making inquiries and/or investigations as to the real cause of this patient's death." (ROA.3641)

Additionally, none of the flurry of text messages between the Jailer-Defendants and Green during the night of June 14 and following day were retained. (*E.g.*, ROA.2975) As licensed jailers, the Defendant-Jailers would have known that a custodial jail death investigation would follow and that personal cell phones containing work related the text messages should be preserved. (ROA.3617; *see also* Issue 1(D) *infra*)

## SUMMARY OF THE ARGUMENT

The district court erred in uncritically accepting Defendants' testimony as true, indulging inferences in Defendants' favor, and frequently mischaracterizing Plaintiffs' controverting evidence and discounting it as no evidence. Plaintiffs' evidence demonstrates that Corley and Green ignored Newsome's Addison's disease for months. As a result Newsome developed a life-threatening Addisonian crisis and was exhibiting obvious signs of the crisis during June 14 and 15, and likely earlier.

Rather than treat Newsome's Addisonian crisis, Nurse Green simply drugged Newsome with sedatives and waited for jail officials to release her on a personal recognizance bond. Throughout the 14th and 15th, it would have been obvious to a layman that Newsome was experiencing a medical crisis which needed emergency intervention. Jailers failed to respond to it because it was Anderson County's policy to avoid responsibility for critically ill detainees with chronic conditions by releasing them.

As both Nurse Green and Captain Choate emphasized to Ranger Baggett, the jail is understaffed. It has one part-time nurse with another full-time job, and one part-time "sick call" doctor who lives in two different cities an hour or more away – to cover 200 or more detainees.[7] In an effort to minimize his conduct, Green complained to Baggett: "You can't do with a part time medical staff anymore." (ROA.2874) At least this is true. Corley and Green plainly provided little if any chronic care, and when a detainee became critically ill from their indifference to a detainee's chronic condition, the jail routinely pushed the detainee out the door with a PR bond. Such a policy is fraught with obvious dangers, as chronic care is denied and emergency care greatly delayed.

---

[7] TCJS states the jail has capacity for 300. https://www.tcjs.state.tx.us/wp-content/uploads/2022/08/AbbreRptCurrent.pdf

The dissonance created by Defendants' depiction of Newsome as a dangerous first-degree felon, and the County's willingness to release her on recognizance after she became dangerously ill, speaks volumes. She is treated as a dangerous felon held on a high bond, until the County has to pay for hospitalization. Then the jail doors suddenly fly open. Defendants' version of the events is fraught with credibility gaps, and a jury can rightly reject it. Plaintiffs' summary judgment evidence demonstrates Defendants' deliberate indifference and thoroughly controverts their assertions that they provided attentive care to Newsome and she was exhibiting no signs of distress, until the 50-year old just happen to die with no warning.

There is ample evidence that Anderson County's policies, as implemented by Sheriff Taylor as the chief policymaker for the jail, created a hostile environment for critically ill detainees which was a moving force in causing Nurse Green and the Jailer-Defendants to delay providing emergency medical care to Newsome. Upon reversal of the district court's rulings as to the individual Defendants, Plaintiff's *Monell* claim should be remanded for further consideration. On remand, Plaintiffs should be permitted to conform her pleadings to the evidence obtained during discovery, join Lt. Tia Pierson as an additional Jailer-Defendant responsible for Newsome's suffering and death, and conduct adequate discovery allowing Plaintiffs to state their best case.

## ARGUMENT

**ISSUE 1: The district court erred in granting summary judgment for each individual Defendant asserting qualified immunity because Plaintiffs raised fact issues whether each Defendant, in violation of clearly established law, was deliberately indifferent to Newsome's serious medical needs.**

A.    Legal Standards

1.    *Summary judgment and standard of review.*

Summary judgment is reviewed de novo by well-known standards. *Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020). "Summary judgment is not appropriate when questions about the credibility of key witnesses loom . . .  and the evidence could permit the trier-of-fact to treat their testimony with skeptical scrutiny." *Pena v. City of Rio Grande City, Texas*, 816 F. App'x 966, 974 n.11 (5th Cir. 2020) (quoting *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009)). A court should not "automatically accept [an officer's] testimony about what happened." *Fairchild v. Coryell Cty.*, 40 F.4th 359, 363 (5th Cir. 2022).

2.    *Serious medical needs.*

A pretrial detainee has a Fourteenth Amendment guarantee to medical care and protection from harm. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). This Circuit applies a subjective deliberate indifference standard to pre-trial detainee claims other than

those for excessive force. *Cope v. Cogdill*, 3 F.4th 198, 207 n. 7 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2573 (2022).

Deliberate indifference requires that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). Although a rigorous standard, deliberate indifference is not an impossible to prove; defendants do not escape liability by simply denying knowledge. Deliberate indifference may be established through inferences from circumstantial evidence, and a factfinder may infer the requisite knowledge when the risk of harm is obvious. *Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994); *Dyer v. Houston*, 964 F.3d 374, 385 (5th Cir. 2020).

A confining officer acts with deliberate indifference if the officer knows a detainee faces a substantial risk of serious bodily harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 847. Consequently, it has been clearly established law long before these events in 2018 that a custodial or medical officer acts with deliberate indifference to a detainee's serious medical needs if the officer refuses treatment, ignores the detainee's complaints, intentionally treats him incorrectly, or engages in any similar conduct that clearly evinces a wanton disregard for any serious medical needs. *Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2022) (citing, *inter alia*, *Easter v. Powell*, 467

F.3d 459, 465 (5th Cir. 2006) (per curiam)); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

The same standards apply to medical professionals acting for a prison. *E.g., Estelle*, 429 U.S. at 102-107; *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

A delay in medical care violates the Constitution " 'if there has been deliberate indifference [that] results in substantial harm*.*' " *Easter*, 467 F.3d at 464. The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for delay. *Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994). A delay for life-threatening injuries "is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *See Valderrama v. Rousseau*, 780 F.3d 1108, 1120 (11th Cir. 2015). "[W]hen officers intentionally delay seeking treatment for a life-threatening injury, they act with deliberate indifference." *Valderrama*, 780 F.3d at 1121. Consequently, failing to promptly obtain emergency assistance when a detainee faces a known, serious medical emergency is unconstitutional. *Cope*, 3 F.4th at 209. A jury can infer deliberate indifference when an officer fails to justify or explain a delay in medical treatment. *Wade v. Daniels*, 36 F.4th 1318, 1327-28 (11th Cir. 2022).

Regardless whether the delay causes death, plaintiffs may recover for pain suffered during a delay in treatment. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017).

3.    *Qualified immunity.*

Qualified immunity is judged according to the well-known two-step standard: (1) whether the alleged facts make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018).

Not only should courts refrain from defining clearly established law at too high of generality, but likewise established law should not be defined with excessive granularity when a general constitutional rule already identified in the decisional law applies with obvious clarity to the conduct in question. *Taylor v. Riojas*, 141 S.Ct. 52, 53-54 (2020) (per curiam); *Tyson v. Sabine*, 42 F.4th 508 (5th Cir. 2022).

4.    *Video evidence.*

When video evidence is inconclusive, a court *must* credit the plaintiff's version of events. *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 339-40 (5th Cir. 2020) ("While the officers maintain that Joseph was resisting, the video does not preclude the possibility that he wasn't."); *Fairchild*, 40 F.4th at 363 ("[T]he district court's view is not the only view a jury could take of the evidence. . . .[A] jury could reach different conclusions on a number of facts that impact the reasonableness calculus."). A jury is "free to choose among reasonable constructions of the evidence." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc).

B.    The Medical-Defendants were deliberately indifferent to Newsome's serious medical needs.

Medical-Defendants Corley and Green claim that they provided treatment for Newsome's Addison's disease is contradicted by the lack of any record of a treatment plan or any course of treatment that remotely addressed Newsome's condition, including not a single blood test to monitor her disease before the day she died. The Medical-Defendants' complete failure to address her Addison's condition is confirmed by the fact that the disease progressed from in control when Newsome was detained to a deadly Addisonian crisis in three months, during which she developed alarming symptoms, including severe abdominal pain, swelling in both legs, vomiting blood, and dangerously low blood pressure. There existed no reason for the 50-year old detainee to die except for the Defendants' collective deliberate indifference to her serious medical needs.

1.    *Nurse Green.*

The district court's depiction of Nurse Green and other Defendants as providing attentive care to Newsome throughout her detention rests solely on Defendants' self-serving accounts of their conduct, and is controverted by substantial contrary evidence. Thus, for example, the district court accepts uncritically Nurse Green's assertion Newsome twice told him that she did not want to go to a hospital. Putting aside whether a critically ill detainee with "longstanding psychiatric issues" could make an informed choice not be hospitalized, independent

witnesses detained with Newsome testified that throughout the final 24 hours of her detention, Newsome was crying out begging to be taken to a hospital. A jury is entitled to believe this testimony and conclude it is unlikely Newsome would beg to be taken to a hospital over the course of hours, yet twice tell Green the opposite. Plaintiffs further dispute that Green even visited Newsome the first time Green claims Newsome allegedly said this. A jury could therefore determine that Green's account is not credible. Therefore, it cannot support summary judgment.

The district court likewise improperly indulges inferences in Defendants' favor. Thus, the district court cites as evidence of Green and Corley's care for Newsome that they claim to have requested her medical records. A jury could infer precisely the opposite from the facts that (1) they never *obtained* Newsome's medical records from any source for months; (2) there is no record of any such request having been made (ROA.3615); and Defendants never obtained a HIPPA release authorization from Newsome. A far more likely inference than Newsome's private physician having failed to respond to Medical-Defendants' requests is that they never made any requests and are now lying because they know they should have.

Other evidence noted by the court is not responsive either to Defendants' failure to treat Newsome's Addison disease generally, thereby allowing it to develop into a crisis, or Defendants' failure to respond to the crisis. Thus, the court states that

on April 4 Green treated her with a liter of saline for mistakenly taking an extra blood pressure pill, and later that month for acid reflux. (ROA.4158) This has no bearing on whether they were deliberately indifferent to her life-threatening condition.

The court further credits Green's testimony that Newsome allegedly "had a very open line of communication" regarding her medical treatment and "wasn't a problematic patient at all." (ROA.4159) Yet Newsome died of an Addisonian crisis after her disease went untreated for months. Green's description of Newsome as not a "problematic patient at all" is belied by the suicide assessment and medical history form dictated by Newsome on intake, which includes an extensive list of chronic conditions, including Addison's. (ROA.2423-2424) Green's description is further inconsistent with both his and Corley's notations that "[e]valuation of her past history is complicated because the patient is a poor historian." (ROA.2808, 4159) Even Corley recognized that Newsome's extensive chronic conditions made obtaining her medical records all the more important; yet he never did. Defendants knew that Newsome suffered from Addison's, that Addison's could erupt into a life-threatening crisis, and that Newsome was at even greater risk because of multiple complicating conditions, including depression and "longstanding psychiatric issues." It is a more reasonable inference that "Newsome was not a problematic patient" because Corley and Green ignored her and made no effort to manage her

Addison's disease. Because Addison's is manageable it is a reasonable inference that Newsome died because Corley and Green did not manage it and made no effort to do so, and that they falsely reported "no distress" when in fact Newsome was in great distress. That the 50 year-old died when she should not is alone evidence that Corley and Green failed to treat her condition, instead providing her with inconsequential treatments for gas and indigestion, rather than addressing her critical medical needs. The court's reasoning is like excusing medical professionals for the wholesale failure to treat a detainee's worsening cancer because she was prescribed aspirin. Newsome needed vigilant blood-work and ongoing steroid treatment, not Gas-X.

Moreover, Medical-Defendants wholly failed to respond to Newsome's final crisis, caused by their lack of care. On the 14th and 15th Newsome was vomiting a "dark brown substance," which any medical professional should have immediately recognized as digested blood. She also experienced stomach pain and pain in her right flank. During the night she experienced alarmingly low blood pressure of 80/40 (ROA.3432), and video confirms she was unable to stand or walk by herself. (ROA.3224 [1, 3, 6]) Her blood pressure was so low that any lay person would recognize that Newsome's condition was critical, and a health professional would recognize it as an Addisonian crisis from a known Addison's patient. The most favorable inference to Plaintiffs is that Green was aware of these symptoms, recognized it them as a likely Addisonian crisis, failed to obtain treatment for her,

then falsely claimed to have examined her and found her "alert and oriented" to avoid liability.

The court further accepted Green's testimony that he came to the jail during Newsome's final night, examined her, and administered a liter of saline and anti-nausea medicine. The court rejected Plaintiffs' controverting evidence from two witnesses that they were in the area where Newsome was housed that evening and never saw Green. The court erroneously describes the testimony as failing to "recall" whether Green gave Newsome medicine that night. This does not fairly recount the testimony that the witnesses never saw Green at the jail that night.

Moreover, if Green had been at the jail that night, it would seem that one of the jail's numerous cameras would have recorded his presence somewhere in the jail, and it would have been a simple matter for Defendants to have provided the video in their extensive summary judgment filings. But they did not. This too raises a fact issue as to whether Green's account is true.

Equally important, the court omits corroborating expert testimony that Green did not treat Newsome with saline as he claims because had he done so, she would not have been severely dehydrated as shown by her blood work taken at 7:40 a.m. (ROA.3916) Plaintiffs' evidence easily raises a fact issue as to whether Green examined or treated Newsome during the night.

In addition to failing to treat Newsome, Green intentionally treated Newsome incorrectly by administering sedatives during the morning of the 15th. As discussed by Plaintiffs' expert, a patient in Newsome's condition should never be treated with a narcotic and sedatives because they *may cause death*. This is therefore not an issue of disagreement among possible treatments. The drugs Green administered are contra-indicated and hastened Newsome's death. A reasonable inference from the evidence is that Green knew that a narcotic should not be administered to Newsome, but he nonetheless did so as a stopgap measure to keep Newsome quiet while the jail worked to obtain her release on a personal recognizance bond. No other explanation reasonably explains why a nurse would administer an unprescribed narcotic to a patient that every medical professional knows should not be administered.

Finally, Green failed to act on the critical value lab results he received at 10:39 a.m. Plaintiffs' evidence is more than sufficient to raise a fact issue that Green received the values, recognized their importance, and intentionally failed to act upon them by sending Newsome to the hospital because he was cooperating with the Sheriff's PR-Bond policy. The district court nonetheless disregarded all evidence that Green received the values because the technician stated in a deposition, two years after the fact, that he could not from his own memory recall the time he reported the results to Green, notwithstanding that he recorded the time in the lab's records at the time of the event, and shortly afterwards told the investigating Ranger

that he reported the values to Green as stated in the record. Of course, this is precisely why records are made; memories of precise details may fade over time. But there is no reason to doubt the contemporaneous record, and even if there were, that would be an issue for a jury and not the court. Green's statement to Ranger Baggett that he would not "sit" on those values admits Green recognized they were life-threatening results that required immediate action.

A jury can conclude that Green received the results at 10:39 a.m. as the lab report states, as Technician Wood told Ranger Baggett, and even Green admitted "very well could" have occurred. The jury could further disbelieve Green's weak explanation to Baggett that he may have gotten busy and forgot about them. (ROA.2948-2949) Instead the jury may properly conclude that Green deliberately failed to act because, as he admitted to Jacob Mobley, he did not send Newsome to the hospital because of the Sheriff's policies restricting detainee hospitalizations. (ROA.3091)

Additionally, as discussed *infra* at subpart D, Green's spoliation of electronic evidence also raises fact issues precluding summary judgment.

2.     *Dr. Corley*.

Dr. Corley's summary judgment position is self-contradictory, contradicted by substantial evidence, and inconsistent with his own written records, thus raising multiple fact issues defeating summary judgment.

Dr. Corley's summary judgment motion first claims he was never subjectively aware of a substantial risk of harm to Newsome's health. (ROA.1626) This is contradicted by Corley examination notes that he knew Newsome suffered from Addison's disease. (ROA.3597) Moreover, this is mentioned without any indication that this is new information to him, and it was not because it is also in Newsome's intake paperwork. Additionally, as confirmed by Plaintiffs' experts, any physician would know that Addison's is a serious threat to a patient's health and can become deadly if not managed properly. (ROA.3615-16)  Dr. Corley admits that as an E.R. physician he knew that the earlier intervention occurs for an Addison's patient, the better the chances are of saving a life. (ROA.3003-3004)

In his summary judgment motion Corley admits that May 11 was his only personal contact with Newsome, and claims that this examination "was fleeting and unrelated to the Addison's condition she reported . . . ." (ROA.1626) Consequently, Corley admits that despite knowing that Newsome had a potentially deadly condition, he only once "fleetingly" observed her and *he never examined her for treating Addison's during Newsome's entire 97-day incarceration*. This alone raises a fact issue as to Corley's deliberate indifference to Newsome's serious medical needs. Yet there is considerably more.

Pursuant to paragraph C of the HSP, Corley was responsible for developing a treatment plan for detainees with chronic conditions. (ROA.2853) Corley states in

his interrogatory responses that "[a]ny treatment plans will be reflected in individual charts held by the custodian of medical records for the jail." (ROA.3606) But no such treatment plan exists for Newsome. Aside from Corley's notes from the fleeting contact of May 11, there exists only a brief "Medical Activity Log" allegedly showing the treatment Newsome received during detention. (ROA.3599-3560) This document reflects no treatment plan to manage Addison's disease.

Corley seems to raise three responses to the nonexistence of any treatment plan to manage Newsome's Addison's: (1) he was unfamiliar with the HSP and could not recall seeing it (ROA.3662); (2) Nurse Green made no referral to Corley regarding Newsome after Green's assessment of her on arrival (ROA.1636); (3) the Medical-Defendants complied with the plan by implementing an unwritten treatment plan of continuing the same treatment of Newsome's private physician. (ROA.1680) The first explanation is problematic given that Corley was the jail's medical director whom the County had contracted to implement its HSP. It is not credible he would not know its requirements. Additionally, he admits he probably received it. (ROA.3662) The second explanation is inconsistent with Corley's acknowledgment in the notes of the fleeting examination of May 11 that he was familiar with Newsome's history of Addison's disease.

The third explanation is even more problematic. It is inconsistent with the first two and Corley's deposition testimony. To credit Corley's third explanation, one has

to believe he prepared a treatment plan for a chronically ill patient without ever examining her or reviewing any of her medical records. It is undisputed that Corley never obtained medical records of Newsome's private physician. (ROA.3871) Consequently, *Corley could not have known what treatment plan Newsome's private physician had undertaken*. This is precisely the excuse Corley gives in his deposition for allegedly not understanding Newsome's chronic conditions. Furthermore, if it is Corley's contention that Newsome relayed her physician's treatment plan, then that is inconsistent with Corley and Green labeling Newsome as a "poor historian" of a health history complicated by "longstanding psychiatric issues." (ROA.3597, 3600) Corley could not possibly have believed he was following the treatment regimen of another physician when, by his own admission, he had no records and no other reliable information of the patient's treatment history. If it is Corley contention that the treatment plan was simply administering the medication that Newsome currently had on hand, that too is problematic. The treatment for Addison's is steroid medication and monitoring blood work. (ROA.3621, 3641-3642) Newsome's Master Medication List includes had no medication *for Addison's*, and Corley never obtained blood work before the day Newsome died.

Thus, the far more reasonable inference that arises from these facts, and the inference that Plaintiffs are entitled on summary judgment, is that although Corley testified that he knew that Newsome suffered from Addison's and that Addison's is

deadly if not treated, Corley failed to treat Newsome for Addison's throughout her three-month detention. That is why no written treatment plan exists, and why Newsome developed an Addisonian crisis and died. Corley's failure to treat Newsome for a known serious condition constitutes deliberate indifference. *See, e.g.*, *Estelle*, 429 U.S. at 103; *Domino*, 239 F.3d at 755-56; *Dyer*, 964 F.3d at 382.

Additionally, the evidence supports the conclusion that Corley and Green intentionally treated Newsome incorrectly for Addison's. Nurse Green claims that he administered a narcotic (Tylenol 4) and the antihistamine Phenergan to Newsome on the morning of June 15, pursuant to directions from Corley. (ROA.2858) There exists no written prescription or orders, as should exist for administering a narcotic, but Corley does not deny that he gave oral direction to Green to administer it. (ROA.3606, 3619-20) Corley further states that he has no criticism of Green's conduct. (ROA.3605) Additionally, a nurse would not ordinarily be in possession of a narcotic unless a doctor or pharmacy provides it. There is no record of the jail pharmacy ordering or stocking Tylenol 4 for Newsome. (ROA.3619, 3642) Consequently, it is a reasonable and likely inference that Corley provided Green with the narcotic. Tylenol 4 and Phenergan are not simply the wrong medication for Addison's, but they are contra-indicated because they will make the patient's condition more difficult to treat and may cause death. Plaintiffs' medical expert (Sands) further opines that these drugs accelerated Newsome's death. (ROA.3643)

This is further evidence permitting a finding that Corley and Green were deliberately indifferent to Newsome's serious medical needs by intentionally treating Newsome incorrectly.

Corley's motive is fairly inferred from the evidence. Substantial evidence supports a finding that the County had a policy of discouraging hospitalizing detainees for serious medical conditions, but instead routinely attempted to obtain the detainee' release to avoid the cost of treatment. As the County's only jail doctor, it is a reasonable inference that Corley was familiar with the County's policy. Additionally, witness testimony demonstrates that Newsome was crying out in pain and pleading to be taken to a hospital while the County furiously worked to obtain Newsome's release. Green likely relayed this information to Corley, if Corley was not already aware of it from others and/or surmised it because of his familiarity with County policy. To placate their benefactors, Corley and Green delayed having Newsome hospitalized to allow the County time to obtain Newsome's release. To keep Newsome quiet while the County worked on her release, they drugged Newsome with a narcotic and antihistamine so she would become drowsy and fall asleep, and therefore stop crying out for help. Thus, it is a reasonable inference that Green and Corley intentionally mistreated Newsome with sedatives to keep her from continuing to call for help. This is the only plausible explanation for why Corley and Green intentionally treated a patient suffering an Addisonian crisis with contra-

indicated sedatives that contributed to her death. These same facts give rise to a claim for deliberate indifference from Corley delaying treatment by failing to send Newsome to a hospital while she was suffering from an Addisonian crisis.

Of course, Corley and Green's scheme to calm Newsome with drugs while the County worked to obtain her release blew up in their face when Newsome died. Given the timing of the 5:00 phone call from Green to Corley, i.e., immediately after Newsome was found nonresponsive and presumably dead, it is a reasonable inference that Green informed Corley that Newsome had died, and the two began developing a cover story. A jury could reasonably conclude that it is simply too coincidental and not at all credible that the first time Dr. Corley became subjectively aware of Newsome's critical condition was immediately after she died.

3.    Medical-Defendants are not entitled to qualified immunity.

Medical-Defendants' deliberate indifference as discussed above was in violation of clearly established law by  refusing to treat Newsome, ignoring her complaints, intentionally treated her incorrectly with narcotic and other sedative, and/or engaging in any similar conduct as described above that clearly evinces a wanton disregard for any serious medical needs. *E.g. Estelle*, 429 U.S. at 102-107; *Johnson*, 759 F.2d at 1238. Moreover, their violations are obvious and therefore require no closely analogous precedent. *See Taylor*, 141 S.Ct. at 53-54.

C.    Each Jailer-Defendant was deliberately indifferent to Newsome's serious medical needs.

Plaintiffs' summary judgment evidence shows that Newsome was screaming in distress for several hours before her death; she repeatedly begged to go to a hospital; Nurse Green never saw her during the night; jailers knew her blood pressure had dropped to an alarming 80/40; Newsome was throwing up blood; and Newsome could not stand or walk. Yet each of the Jailer-Defendants ignored Newsome's cries and requests, and failed to obtain emergency medical care. The Jailer-Defendants' summary judgment evidence consists largely of self-serving affidavits which are full of post hoc rationalizations. They claim to have observed her and never subjectively believed Newsome was in any distress. Defendants' affidavits merely raise fact issues as to their credibility, and are insufficient to support summary judgment. The district court erred in accepting Defendants' version of events. *Fairchild*, 40 F.4th at 363.

1.    Captain Todd Choate

Choate was the captain in charge of the jail. (ROA.2014) Choate's version of events in his summary judgment affidavit is an obvious attempt to walk back both his statement to Ranger Baggett and his deposition testimony. (*Cf.* ROA.2412-16 *with* ROA.2923, 3462) Choate told Baggett that before knowing Newsome's blood test results, he had already made arrangements for security at the hospital in the event Newsome had a long hospital stay because "we are short-staffed." (ROA.2923)

Choate further explained that in an attempt to avoid providing security, he contacted the district attorney to obtain a PR bond for Newsome's release because it was jail policy to do so *anytime* a detainee could be facing a long hospital stay: "*I always call [the DA] anytime we have somebody that's going to be in the hospital for a long stay . . . .*" (ROA.2923 [emphasis added]) Thus, Choate admitted that when he called the DA he had already subjectively formed an opinion that Newsome's condition was serious and could result in extended hospitalization. He further admitted that it was jail policy to avoid transferring seriously ill detainees to a hospital, but to instead delay hospitalization while the jail sought their release on a PR Bond. Choate testified similarly at his deposition: "Anytime that we believe someone is going to go to the hospital, we will call the DA's office, see if they will entertain a PR bond." (ROA.3462) When asked what a PR bond has to do with someone going to a hospital, Choate attributed the policy to insufficient staffing: "Due to staffing. Because we wouldn't have the staffing to sit at the hospital." (ROA.3462) Thus, Choate again admitted that he believed Newsome needed to be hospitalized, and *anytime* that occurs the jail first attempts to obtain the detainee's release.

Choate's summary judgment affidavit provides an inconsistent explanation, pitching Defendants' new "stomach bug" theory:

> I was surprised to hear that Ms. Newsome was unresponsive. Earlier in the day, I was made aware that Ms. Newsome did not feel well. At the time, there was a stomach bug going around the Jail and I thought Ms. Newsome may have caught the stomach bug. As I often do when an

inmate has a history of medical issues and is not feeling well, I contacted the District Attorney to inquire about obtaining a Personal Recognizance Bond for Ms. Newsome. I made this inquiry because it would give Ms. Newsome the opportunity to seek medical attention from her personal doctors and to rest comfortably at her home instead of at the Jail. At no time during my conversations about a Personal Recognizance Bond did I ever believe Ms. Newsome was having an emergency medical issue.

(ROA.2414-15)

Claiming he did not believe Newsome was having an emergency is inconsistent with his admissions that he subjectively believed that Newsome was so ill that she could need extended hospitalization for which he had (allegedly) arranged security. His affidavit is inconsistent with his earlier explanation that the DA is called "[a]nytime that we believe someone is going to go to the hospital." According to Choate's original account, because the DA is contacted *after* the jailers form a belief that the detainee needs to be hospitalized, Choate would not have contacted the DA unless he already believed Newsome needed to be hospitalized. There is no doubt that Choate's earlier explanations unequivocally applied to all detainee hospitalizations because he ties the policy to insufficient staffing to provide security at the hospital. "Insufficient staffing" is just another way of stating it costs too much.

Choate's affidavit is an attempt at misdirection to change the circumstance of release to when "an inmate has a history of medical issues and is not feeling well." This is not what Choate twice stated previously. A jury could conclude Choate's new explanation was fabricated for litigation, find there was no "stomach bug," and

determine Choate knew Newsome was critically ill and needed to be hospitalized but participated with other defendants in delaying emergency medical treatment for Newsome because of the jail's PR-bond policy to first seek the release of any detainee needing hospitalization.

Choate's new account is beyond incredulous. As Defendants emphasize with their irrelevant attack on Newsome's character, Newsome was arrested for aggravated assault with a deadly weapon, a first degree felony, requiring a $20,000 bond. According to Choate's affidavit, Anderson County's usual practice is to have felony prisoners released on personal recognizance for a tummy ache so they can relax at home. One can only imagine the rash of stomach aches which would be reported by detainees who could not bail out if such a policy existed. Choate of course identifies no other prisoners, felony or misdemeanor, who were released because of the alleged "stomach bug" running through the jail. A jury could readily conclude it is not credible that a jail releases on personal recognizance felony prisoners subject to large detention bonds because of minor stomachaches.

Additionally, Choate's new version conflicts with the Medical-Defendants' story they allegedly planned to have Newsome sent to the hospital for a CT scan because of a suspected bowel obstruction. (ROA.2806) Choate and Green repeatedly communicated on June 15. Green immediately called Choate after obtaining the critical value test results shortly after 10:30 a.m., and he continued to follow up with

Choate on the status of the PR bond. (ROA.2922, 2926, 2928, 2948, 3539) Green makes no reference in the Medical Activity Log to Newsome contracting a "stomach bug." (ROA.2404-2808) It is not credible that Choate and Green were repeatedly communicating on the 15th but were working at cross purposes without knowing what the other was doing. A jury could readily conclude that the defendants' inconsistent stories are intended to coverup the truth. It is a far more reasonable inference that Choate and the other Jailer-Defendants observed Newsome's serious medical condition, subjectively concluded she was seriously ill and needed to be hospitalized, then delayed emergency medical care while Choate and others, pursuant to County policy, worked to have Newsome released on personal recognizance to avoid the expense of Newsome's hospitalization and to deflect responsibility from all Defendants for allowing Newsome to become critically ill from lack of care. Because a jury could conclude Choate improperly denied and delayed emergency medical care for Newsome for non-medical reasons, fact issues exist as to whether Choate was deliberately indifferent to Newsome's serious medical needs.    Appellants incorporate the foregoing analysis of Choate's conduct, embraced by the other jailer/Defendants, into their conduct as discussed below.

2.    Jailer Alicia Wilson

On June 12, 2018, three days before Newsome died, Newsome made a verbal request to Jailer Wilson to see a doctor because Newsome was experiencing severe stomach pain. (ROA.3495) Wilson ignored Newsome's request. (ROA.3495) Wilson failed to document the request, never made medical staff aware of the request, and did not respond to the request independently, such as calling 911. (ROA.3502) Wilson's failures were a gross deviation from basic jailer standards and demonstrate her deliberate indifference to Newsome's serious medical needs. (ROA.3502, 3507-3508)

3.    Jailer Jonathan Strong

Jailer Strong was working during the night of June 14-15, and used a wheelchair to place Newsome into the holding cell at approximately 11:30 p.m. for medical watch. (ROA.3429, 3224 [1]]) Jailer Strong therefore personally observed Newsome's serious condition, including her inability to walk, and it is a reasonable inference that he would have heard Newsome's repeated cries of pain and pleas for a doctor and to be taken to a hospital, but ignored them. (*See* ROA.3428-3431) It is also likely that he also would have observed that Newsome was throwing up blood for some time. (ROA.3429, 3432) Strong could have called 911 for emergency assistance but did not. (ROA.3523)

4.    Sergeant Robin Jones

During the early morning hours of June 15, Sergeant Jones was working near the holding cell where Newsome was on medical watch. (ROA.3532, 3224 [3]) Therefore it is a reasonable inference that she would have heard Newsome's repeated cries of pain and pleas for a doctor and to be taken to a hospital. (*See* ROA.3428-3431) She also would have observed that Newsome had been throwing up blood and could not stand. (ROA.3432, 3224 [3]) Additionally, around 2:00 a.m., she took Newsome's blood pressure and yelled out a reading of 80/40. (ROA.3432, 3224 [3]) It would be obvious to a layperson that these circumstances require emergency medical attention. Jones could have called EMS but did not. (ROA.3523) Accordingly, a jury could determine she was deliberately indifferent to Newsome's serious medical needs.

5.    Jailers Matthew Wickersham, Jessica Carpenter, and Dakota Hughes

Jailers Wickersham, Carpenter, and Hughes were on duty June 15 near Newsome's holding cell, and assisted moving Newsome to the toilet around 4:20 p.m. Each personally observed Newsome, and therefore observed the same serious condition that caused Choate to conclude that Newsome needed hospitalization. (*See* ROA.2498) Carpenter concedes that Newsome could be heard by jailers by calling out from her cell. (ROA.2498) It is a reasonable inference each would have heard

Newsome's repeated cries of pain and pleas for a doctor and to be taken to a hospital, but ignored them. (*See* ROA.3428-3431)

Additionally, in Hughes's original statement, he states that upon lifting Newsome to a standing position to assist her to the toilet around 4:20 p.m., "[s]he grabbed the wall then fell[.] I rolled her on her side and she was puking." (ROA.3527) Hughes's statement says nothing about Newsome's "knee giving out." (ROA.3527-3528) Therefore each jailer observed Newsome grab the wall and fall, and vomit. (ROA.3429, 3432, 3527) Because Newsome had been throwing up blood during the night, it is likely each saw Newsome throw up blood after Newsome fell against the wall and that each knew that Newsome had been throwing up blood for some time. (*See* ROA.3495) This is further supported by Trustee Schuckers who stated that when removing trash from Newsome's cell around 1:30 a.m., she observed that Newsome had been throwing up a "black substance" into a cup. (ROA.3432) Detainee Sweet further confirms this, stating that shortly after Newsome died he was told by a trustee that Newsome was vomiting "what looked like coffee grounds" before she died (ROA.3429) Plaintiffs' expert (Osborne) confirms that Newsome was vomiting emesis, i.e., digested blood. (ROA.3617)

Although each personally observed Newsome's critical condition, and notwithstanding that Wickersham testified that detainees on medical watch are checked every 15 minutes (ROA.3477), each jailer left Newsome's cell at or before

4:30 and no one entered the cell to check on her for over 35 minutes. (ROA.3429 [6])

Up observing Newsome at 4:59, Carpenter appeared alarmed, went back and forth looking into the cell, and communicated with Lt. Pierson, who then also looked in the cell. (ROA.3224 [6]) Neither, however, bothered to enter and apparently waited for Wickersham to check on Newsome. (ROA.3224 [6])

When Wickersham finally did so at 5:05, at first he merely looked in the window. (ROA.3224 [6]) Instead of going in the cell, he walked to the wall and stood for over a minute, and began kicking an empty chair (much of this is missing because the curated video skips).  (ROA.3429 [6]) Upon finally entering Newsome's cell at 5:06:22, he found Newsome unresponsive, i.e., not breathing and no pulse. (ROA.2429-2430) He existed after about 20 seconds to get gloves, then reentered at 5:06:55, followed by Carpenter and Lt. Pierson. (ROA.3224 [6]) Amazingly, none of the three ever attempted to resuscitate Newsome. (ROA.3224 [6]) Instead, while Carpenter and Pierson waited, Wickersham left to call Nurse Green, later stating he was unsure of "the lines of the medical situation." (ROA.2499, 3061, 3224 [6]) Hughes also never returned to check on Hughes before she was found nonresponsive, and never commenced CPR. (ROA.3224 [6])

Eventually jailers brought Newsome out of the cell, then milled around for several minutes. Wickersham incompetently attempted to take Newsome's blood

pressure, despite knowing Newsome had no pulse. (ROA.3224 [6]) Eventually, at 5:14:08, Jailers Cate and Sparkman commenced chest compressions (without attempting breathing resuscitation), nearly eight minutes after Wickersham, Carpenter, and Pierson all knew that Newsome had stopped breathing, and 15 minutes after Carpenter observed that something was wrong. (ROA.3224 [6]) A detainee who is not breathing does not have eight or 15 minutes for jailers to confer and consult with a nurse before attempting resuscitation. That an experienced jailer felt he needed to call Nurse Green before calling EMS speaks volumes as to the County's hostility toward detainee hospitalization and the impact its policies created in delaying emergency medical care.

6.    Travis Wesson

Jailer Wesson was on duty when Newsome was found unresponsive and heard someone say "get gloves and help." (ROA.2431) Wesson went to Newsome's cell and observed Newsome in the wheelchair, nonresponsive with no color, but did nothing while Wickersham called Green. (ROA.2431, 3224 [6]) After Wickersham returned, he observed the futile acts of other jailers taking Newsome's blood pressure and bringing in an AED machine which was missing parts and did not work, and throughout failing to attempt resuscitation for several minutes. Yet, despite knowing Newsome had no pulse, Wesson never made any effort to resuscitate Newsome. (ROA.2431, 3224 [6])

In summary, the jail video clearly shows the disgust and the callous disregard for Newsome, and a jury could determine each jailer was deliberately indifferent to Newsome's serious medical needs.. After being left in her cell and her cries for help ignored until becoming unresponsive, she was tied into a wheelchair then pushed to the hallway while covered in vomit and diarrhea soiling her torn t-shirt and shorts. (ROA.3374, 3224 [3-6]) Then she was left in the hall as jailers milled around her, trying not to touch her or step in the bodily fluids covering her and her wheelchair. (ROA.3224 [6]) Crucial minutes ticked away without anyone even attempting CPR until it was far too late. (ROA.3224 [6])



(ROA.3224 [6])



(ROA.3224 [6])

The Jailer-Defendants denials that they did not observe Newsome's emergency condition and that Newsome suddenly developed an orthopedic condition that caused her knee to give out in the last hour of her life, are not credible and merely raise fact issues. Defendants' affidavits all omit Hughes's observation in his statement that Newsome was vomiting when she fell to the floor. It is a reasonable inference that Newsome fell because she was too sick to stand, and not because of a sudden orthopedic injury in the last hour of her life. This is further supported by the testimony of Trustee Schuckers that when she assisted taking Newsome to the shower about 1:30 a.m., Newsome was unable to walk on her own. (ROA.3432)

Because the Jailer-Defendants acted unreasonably in light of clearly established law, they are not entitled to qualified immunity. Under similar conditions the Fifth Circuit has held that jailers violate clearly established law as decided by *Easter v. Powell* when they ignore cries for help and pleas for a doctor from a seriously ill detainee in deteriorating health. *See Sims*, 35 F.4th at 951-52. Moreover, the violations here are obvious and therefore require no closely analogous precedent. *See Taylor*, 141 S.Ct. at 53-54.

7.     Sheriff Greg Taylor

Sheriff Taylor is the official policymaker for the jail, and is responsible for maintaining the PR-bond Policy and associated policies which limited and

discouraged providing emergency medical treatment and hospitalization for Newsome and other detainees. Sheriff Taylor is liable in his supervisory capacity for implementing unconstitutional policies.

To support a claim against supervisory liability the Plaintiffs must show that Defendant's conduct caused the denial of Ms. Newsome's constitutional rights by implementing an unconstitutional policy; a subordinate of the Defendant's violated Ms. Newsome's constitutional rights as a result of following the unconstitutional policy; and the supervisor adopted the policy with deliberate indifference. *See* Federal Pattern Jury Instructions, Civil Rights - 42 U.S.C. §1983, No. 10.4, "Liability of a Supervisor." To show that the supervisor adopted the policy with deliberate indifference it must be shown that the supervisor was aware of facts from which the inference could be drawn that a substantial risk of serious harm or a violation of constitutional rights existed, and the supervisor actually drew that inference. To show deliberate indifference based on a single incident, it must have been apparent or obvious that a constitutional violation was the highly predictable consequence of the unconstitutional policy. *Id*.

It is clear from the evidence that Defendant Taylor implemented policies hostile to detainee medical care, including requiring that jailers attempt to arrange PR bonds for detainees needing hospitalization as the first step in responding to a serious medical need. This was admitted as Jail policy by Choate. Knowing that

someone was going to be transferred to the hospital for care demonstrates knowledge that their medical needs are serious. Therefore it had to be obvious to Taylor that it was highly predictable that his policy could result in serious medical needs being unaddressed at his jail. The evidence shows his subordinates (the Jailer-Defendants and Green) were following Taylor's unconstitutional policy in delaying treatment of Newsome's serious medical needs.

Like the other individual defendants, Taylor is not entitled to qualified immunity. No reasonable Sheriff would adopt a policy that would certainly result in delays in medical care for inmate/detainees with serious medical needs. Indiscriminately delaying medical care to those in need of hospitalization constitutes deliberate indifference in violation of clearly established law. *See Sims*, 35 F.4th at 951.

D.     Defendants' spoliation of electronic data creates fact issues.

A series of crucially important text messages that were exchanged among Green and the jailers during June 14 and 15 are unavailable to Plaintiffs and apparently destroyed. These include:

1.     Two 1:22 a.m. texts from Lt. Tia Pierson to Green just before Newsome was removed from her cell to shower and her blood pressure found to be 80/40. (ROA.1146, 3539)

2.     A series of five texts from Green to Captain Choate and Pierson between 2:18

a.m. and 3:57 a.m. while Newsome cried out for help. (ROA.1146, 3539)

3.    Three text messages sent from Choate to Defendant Green between 2:40 p.m. and 3:05 p.m. June 15 as the jail worked to release Newsome. (ROA.1147, 3539) These texts likely related to Newsome's condition as jailers worked to get Newsome released on a PR bond, particular since Choate admits that he and Green were communicating on the matter throughout the day. (ROA.2922, 2926, 2928)

Green and the Jailer-Defendants had a duty to preserve the contents of the text messages in anticipation of litigation. Fed. R. Civ. P. 37(e). First, the Jailer-Defendants knew that Texas Rangers had begun their criminal investigation by obtaining statements beginning the day of Newsome's death, with follow-up continuing for over a year. (ROA.781-782, 2856-2974) Second, the County engaged counsel for defense of a claim arising out of Newsome's death only 4 days afterwards, obviously anticipating litigation. (ROA.781) Third, Texas law requires that data stored on personal electronic devices of public employees related to their employment is a "local government record;" therefore, a duty exists to preserve the data for production. *Adkisson v. Paxton*, 459 S.W.3d 761, 773-75 (Tex. App.—Austin 2015, no pet.).

Green, Choate, and Pierson all claim to have obtained new phones after Newsome's death and discarded their prior phones without preserving or transferring stored text messages. (ROA.1149-1150, 2975) Given the timing and the context, the

destroyed text messages almost certainly related to Newsome's dire medical condition, the need for approval to declare an emergency medical condition requiring hospital care, and her potential release on a PR bond. Although some people discard a phone with its data upon obtaining a new one, many also keep their old phone and/or transfer electronic data to their new phone, particularly when it is also used for business, let alone when it contains evidence relevant to ongoing criminal and civil investigations. It strains credulity that each of these three, as well as every Defendant who was deposed, would innocently discard their phone and fail to preserve electronic data when they know they are witnesses in ongoing investigations. These circumstances permit, if not compel, the conclusion that Defendants' employees engaged in collective action to frustrate future discovery by destroying incriminating evidence. It takes no imagination to conclude the texts described Newsome's dire condition and the risk of delaying emergency medical treatment while County officials worked to gain her release. The destruction of such evidence greatly prejudices Plaintiffs as it allows Defendants to feign ignorance and/or fabricate evidence concerning Newsome's condition in the hours before her death that would surely be impeached by the destroyed text messages. At a minimum, the destruction of critical relevant evidence by Defendants' employees raises additional fact issues that should be considered by a jury and preclude summary judgment.

**ISSUE 2: The district court erred in granting summary judgment for Anderson County because Plaintiffs raised fact issues on Plaintiffs' *Monell* claim.**

A.    Legal standards and standard of review**.**

The same de novo standard of review applies to the summary for Anderson County. *Batiste*, 976 F.3d at 500.

Local governments are liable for a policy or custom that causes a constitutional injury. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). Plaintiffs' *Monell* claim requires Plaintiffs to show (1) "an official policy (or custom)," (2) that "a policy maker can be charged with actual or constructive knowledge," and (3) "a constitutional violation whose 'moving force' is that policy (or custom)." *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021). The first element exists if a practice is "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350 (2011).

The second element requires Plaintiffs to demonstrate whether a policymaker actually or constructively knew of the policy, custom, and/or practice. *See Newbury*, 991 F.3d at 680. "[P]olicymakers failing to take corrective action after their subordinates violate the constitution is some evidence that they know about an unconstitutional custom." *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 & n.56 (5th Cir. 2022) (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 580 n.18 (5th Cir.

2001); *Sanchez*, 956 F.3d at 793.

The third element requires that the policy must have been the moving force behind the constitutional violation, which simply means that "there must be a direct causal link" between the policy and the violation. *Piotrowski*, 237 F.3d at 580.

It is not necessary that a policy or practice be the *exclusive* cause of the constitutional deprivation. *Sanchez*, 956 F.3d at 795. Courts "may ... consider how individual policies or practices interact with one another within the larger system." *Id*. Municipal liability attaches if the policies, when viewed in combination, have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Id.*

B.    Anderson County's policies were a moving force in causing the constitutional violations which led to Newsome's critical illness and death.

The district court considered Plaintiffs' *Monell* claim under the erroneous assumption that the individual defendants committed no constitutional violations. If this Court resolves Plaintiffs' issues regarding the individual defendants in Plaintiffs' favor, it should remand the *Monell* claim for reconsideration in light of the ruling(s) concerning the individual defendants. *Fairchild*, 40 F.4th 367.

When as here multiple employees act in the same unconstitutional manner in response to the same incident, it is reasonable to infer that they are acting pursuant to their employer's policy rather than improvising. "When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction

arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy." *Sanchez*, 956 F.3d at 793; *Grandstaff*, 767 F.2d at 171. The group conduct of the several Defendants here, and lack of response by their employer, is comparable to that in *Sanchez*, *Joseph*, and *Grandstaff*, and similarly egregious. Here multiple jailers and two medical agents all responded the same way to the same event. They delayed medical treatment, and Newsome died from her condition. And there is no record of disciplining any defendant; in fact Corley and Green were rewarded with a new contract for TAKET. (ROA.1640, 1789)

Additionally, there exists direct evidence of Anderson County's policies restricting hospitalization and thereby delaying critical care for detainees. The captain whom Sheriff Taylor placed in charge of the jail repeatedly stated that the jail always attempts to obtain a PR bond for detainees needing hospitalization. Nurse Green admitted to a jailer that the real reason he did not send Newsome to the hospital is because of Chief Taylor restricts detainee hospitalization. Furthermore, Chief Taylor admitted he was involved in discussions to release Newsome. Another jailer testified that calling EMS required a sergeant's approval and ordinary jailers could not do so. (ROA.3523) This is all evidence from which a jury could conclude that Taylor was aware of and approved a policy of discouraging detainee hospitalizations and routinely delayed hospitalization by requiring jailers to first pursuing a PR bond to avoid the costs of associated with hospitalizing detainees.

When a chief policymaker is aware of the policy, there exists no need to demonstrate a pattern. *See Sanchez*, 956 F.3d 793.

These are particularly dangerous policies here where the jail relied on one part-time nurse and doctor, occupied by other endeavors, to provide care for 200 or more detainees. Medical-Defendants could not possibly be available 24/7, thereby requiring the jail to utilize the county hospital for urgent and critical care unavailable at the jail. Delaying access to the hospital while jailers hunt down a part time nurse for instructions, or explain an emergency to a sergeant to call EMS, or to ask the district attorney to entertain a PR bond, means that detainees will suffer while care is delayed. And occurred here, some will die. This is a highly predictable result of Anderson County's customs and practices. Acting together these policies evince a hostility to obtaining hospital emergency care for detainees, and jailers will naturally be chilled in obtaining emergency assistance. This reticence to act was very much on display here. For example, Wickersham perceived the need to call Nurse Green for instructions without first rendering any aid to Newsome. Similarly, Jailer Wilson's believed she was not permitted to call 911 (ROA.3523) Event if ultimately a jury determines that to be incorrect, her reticence demonstrates how the County's policies inhibit aid to critically ill detainees, and thus are a moving force that caused the individual defendants' constitutional violations. The dangers of such practices are so obvious, and so likely to result in constitutional violations, that County

policymakers can reasonably be said to have been deliberately indifferent in allowing them to continue. *See City of Canton*, 489 U.S. at 390 & n.10.

Additionally, these facts raise a conditions-of-confinement theory. *See Sanchez v. Young Cnty., Texas*, 866 F.3d 274, 279 n.3 (5th Cir. 2017) (plaintiffs can bring a pretrial detainee case under alternative theories of episodic acts and omissions or unconstitutional conditions of confinement). Unlike episodic acts that require deliberate indifference, a conditions-of-confinement claim requires no showing of specific intent. *Id*. at 279.

The jail's conditions apply to all detainees needing hospitalization and are therefore pervasive general conditions and practices applied to pretrial detainees. *Bell*, 441 U.S. at 535, 99 S.Ct. 1861; *Hare*, 74 F.3d at 644. Delaying critical medical care is antithetical to the County's constitutional duty to provide for the serious medical needs of detainees. Thus the County's policies delaying critical care are not reasonably related to legitimate government objective and constitute impermissible punishment.

**ISSUE 3: The district court erred in denying Plaintiffs leave to file their third amended complaint.**

This Court reviews a decision to deny an amendment for abuse of discretion. *Emory v. Texas State Bd. of Med. Examiners*, 748 F.2d 1023, 1027 (5th Cir. 1984).

The district court denied leave to file Plaintiffs' third amended complaint adding Lt. Pierson as an additional defendant and expressly asserting the additional

*Monell* theory that Anderson County's policy of releasing critically ill detainees on a personal recognizance bond was a moving force in Newsome's death. The district court considered the *Monell* issue to be moot because of its conclusions there were no constitutional violations or evidence the policy was a cause of Newsome's death. On rehearing, the court added that it believed the amendment to be futile for the same reason. The court did not address the additional defendant.

For the reasons set forth above, the district court erred in concluding the additional *Monell* allegations were moot and futile. Plaintiffs timely sought leave to amend to conform their complaint to evidence obtained through discovery, and the issue of the jail's PR-bond policy was addressed by Anderson County without objection. Upon reversing, this Court should also reverse the district court's order denying leave to amend and remand for further consideration.

## CONCLUSION

Appellants pray that the district court's rulings be reversed and the case remanded for further proceedings.

Respectfully submitted,

/s/ Bruce K. Thomas
Bruce K. Thomas
State Bar No. 19844300
Law Office of Bruce K. Thomas
12900 Preston Rd., Suite 590
Dallas, Texas  75230
Phone/Fax:  214/296-9650
bthomas@bthomaslaw.com

Charles W. Nichols
Texas Bar No 14994200
Email:  cnichols@charleswnicholslaw.com
Donald J. Larkin
Texas Bar No 24057702
Email:  donald@charleswnicholslaw.com
617 E. Lacy St.
Palestine, TX 75801
Tel. (903) 729-5104
Fax. (903) 729-0347

**ATTORNEYS FOR PLAINTIFFS-APPELLANTS**

## CERTIFICATE OF SERVICE

I certify that on February 23, 2023, the foregoing document was served, via

the Court's CM/ECF Document Filing System, upon the following registered

CM/ECF users:

**Ms. Lee Ina Correa**
**Mr. Robert Scott Davis**
**Mr. James A. Evans III**
**Mr. David Ryan Herring Iglesias**
**Mr. Douglas Edward Markham**
**Ms. Diana Melissa Navarro**
**Mr. Joel Randal Sprott**

*Counsel for Defendants-Appellees*

/s/ Bruce K. Thomas
Bruce K. Thomas

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 12969 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 (Version 2205) in Times New Roman 14-point font, and 12-point font for footnotes.

/s/ Bruce K. Thomas
Bruce K. Thomas