**Case No. 22-40559**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

Amber Ford; Regan Kimbrough; Donald Newsome,

Plaintiffs - Appellants

v.

Anderson County, Texas; Taket Holdings, L.L.C.; Adam Corley;
Timothy Green; Greg Taylor; Robin Jones; Jonathan Strong;
Jessica Carpenter; Alicia Wilson; Matthew Wickersham; Travis
Wesson; Dakota Hughes; Todd Choate,

Defendants – Appellees

On Appeal from
United States District Court for the Eastern District of Texas
6:19-cv-00384-JDK

**Appellants' Reply Brief**

Bruce K. Thomas
Law Office of Bruce K. Thomas
Texas State Bar No. 19844300
bthomas@bthomaslaw.com
12900 Preston Rd, Ste 590
Dallas, Texas 75230
Phone/Fax:  (214) 296-9650

Charles W. Nichols
Texas Bar No 14994200
cnichols@charleswnicholslaw.com
Donald J. Larkin
Texas Bar No 24057702
donald@charleswnicholslaw.com
617 E. Lacy St.
Palestine, TX 75801
Tel. (903) 729-5104
Fax. (903) 729-0347
ATTORNEYS FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................2

TABLE OF AUTHORITIES ........................................................4

TO THE HONORABLE COURT: ...............................................7

I.      INTRODUCTION ..........................................................7

II.     Argument......................................................................13

A.      Fact issues exist as to the deliberate indifference of Nurse Green and Dr. Corley...................................................................................13

B.      Fact issues also exist regarding the deliberate indifference of the County and its jailers. ...............................................................................30

    1.      The Jailer-Defendants............................................30

    2.      The County. ...........................................................35

C.      The constitutional violations of the individual defendants are clearly established....................................................................................41

D.      The district court erred in denying leave to amend. ......................43

E.      The Defendants' evidentiary objections lack merit.......................45

    1.      Defendants' evidentiary objections should be deemed waived for insufficient briefing..........................................................45

2.  Plaintiffs properly relied on expert testimony. ..........................................47

3.  The District Court correctly overruled Defendants' objections to the detainee affidavits and Green's statements to Ranger Baggett. .......................50

4.  Plaintiffs' responded to Defendants' objections below and demonstrated they were without merit. ...................................................................................50

**CONCLUSION** ......................................................................................................**61**

**CERTIFICATE OF SERVICE** .........................................................................**63**

**CERTIFICATE OF COMPLIANCE** ................................................................**63**

# TABLE OF AUTHORITIES

## Cases

*Alderson v. Concordia Par. Corr. Facility*, 848 F. 3d 415, 422 (5th Cir. 2017) ....21

*Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009)................................52

*Allen v. Hays*, 65 F.4th 736, 748 (5th Cir. 2023).............................................. 30, 43

*Am. Fed'n of Musicians of U.S. & Can. v. Paramount Pictures Corp.*, 903 F.3d 968, 976-977 (9th Cir. 2018) ..............................................................................51

*Ariyan, Inc. v. Sewage & Water Bd. of New Orleans*, 29 F.4th 226, 229 (5th Cir. 2022) ..................................................................................................................43

*Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003)................................ 16, 21, 42

*Barthelemy v. Air Lines Pilots Ass'n*, 987 F.2d 999, 1018 (9th Cir. 1990).............57

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)...........................................38

*Campbell v. PBL*, 744 F. App'x 192, 198 (5th Cir. 2018)......................................50

*Cesal v. Moats*, 851 F. 3d 714, 723 (7th Cir. 2017) ........................................ 18, 21

*Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021), *cert denied*, ⎯⎯ U.S. ⎯⎯, 142 S.Ct. 2573 (2022) ........................................................................................................30

*Dauzat v. Carter*, 670 F. App'x 297, 298 (5th Cir. 2016) (unpublished) (per curiam) ...............................................................................................................17

*De'lonta v. Johnson*, 708 F3d 520, 526 (4th Cir. 2013) .......................................13

*Delaughter v. Woodall*, 909 F.3d 130, 138 n.7 (5th Cir. 2018)........................ 15, 30

*Dyer v. Houston*, 964 F.3d 374, 382 (5th Cir. 2020)..............................................34

*Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006).................................... passim

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) .............................................. passim

*Fairchild v. Coryell Cty.*, 40 F.4th 359, 363 (5th Cir. 2022)............................ 32, 35

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3rd Cir. 2016) ..................................................................................................................49

*Galvan v. Calhoun Cty.*, 719 F. App'x 372, 374–75 (5th Cir. 2018) (unpublished) (per curiam).................................................................................... 15, 20, 42

*Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)........................... 17, 18

*Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ........................47

*Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)...........................37

*Hanna v. Corrections Corp. of America*, 95 F. App'x 531, 532 (5th Cir. 2004) (unpublished) (per curiam) ....................................................................... 15, 30

*Hare v. City of Corinth*, 74 F.3d 633, 644-45 (5th Cir. 1996) (en banc)................39

*Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999) (per curiam)... 16, 21, 42

*Hughes v. Noble*, 295 F.2d 495 (5th Cir. 1961)................................................1, 17

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 539-539 (4th Cir. 2015) ........................................................................52

*In re Kemmler*, 136 U.S. 436, 447 (1890) ................................................7

*Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ........................................ 37, 38

*Johnson v. Treen*, 759 F.2d 1236, 1238-36 (5th Cir. 1985) ...................... 13, 16, 28

*Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ..........................................13

*Ledesma v. Swartz*, No. 97-10799, 1997 WL 811746, at *1 (5th Cir. 1997) (unpublished) (per curiam) ...................................................... 16, 20, 42

*Lee v. Offshore Logistical and Transport*, L.L.C., 859 F.3d 353, 354-55  (5th Cir. 2017) ........................................................................................49

*Loosier v. Unknown Med. Doctor*, 435 Fed. Appx. 302, 306, 2010 WL 7114192 at *2 (5th Cir. June 1, 2010) (unpublished)............................................17

*Mandel v. Doe*, 888 F. 2d 783, 789 (11th Cir. 1989)........................................ 18, 21

*Montano v. Orange County*, 842 F.3d 865 (5th Cir. 2016) .....................................36

*Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 & n.56 (5th Cir. 2022)....36

*Perez v. Anderson*, 350 Fed. Appx. 959, 961–62, 2009 WL 3461292, at *2 (5th Cir. Oct. 28 2009) (unpublished) ........................................................17

*Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016)........................................ 13, 21

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001)................................36

*Ratliff v. Aransas Cnty.*, 948 F.3d 281, 284 (5th Cir. 2020)................................38

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155-51 (2000)..... 32, 47

*Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346 (5th Cir. 2014) (unpublished) (per curiam)...................................................................... 16, 20, 42

*Sanchez v. Oliver*, 995 F.3d 461, 474 (5th Cir. 2021) ............................................17

*Sanchez v. Young Cnty., Texas*, 866 F.3d 274, 279 & n.3 (5th Cir. 2017) 38, 39, 40, 44

*Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 792-93 (5th Cir. 2020)........... passim

*Sims v. Griffin*, 35 F.4th 945, 951-52 (5th Cir. 2022)....................................... passim

*Soden v. Freightliner Corp.*, 714 F.2d 498, 502-03 (5th Cir. 1983) ......................48

*Spikes v. McVea*, 8 F.4th 428, 435–36 (5th Cir.), *on reh'g*, 12 F.4th 833 (5th Cir. 2021), *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021) ........................................................................................ passim

*Spikes v. McVea*, No. CV 17-8164, 2022 WL 1320446, at *9 (E.D. La. May 3, 2022), *appeal filed*, No. 22-30327 (5th Cir. Jun. 3, 2022) ...................................15

*Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ......................................................18

*Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016) ......................43

*U.S. v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010)...............................................45

*Williams v. Vincent*, 508 F.2d 541 (2nd Cir. 1974)....................................................14

## Other Authorities

28 U.S.C. § 1746 ...........................................................................................................51

5 C. Wright & A. Miller, Federal Practice and Procedure § 1219, at 277–278 (3d ed. 2004)..........................................................................................................38

Fed. R. Civ. P. 56(c)(3) ...............................................................................................60

Fed. R. Evd. 801(d)(2) .................................................................................................50

Fed. R. Evd. 801(d)(2)(D)............................................................................................57

Fed. R. Evd. 803(6) ......................................................................................................53

Fed. R. Evd. 803(8) ......................................................................................................54

Fed. R. Evd. 901(b)(7)..................................................................................................54

Fed. R. Evd. 902(8) ......................................................................................................51

Fed. Rule Civ. Proc. 15(a)(2).......................................................................................38

**TO THE HONORABLE COURT:**

## I.    INTRODUCTION

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death[.]"

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (citing *In re Kemmler*, 136 U.S. 436, 447

(1890)). The worst case occurred here.

Importantly, this is not a case where the life-threatening condition of the

detainee was unknown to the Defendants. Dr. Corley did not need to order extensive

tests or investigate alternative causes of symptoms to determine that Rhonda

Newsome suffered from Addison's disease. Rhonda's Addison's disease was a

known risk. From the outset of her detention it was documented in jail records that

Rhonda suffered from Addison's disease and needed ongoing treatment. As medical

professionals, Defendants Corley and Green knew that although Addison's is

eminently treatable, if allowed to remain untreated it becomes life-threatening.

(ROA.3641, 3615-16) Therefore all that Corley and Green needed to do to protect

Rhonda from the known risk of suffering a deadly Addisonian crisis was to manage

a chronic condition which was fully known to them. Yet it is undisputed that Corley

and Green never treated Rhonda *for Addison's* – no ongoing blood tests; no

Addison's medication ordered; no prescriptions written for Addison's medication;

and not a single Addison's medication listed on Rhonda's Master Medication List. (ROA.2804-2808, 2809, 3620, 3642) As the effects of Corley and Green's ongoing indifference to treating Rhonda's Addison's disease became manifest during Rhonda's final hours on June 14 and 15, even as Rhonda screamed in pain and begged for treatment, *all* Defendants delayed emergency medical treatment, no doubt for the non-medical reason that the sheriff and jail captain wanted to release Rhonda rather than have her hospitalized while in custody. It therefore could not have been a surprise to any Defendant that Rhonda died from her untreated deadly condition. What surprised Defendants is that they were unable to push her out of the jail door before she died.

Defendants respond with conclusory arguments, implausible explanations, and strained rationalizations which stand the standard of review on its head. They assume the truth of all Defendants' statements, ignore all contrary evidence, and indulge every inference, no matter how improbable, in their favor. The result is a host of contradictions which could not more emphatically implicate the Defendants' credibility and demonstrate the existence of multiple fact issues. Defendants attempt to walk a tightrope from the outset. They first depict Rhonda as a violent felon who was a danger to her family and the community, and therefore must be detained subject to a large detention bond. Then inexplicably, in Rhonda's final hours, jail officials decide that detaining Rhonda is unimportant and embark on a campaign to

have her released into the community on her own recognizance. Likewise, Defendants inconsistently claim both that Rhonda was so sick that she needed to be immediately released, notwithstanding her inability to post bond, yet at the same time say she was alert and responsive and in no need of immediate medical attention.

The explanation offered by Jail Captain Choate for the jail's sudden desire to release Rhonda without bond on June 15 is in itself head spinning. First he claims he was so concerned with Rhonda's poor health and illness that he contacted the district attorney personally to seek her release, and also conferred with the sheriff, as he always did when a detainee needed to go to the hospital for an extended stay. (ROA.2923, 3021, 3042) Choate further told Ranger Baggett that before contacting the district attorney, Choate had already made arrangements to provide security at the hospital in anticipation that Rhonda would be hospitalized. (ROA.2923, 3462) Records further show that Choate was in communication with the jail nurse throughout the day. (ROA.3093, 2926, 2930) Yet, on the other hand, Choate claims there was no need for him to observe or interact with Rhonda before making the decision to seek her release, and at no time did he call for a doctor or EMS, or send Rhonda to a hospital, or make any other effort to obtain any medical diagnosis of her condition. (ROA.2412-16) Rather Captain Choate now claims to have taken the extraordinary action to have this allegedly violent felon released without bond because he claims to have assumed Rhonda contracted a "stomach bug," an ailment

she never had and a diagnosis that no medical professional ever made. Not only is Choate's testimony that he was unaware Rhonda needed hospitalization contradicted by his own statement to Ranger Baggett that Choate had prepared to send Rhonda to the hospital, it is also inconsistent with the claims of Nurse Green and Dr. Corley that they allegedly had decided to have Rhonda sent to the hospital to test for a bowel obstruction when, as coincidence would have it (according to Defendants), jailers called Green to tell him that Rhonda was found in her cell unresponsive. And to strain coincidence even further, not a single one of the flurry of text messages exchanged between Choate and Green and the other Defendants during Rhonda's final hours was preserved, notwithstanding that Defendants knew the Texas Rangers would immediately investigate this jail death.

Green and Corley's explanations for their conduct are likewise full of implausible contradictions, and at odds with both physical evidence and other witnesses. They claim at the outset of Rhonda's detention to have formed a treatment plan for managing Rhonda's Addison disease, but strangely never documented it, and indisputably never implemented it since they never treated her for Addison's. Moreover, despite knowing she suffered from Addison's, knowing that they never treated her for it, knowing that untreated Addison's would become a deadly crisis, and knowing that she exhibited classic Addison's symptoms of flatulence, leg swelling, and low blood pressure, claim never to have considered that she was

suffering from the Addisonian crisis that killed her. (ROA.2807, 3597, 3615, 3620 [classic symptoms]; ROA.2423-2424, 3597 [knowledge of Rhonda's Addison's disease]; ROA.1626, 3599-60, 3615-3622, 3639-3643 [no Addison's treatment]; ROA.3615-16, 3003-3004 [life-threatening danger of untreated Addison's]) During Rhonda's final night, Green implausibly claims to have come into the jail at midnight to provide Rhonda with fluids, despite never being observed on camera or seen by any jail personnel. (ROA.3224 [1-5]; ROA.3406, 3653) Moreover, his implausible story is contradicted by Rhonda's blood tests results from the next morning which showed that she was severely dehydrated, and therefore received no such treatment. (ROA.3916) Additionally, when Green briefly come to the jail the next morning to collect the only blood sample obtained from Rhonda during her entire detention, Green can be seen on video searching for Rhonda's cell, clearly unaware in which cell Rhonda was detained. (ROA.3224 [5]) This despite claiming that he had been there to see her only a few hours earlier. Furthermore, Green's perfunctory visit on the morning of the 15th – only four minutes in Rhonda's cell (ROA.3224 [5]) – was far too brief for Green to have administered fluids to Rhonda or for him to have conducted more than a cursory assessment of Rhonda's condition.

Green's implausible explanations continue throughout June 15. Green claims that Rhonda refused to go the hospital, notwithstanding Green's failure to document any such refusal, and notwithstanding the testimony of multiple witnesses that

11

Rhonda had been crying out for hours pleading for help and begging to go to the hospital. And what is even more implausible, if that is possible, Green admits to discussing Rhonda's test results with lab technician Wood at approximately 10:30 a.m. the morning of Rhonda's death, but claims not to have discussed the most important part of the results, the critical values that showed she needed immediate emergency treatment. Wood of course documents precisely the opposite.

And on and on it goes, as the contradictions and strained coincidences keep piling up. Rhonda was unable to walk because in the final hours of her life her knee just happen to "give out." The jailers couldn't hear Rhonda yelling for help, but other detainees throughout the area could. Rhonda looked fine, but she just happened to die. Every claim, every action, contradicted and at cross-purposes with another; every explanation incredulous. All Defendants profess to have demonstrated great concern for Rhonda's welfare, yet not one did anything to prevent her from dying. Defendants accounts simply do not add up – until one learns the critical fact that ties all Defendants' actions together: the jail's policy is to release critically ill detainees on their own recognizance rather than have them treated while in custody. With that all becomes clear. No one acted to obtain emergency assistance for Rhonda because they were waiting for her to be released, and then become someone else's problem. Defendants hoped that by releasing her they would never be called to account for allowing Rhonda to become critically ill in the first place. They were wrong.

## II.    Argument.

A.    Fact issues exist as to the deliberate indifference of Nurse Green and Dr. Corley.

Green and Corley rely on a variant of what can be termed the "aspirin defense." This rejected defense asserts that as long as a medical defendant provided some cursory treatment, such as prescribing aspirin to critically ill patient (or as here, providing over-the-counter treatments for indigestion and gas to an Addison's patient), this reflects "some care" which refutes deliberate indifference. But that is not the law.

There exists widespread agreement among the circuits that a total deprivation of care is not a necessary condition for finding a constitutional violation. *See, e.g., Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (total deprivation of care unnecessary to establish constitutional violation); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("just because Appellees have provided De'lonta with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment") (emphasis in original); *see also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (en banc) ("[I]f knowing a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and sends him back to his cell, a jury could find deliberate indifference even though the prisoner received some treatment."). This result necessarily follows from the Supreme Court's guidance in *Estelle* stating that a

medical defendant's decision to take an easier but less efficacious course of treatment can be evidence of deliberate indifference which supports a Section 1983 claim. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (citing with approval *Williams v. Vincent*, 508 F.2d 541 (2nd Cir. 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference . . . rather than an exercise of professional judgment")).

This Circuit recently addressed *Estelle* in *Spikes*. *See Spikes v. McVea*, 8 F.4th 428, 437-440 (5th Cir.), *on reh'g*, 12 F.4th 833 (5th Cir. 2021),[1] *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021)). In *Spikes* medical personnel over the course of six weeks treated an inmate suffering from a fractured hip with ibuprofen and a muscle rub, despite the inmate repeatedly complaining of intense pain and the inability to walk. *Id*. at 432-33. The panel majority determined that "a jury might find that Spikes's prolonged inability to walk and complete lack of response to treatment show that Defendants were deliberately indifferent to his obvious symptoms and unchanged condition." *Id*. at 436.

The *Spikes* panel noted that "[i]n similar cases, we have recognized that an official is deliberately indifferent to a prisoner's serious medical need when he

---

[1] Although on rehearing the *Spikes* panel vacated the district court's order and remanded for an individualized analysis of each defendant's conduct, the panel did not withdraw its original opinion or alter its legal analysis as to deliberate indifference.

delays treatment with responses so cursory or minimal that they cause unnecessary suffering." *Id*. at 437. Upon surveying caselaw, the opinion concluded that it is well-settled that "delays in treatment, marked by plainly unresponsive care, rise to the level of deliberate indifference." *Id.* at 440; *see also Spikes v. McVea*, No. CV 17-8164, 2022 WL 1320446, at *9 (E.D. La. May 3, 2022), *appeal filed*, No. 22-30327 (5th Cir. Jun. 3, 2022) ("[T]he Fifth Circuit has recognized that an official is deliberately indifferent to a prisoner's serious medical needs when the official delays treatment with responses so cursory or minimal that they cause unnecessary suffering.") (collecting cases). Likewise, defendants are deliberately indifferent to serious medical needs when they delay treatment for non-medical reasons. *Spikes*, 8 F.4th at 436 & n.30 (citing *Delaughter v. Woodall*, 909 F.3d 130, 138 n.7 (5th Cir. 2018); *Hanna v. Corrections Corp. of America*, 95 F. App'x 531, 532 (5th Cir. 2004) (unpublished) (per curiam)).

The *Spikes* panel likewise concluded that these principles were well established prior to the occurrence of these events in 2016, and in support cited numerous decisions that provided fair notice to the defendants that such conduct is unconstitutional. *See Spikes*, 8 F.4th at 436 n.32, 438 & n.36 (citing *Galvan v. Calhoun Cty.*, 719 F. App'x 372, 374–75 (5th Cir. 2018) (unpublished) (per curiam) (concluding that prisoner stated deliberate indifference claim where prison officials responded to his complaints of excruciating stomach pain by offering Pepto-Bismol

and a home remedy, only granting him access to a prison doctor three days later); *Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346 (5th Cir. 2014) (unpublished) (per curiam) (state prisoner made repeated complaints of nausea, bilious vomiting, and extreme abdominal pain; nurse originally responded with nausea medicine and enema, but on the eleventh day of complaints authorized transport to a hospital, where prisoner was diagnosed with a ruptured appendix; notwithstanding that nurse offered some treatment, district court's determination was affirmed that nurse disregarded prisoner's substantial health risk by denying him "access to a medical professional competent to diagnose and treat his condition"); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (juvenile offender became dehydrated while participating in boot camp, began vomiting, and became unconscious; camp's officials rendered first aid but waited nearly two hours to call an ambulance; even though the officials offered minimal care, nearly two-hour delay in contacting competent medical professionals "r[ose] to the level of deliberate indifference."); *Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999) (per curiam) (holding that prisoner stated deliberate indifference claim when he alleged that prison officials performed only a cursory inspection of his mouth and ignored his repeated complaints of excruciating pain for eight days after his jaw re-broke); *Ledesma v. Swartz*, No. 97-10799, 1997 WL 811746, at *1 (5th Cir. 1997) (unpublished) (per curiam) (holding that prisoner stated deliberate indifference claim by alleging that

prison physician responded to prisoner's complaints of a broken jaw from a fall with nothing more than Motrin, a liquid diet, and delayed scheduling x-rays for five days); *see also Dauzat v. Carter*, 670 F. App'x 297, 298 (5th Cir. 2016) (unpublished) (per curiam) (concluding that medical personnel's awareness of a substantial health risk could be inferred from symptoms " 'so apparent that even a layman would recognize that care [was] required' " (alteration in original) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)).

Other Fifth Circuit cases similarly confirm that some cursory care does not defeat deliberate indifference for a medical defendant's delay in addressing a detainee's serious medical needs. *Loosier v. Unknown Med. Doctor*, 435 Fed. Appx. 302, 306, 2010 WL 7114192 at *2 (5th Cir. June 1, 2010) (unpublished) (finding doctor deliberately indifferent when she failed to provide medical care although she was aware of prisoner patient's extreme pain, shoulder numbness, and neck brace, even where initial X-ray tech reported no injury); *Perez v. Anderson*, 350 Fed. Appx. 959, 961–62, 2009 WL 3461292, at *2 (5th Cir. Oct. 28, 2009) (unpublished) (finding allegations that doctor and nurse failed to order X-rays or offer meaningful pain relief to prisoner patient for months constituted deliberate indifference); *Hughes v. Noble*, 295 F.2d 495 (5th Cir. 1961) (finding deliberate indifference for thirteen-hour delay in treating broken, dislocated cervical vertebrae); *see also Sanchez v. Oliver*, 995 F.3d 461, 474 (5th Cir. 2021) (recognizing that a failure to assess patient

meaningfully might rise to level of deliberate indifference). As noted in *Spikes*, "Other circuits have also recognized that delays in necessary medical care that include cursory or grossly inadequate treatments constitute deliberate indifference." 8 F.4th at 438 n.36 (citing *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017) ("Continuing an ineffective treatment plan also may evidence deliberate indifference."); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."); *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ("If the symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing, so CPR must be administered—a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983.")).

Like the Defendants in the current case, the defendants (and dissent) in *Spikes* relied on cases such as *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006), and maintained they had merely misdiagnosed the detainee and were at most negligent. *Spikes* rejected the defendants' argument because from the evidence a jury could conclude the medical defendants had confronted a known risk. Using the holding in *Estelle v. Gamble* as a counterexample, the Court explained:

> Unlike the case before us, Gamble faltered in demonstrating that officials disregarded a *known* risk to him. Other than staff's awareness of his continued complaints, Gamble made no allegation suggesting that the prison's medical personnel knew of a serious ailment untreated.

He never alleged that he presented to staff with immobility due to his pain, nor did he suggest that doctors documented any physical deformity resulting from his injury. By contrast, Spikes reported to the infirmary repeatedly in a wheelchair. There was documented swelling to his hip. And at all times, he was unable to walk, stand on, or bend his leg. Dr. McVea conceded these symptoms were consistent with a fracture, testifying that a muscle strain would begin to improve after a week and that a patient's inability to walk would be indicative of a break. In short, unlike Gamble, Spikes's injury rendered him immobile, a symptom so severe for so long that jurors could conclude that his nurses and physician knew that a severe fracture was the likely culprit, a reality they disregarded by offering him little more than ibuprofen for forty-two days—failures, here summing, to indifference.

*Spikes*, 8 F.4th at 436 (emphasis in original) (internal citations omitted).

Plaintiffs in the current case do not contend that Green and Corley provided no treatment to Rhonda whatsoever; rather, these defendants provided no treatment *for Addison's disease and no treatment for Rhonda's Addisonian crisis*. Of course, it was Addison's disease which was Rhonda's life-threatening condition. Moreover, Rhonda's diagnosed Addison's disease was clearly a *known risk* to her health. For Corley and Green to provide only cursory and sporadic symptomatic treatment, without addressing her known life threatening condition is perverse, and was indifferent to Rhonda's serious medical needs. The Medical Defendants' argument that they provided "significant medical care" to Rhonda is like a mechanic claiming to have provided significant maintenance for an automobile by occasionally adding windshield wiper fluid, without ever bothering to change the oil. It is only a matter

of time before the car seizes and dies. The same is true for the Medical Defendants' failure to treat Rhonda's Addison's disease.

Corley and Green indisputably knew about Rhonda's Addison's condition. And just as indisputably, they ignored it and failed to treat it. Not only did they fail to treat her Addisonian crisis, but Nurse Green illegally administered a potentially lethal contra-indicated narcotic to Rhonda which hastened her death. (ROA.3643) Rhonda inevitably and unnecessarily died as a result Corley and Green's ongoing indifference to her life-threatening condition. (ROA.3619, 3640-3643) Corley and Green should have been obtaining blood work "early and often" to monitor electrolytes, potassium and sodium, hormones balances, and renal function, and should have prescribed and administered steroid medication to prevent a deadly Addisonian crisis from ever developing. (ROA.3642-43) Merely advising Gas-X to temporarily relieve flatulence, despite knowing that Rhonda suffered from Addison's, is even more egregious than the doctor in *Ledesma* who provided Motrin for a broken jaw. *Ledesma*, 1997 WL 811746, at *1. Medical defendants may not insulate themselves from liability for failing to respond to an inmate's serious medical needs by the cursory expedient of providing an over-the-counter palliative. "[A]n official is deliberately indifferent to a prisoner's serious medical needs when the official delays treatment with responses so cursory or minimal that they cause unnecessary suffering." *Galvan*, 719 F. App'x at 374-375; *Rodrigue*, 557 F. App'x

at 342, 346; *Ledesma*, 1997 WL 811746, at *1; *Harris*, 198 F.3d at 160; *Austin*, 328 F.3d at 210; *see also Mandel*, 888 F. 2d at 789; *Cesal*, 851 F. 3d at 723; *Petties*, 836 F. 3d at 730. Such was the case here.

Additionally, the conduct of the medical defendants in waiting until June 15 to obtain *any* blood work; illegally administering a potentially lethal contra-indicated narcotic to Rhonda after she developed an Addisonian crisis; and ignoring the critical values obtained from Rhonda's blood work on the day of her death, also plainly constitute unresponsive care and rise to the level of deliberate indifference. Thus, Corley and Green are liable for their deliberate indifference from both their failure to treat Rhonda's chronic Addison's disease, as well as their failure to treat her Addisonian crisis. Their malfeasance is not that of simple negligence, or even gross negligence. It is instead egregious deliberate indifference to a known risk of serious harm, which clearly evinces a wanton disregard for Rhonda's serious medical needs. There was never a question of *whether* Corley and Green's indifference to Rhonda's Addison's disease would cause serious injury or death, but only *when*. Even if the jailers had acted timely to provide Rhonda with lifesaving emergency aid and she had not died, Corley and Green would still be liable for the needless pain and suffering they caused by failing to treat Rhonda's Addison's disease. *Alderson v. Concordia Par. Corr. Facility*, 848 F. 3d 415, 422 (5th Cir. 2017) (holding pain suffered by a prisoner caused by delay in medical care supports an award of

damages); *Easter*, 467 F.3d at 464-465 (holding pain suffered during a delay in treatment can constitute substantial harm and form the basis for award of damages).

Furthermore, based on the evidence a jury could further conclude that Corley and Green, like the Jailer-Defendants, delayed emergency medical care for non-medical reasons. Green admitted precisely this to Jailer Jacob Mobley when he told Mobley that the real reason Green did not send Newsome to the hospital was because of the Sheriff's policy restricting detainee hospitalizations. (ROA.3091)

To excuse their failure to treat Rhonda's Addison disease, Corley and Green rely on the untenable premise that they allegedly were unable to obtain Rhonda's medical records from her private physician. (ROA.3871) Although there is substantial evidence that they never tried to obtain her records,[2] even if what they

---

[2] As discussed in Appellants' main brief, there exists no documentary proof that Green or Corley ever attempted to obtain Rhonda's medical records, and their failure to obtain a signed HIPPA release form from Rhonda is proof they did not. Even if there exist exceptions that would have allowed Green and Corley to obtain Rhonda's records without a HIPPA release form, as argued in Green's brief, this is not something Green or jail officials claim to have relied on. In fact, the Jail's Health Services Plan contemplates that a signed release would ordinarily be obtained when a detainee's prior medical records are requested for a chronic condition. The Plan provides: "Inmates suffering from chronic illnesses or long-term illness undergo an assessment of the problem, including a brief history of treatments and treatment providers. If necessary, a release of information is signed so that additional information can be gathered." (ROA.3003, 3661-3662, 4109) Regardless, the existence of any such exception proves too much. This would merely confirm that nothing prevented Green or Corley from obtaining Rhonda's medical records from the hospital where each worked, and which Rhonda frequented as an emergency room patient. (ROA.2862, 2865, 2745, 3780, 3826-3827) The complete lack of any documentation in the Jail's medical file showing any attempt to obtain Rhonda's medical records, or documenting any failure or refusal of her doctor to release her records (ROA.2804-2809), raises an issue of fact as to whether Green's testimony is credible that he unsuccessfully attempted to obtain Rhonda's records.

claim were true, it would not excuse their failure to indefinitely delay treating Rhonda for a life-threatening illness. Apart from the constitutional duty to provide treatment for a detainee's serious medical needs, the jail had a state law duty to treat Rhonda's Addison's disease arising from the passage of the Sarah Bland Act, which was passed in response to another horrible jail death. Texas implemented the Sandra Bland Act effective January 1, 2018, mandating that county jails implement a health services plan to provide minimum medical services and treatment to detained individuals. To that end, the Texas Commission on Jail Standards provided a form of plan to Anderson County, which Anderson County retyped with its name and formally adopted as its own, i.e., the "Anderson County Jail Health Services Plan." (ROA.3896-3898) The Plan was signed by Sheriff Taylor and Captain Choate, and dated January 1, 2018, and requires a written plan for the diagnosis and treatment plan for all chronic illnesses and chronic conditions of a pretrial detainee. (ROA. 3896-3898) A writing is required because the Plan requires that "any information requiring medical/dental/mental health assistance is documented by the facility nurse." (ROA. 3897 [Para. A.2.]) Pursuant to the Plan, Dr. Corley was appointed the medical director for the jail who in turn was responsible for supervising Nurse Green. The proximity to Rhonda Newsome's arrest on March 10, 2018, is remarkable. The passage of the Sandra Bland Act and its implementation by the Texas Commission on Jails Standards was a stark warning and reminder to

Defendants of the consequences which result from the failure to treat detainees such as Rhonda Newsome.

Neither state law, nor the Constitution, allows a county and its medical personnel to indefinitely delay treating a detainee's chronic, life-threatening condition because they have been unable to obtain the detainee's prior medical records. As detailed by Plaintiffs' experts, the treatment for Addison's is well known, consisting of frequent blood monitoring and steroid medication. Rhonda's physician did not possess some secret treatment regime for Addison patients. It is completely unreasonable for Defendants to assert that Rhonda could not be treated without first obtaining records from her private physician.

It is also notable that from the outset of the Sandra Bland Act, Anderson County publicly resisted implementation of the state mandate, and complied in form only. Anderson County Judge Robert Johnston and Sheriff Taylor publicly disparaged the Sandra Bland Act as an "unfunded mandate." (ROA.4526, 4587-4588, 4618, 4625-4526) Consequently, despite adopting a treatment plan on paper, Anderson County did nothing to implement it, including providing no training to its medical personnel to comply with the plan. This is confirmed by both Green and Corley who admitted that they had little to no familiarity with the requirements of the Plan, and made no effort to comply with it. (*E.g.,* ROA.3662) Far from exculpating them, however, this is simply further evidence of Corley and Green's

indifference to the serious medical needs of chronically ill detainees, even in the face of state law mandating care.

It is then little surprise then that Corley and Green did nothing to develop and implement a treatment plan for Rhonda's Addison's disease. Implicitly admitting the importance of developing a treatment plan, and being unable to identify any written plan, Defendants nonetheless claim they developed an unwritten plan. And then because there are no records demonstrating that Rhonda was ever treated for Addison's while incarcerated, they claim that their unwritten "plan" was to continue her private physician's treatment plan once they obtained those records, which they never did. These are nonsensical make-work excuses which a jury can reject. A jury could correctly conclude that there exists no written plan for treating Rhonda's Addison's disease because there never was any plan; that Corley and Green did not obtain Rhonda's records because they never tried to get them; and Corley and Green never treated Rhonda's Addison condition because they were deliberately indifferent to her serious medical needs.

Even Corley's own self-serving account of events in his brief reeks of indifference to Rhonda's serious medical needs. (Corley Brief at 4-7) Corley account necessarily concedes that despite knowing that Rhonda suffered from Addison's, he examined her only once, on May 11, two months after her incarceration. He never ordered a blood draw until the day of her death, and therefore made no attempt to

monitor her blood counts. Moreover, he never ordered or prescribed any steroid medication to treat Rhonda's Addison's disease. In fact, according to Corley's own account, he never followed up with Green or anyone at the jail concerning Rhonda's condition between May 11 and June 14. Consequently, despite observing on May 11 that two months into her incarceration Nurse Green had failed to obtain Rhonda's medical records, Corley never followed up with Green or anyone at the jail about them. And then, after belatedly ordering urgent blood work on the night of June 14 to be conducted the following morning, Corley claims he did not bother to follow up with Green or the lab concerning the results until after 5:00 p.m. the next day. The fact that Corley knew that Rhonda was on medical watch at the jail and ordered the blood work to be performed "STAT" refute his contention that he was unaware that Rhonda was ill and in significant distress. Consequently, fact issues exist as to the credibility of Corley's testimony.

In sum, Corley and Green did nothing to manage Rhonda's life-threatening disease for three months. Instead they simply let it grow progressively worse until it reached a crisis. Then, despite recognizing the need for urgent blood testing after Rhonda became gravely ill, they each failed to manage the crisis, no doubt believing that if they delayed long enough the jail would release Rhonda, and they would not be held to account for allowing Rhonda's condition to become critical.

Of course any follow up on the blood test results would have revealed that the results were ready by 10:30 a.m. on the 15th, and that they showed Rhonda was critically ill and in need of emergency treatment to prevent her death. Under the most favorable view of the facts, this Court must conclude that both Green and Corley were aware of the results during the morning of the 15th and chose not to act on them. First, the Court must disregard Green's denial that he received the critical test results and assume they were reported to Green at approximately 10:30 a.m., as reflected in Technician Wood's records and statement to the Texas Rangers. Additionally, it is a reasonable inference that Green reported the results to Corley shortly after Green received them, because Green admits he ordinarily would have done so upon receiving such results. Thus, the factfinder can conclude that Green's denial is not credible, and that he in fact obtained the critical value results on the morning of the 15th and relayed them to Corley. Consequently, the factfinder can also reject Corley's claim that he was unaware of the critical value results on the morning of June 15, and conclude that Corley like Green was aware of the results, knew that Rhonda was critically ill, and failed to promptly act on this knowledge to save her life. And the reason for his delay of course is that Corley, like Green, was no doubt aware that the jail was working to have Rhonda released. As the jail's medical director and only doctor, it is a reasonable inference that Corley, like Green, was fully aware of the Sheriff's hostility to obtaining treatment for critically ill

detainees, and that the jail's ordinary practice instead was to release critically ill detainees. A jury could therefore conclude that Corley, like Green, failed to take prompt action to save Rhonda's life because he knew the County was working to release her pursuant to its usual practice.

It makes no sense the Corley would order an urgent blood test for a patient that he knew suffered from a life-threatening chronic condition, then do nothing to follow up. It is a far more reasonable inference that both Corley and Green were aware of the results, but intentionally failed to follow up because they anticipated Rhonda's release. This also explains Green's administration of medication that was potentially lethal to a patient in Rhonda's condition, including the illegal administration of a narcotic without a written prescription, as well as the sleep-inducing antihistamine Phenergan. The obvious conclusion is that Green and Corley desired to prevent Rhonda from continuing to call out for help and wanted to keep her quiet until the jail released her. Administering a narcotic without a written prescription is not only unlawful and highly suspicious, but it is consistent with the conclusion that Corley and Green were well aware that they were intentionally treating Rhonda incorrectly. Of course illegally administering a narcotic is by definition incorrect treatment. At the very least it should be deemed "conduct that clearly evinces a wanton disregard for any serious medical needs." *See Johnson v. Treen*, 759 F.2d 1236, 1238-36 (5th Cir. 1985): *see also Easter*, 467 F.3d at 465.

Corley and Green's failure to maintain appropriate documentation is an obvious pattern. There exists no written treatment plan for Rhonda. No documentation exists that any attempt was made to obtain Rhonda's medical records. There is no documentation of Rhonda refusing treatment. There is no prescription for the narcotic Green administered. And of course, Corley and Green's text messages are not preserved. Clearly this is not how medical professionals should behave. Green was formally told this when his license was suspended for failure to maintain records regarding Rhonda's care. The failure of Defendants to maintain records regarding these events that should have been maintained is yet another reason to question the Defendants' credibility. A factfinder could conclude that their failure to maintain records was intentional, and done for the purpose of allowing them to fabricate events after the fact. A jury should be allowed to determine whether Corley and Green's accounts are credible. Upon concluding they are not, a jury could properly determine that they have fabricated events in an attempt to conceal their deliberate indifference to Rhonda Newsome's serious medical needs, and the share responsibility for Rhonda's death with the County and Jailer-Defendants.

B.    Fact issues also exist regarding the deliberate indifference of the County and its jailers.

1.    The Jailer-Defendants.

It is well settled law that ignoring a detainee's cries for medical assistance and failing to promptly provide medical assistance or to call for necessary emergency aid when a detainee faces a known, serious medical emergency constitutes unconstitutional conduct. *Sims v. Griffin*, 35 F.4th 945, 951-52 (5th Cir. 2022) (citing, *inter alia*, *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (per curiam)); *see also Allen v. Hays*, 65 F.4th 736, 748 (5th Cir. 2023) (citing *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021), *cert denied*, —— U.S. ——, 142 S.Ct. 2573 (2022)). Likewise, it is clearly established that delaying treatment for non-medical reasons is unconstitutional. *See Spikes*, 8 F.4th 436 & n.30; *Delaughter*, 909 F.3d at 138 n.7; *Hanna*, 95 F. App'x at 532.

There can be no dispute that Rhonda was suffering from a serious medical emergency in the last hours of her life, and that none of the jailers provided assistance or called for emergency aid. The jailers instead waited until Rhonda was lifeless before calling EMS; i.e., not breathing and no pulse. (ROA.2429, 3060-3061, 3224 [6]) Video evidence shows that Jailers Carpenter and Pierson observed Newsome motionless in her cell at least five minutes before Wickersham finally entered the cell to check Rhonda's pulse. (ROA.3224 [6]) Even then, after

confirming that Rhonda was not breathing and had no pulse, neither Wickersham, Carpenter, Hughes, nor Pierson immediately called EMS. Instead, Wickersham inexplicably called Nurse Green, and not one of the four even attempted resuscitation. (*See* ROA.2499, 3061, 3224 [6])

Thus, there is ample evidence that the jailers' failed to respond to Rhonda's medical crisis. Any evidence tending to show that the Defendant-Jailers knew of Rhonda's serious condition before finally entering her cell to confirm that she was not breathing and had no pulse is sufficient to raise issues of fact as to their deliberate indifference. Any serious consideration of the record compels the conclusion that the evidence easily raises fact issues as to the jailers' knowledge of Rhonda's grave condition well before Wickersham finally entered the cell to confirm that Rhonda was nonresponsive.

Plaintiffs presented volumes of both direct and circumstantial evidence of the jailers' knowledge, including firsthand observations by fact witnesses; expert testimony; medical records; and video evidence. Separately or cumulatively, Plaintiffs' evidence raises fact issues as to each jailer's knowledge of Rhonda's emergency condition in the days and hours prior to her death. As discussed more fully in Appellants' main brief, this evidence includes the following:

1.   **<u>Detainee Testimony</u>** – Fellow detainees testified that Rhonda cried out for help over the course of 17 hours and pleaded to see a doctor and to be taken to a

hospital. (ROA.3651-3654, 3616) If detainees locked in cells all around the intake/control area could hear Rhonda's cries, it is more than a reasonable inference that jailers working in the area and directly observing her also heard her cries, but chose to ignore them. Moreover, the jailers admit that they had no trouble hearing Rhonda when she called out from inside her cell. (*E.g.*, ROA.2498)

Additionally, the trustee attending Rhonda's cell testified that Rhonda was vomiting a black substance, which quite obviously was blood. (ROA.3653) This is confirmed by Plaintiffs' experts and Rhonda's cellmates. (ROA.3495, 3615, 3617) It is also a reasonable inference that jailers entering Rhonda's cell observed the same thing as the trustee observed, and the same thing that Rhonda's cellmates had reported, i.e., Rhonda was throwing up blood. Additionally, as Green concedes in his brief, Rhonda was placed on medical watch for the very purpose of having the jailers provide her with assistance in Green's absence. (Green Brief at 7) From this alone the jailers knew Rhonda was extremely ill and potentially in need of emergency assistance during the hours prior to her death.

The foregoing evidence by itself raises fact issues as to the jailers' knowledge. The district court erred in accepting the jailer's controverted testimony as true that they did not hear Rhonda crying out for help. *Fairchild v. Coryell Cty.*, 40 F.4th 359, 363 (5th Cir. 2022) (district court should not "automatically accept [the defendants'] testimony about what happened.").

2.    **<u>Video evidence</u>** – Jail video shows that Rhonda's condition deteriorated so obviously that she went from being fully ambulatory to being unable to stand or walk by herself. (ROA.3224 [1, 3, 6]; ROA.3429, 3432) Video shows her being placed in her cell by wheelchair around midnight. (ROA.3224 [1]) When she is taken for a shower two hours later, her weight must be supported by the jailers. (ROA.3224 [3]) This is confirmed by a trustee who testified that Rhonda was unable to walk to the shower by herself. (ROA.3653) By the afternoon of the next day, Rhonda's condition had continued to deteriorate to the point that she was unable even to reach the toilet in her cell without assistance, and fell and vomited when assisted. (ROA.3429, 3432) The Jailer-Defendants' denials of knowledge are controverted by both the video evidence and the trustee.

3.    **Medical Evidence** – When Sergeant Jones took Rhonda's blood pressure at 2:00 a.m., she obtained an extremely low reading of 80/40. (ROA.3653) Even a lay person would know such low pressure is alarming. When combined with Rhonda's cries to be taken to a hospital, her vomiting blood, her inability to stand or walk, and the jailers' knowledge of Rhonda's otherwise poor health, including Addison's disease, any rational adult who is not attempting to avoid legal liability would immediately recognize that Rhonda needed emergency medical treatment hours before she was found unresponsive. This too controverts the Jailer-Defendants' testimony.

4.   **Circumstantial Evidence** – The close proximity between the Jailer-Defendants' observation of Rhonda and her death is further evidence that her serious condition was apparent to each jailer who observed her. *See Dyer v. Houston*, 964 F.3d 374, 382 (5th Cir. 2020) ("A reasonable jury could find that Graham's injuries—from which Graham would die within roughly 24 hours—were so severe, and their cause so plainly evident to the Officers, that the Officers acted with deliberate indifference by failing to seek medical attention . . . ."). It is a reasonable inference that Rhonda would have appeared gravely ill and in great distress during her final hours, as she experienced vomiting, hypotension, the inability to ambulate, terrible pain, and stark terror from being trapped without any means of obtaining emergency medical assistance. On the other hand, it is a thoroughly unreasonable inference that Rhonda would have exhibited little or no visible signs of her gravely ill condition, which would take her life in less than 24 hours.

In summary, under the view of the evidence most favorable to Plaintiff, each of the Jailer-Defendants knew Rhonda was extremely ill; throwing up blood; unable to stand or walk on her own; experience alarmingly low blood pressure; and crying out in pain and pleading for medical assistance for hours. Notwithstanding this knowledge, each of the jailers ignored Rhonda's pleas and failed to provide or obtain emergency medical assistance. This is evidence from which a factfinder can easily conclude that the Jailer-Defendants were deliberately indifferent to Rhonda's serious

medical needs. *Sims*, 35 F.4th at 951-52; *Easter*, 467 F.3d at 465. The self-serving testimony of the Jailer-Defendants that Rhonda was responsive can be readily rejected by a jury, and is clearly controverted by Plaintiffs' summary judgment evidence. *See Fairchild*, 40 F.4th at 363. Furthermore, it is no response that Green claims to have visited Rhonda around midnight. As previously discussed, Green's phantom midnight visit is disputed, as is his claim that he treated Rhonda with fluids.

2.      The County.

Anderson County decries Plaintiffs' lack of "pattern evidence" as if this is the only means by which a plaintiff can establish a *Monell* claim. It is not. Pattern evidence is circumstantial evidence tending to demonstrate that county policymakers were aware of and approved of practices undertaken by the county's employees. As discussed in Appellants' main brief, pattern evidence is unnecessary when, as here, there exists direct evidence of the county's policy. Here, the individual responsible for implementing the Sheriff's policy of limiting detainee hospitalizations, Captain Choate, admitted to its existence. Choate explained that the jail would routinely seek to release detainees on their own recognizance rather than incurring the expense of providing hospital security, and this is why he personally called the district attorney to seek Rhonda's release. (ROA.2923, 3462) This is the same type of evidence this Court deemed to be sufficient evidence of policy in *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 792-93 (5th Cir. 2020) (*Young Cnty. II*).

Additionally, Green also admitted in his conversation with Jailer Jacob Mobley that the Sheriff restricted detainee hospitalizations because of the expense and that this was the real reason he did not send Rhonda to the hospital. (ROA.3091) Consequently, jail employees Choate, Green, and Mobley all agree that there exists a county policy of restricting detainee hospitalizations. Consistent evidence obtained from jail employees in another means of proving policy. *Young Cnty. II*, 956 F.3d at 794 (citing *Montano v. Orange County*, 842 F.3d 865 (5th Cir. 2016)).

Furthermore, circumstantial evidence of a policy is limited to pattern evidence. The consistent conduct of multiple employees and the failure of the county to discipline employees also constitutes circumstantial evidence of policy. "[P]olicymakers failing to take corrective action after their subordinates violate the constitution is some evidence that they know about an unconstitutional custom.". *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 510 & n.56 (5th Cir. 2022) (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985)); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 580 n.18 (5th Cir. 2001); *Young Cnty. II*, 956 F.3d at 793. This is so because "[w]hen the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy;" a jury may properly conclude that the complained-of practices were "accepted as the

way things are done and have been done in" that jurisdiction. *Young Cnty.*, 956 F.3d at 793 (citing *Piotrowski*, 237 F.3d at 578 n.18; *Grandstaff*, 767 F.2d at 171).

As discussed in Appellants' main brief, each of these alternative methods for demonstrating county policy apply here. Thus, the lack of pattern evidence is by no means fatal to Plaintiffs' *Monell* claim.

Anderson County fails to address Plaintiffs' conditions of confinement claim, dismissing it as not raised below. The County proceeds under the erroneous assumption that Plaintiffs were required to plead the legal theories underpinning their *Monell* claims. Plaintiffs were not required to do so. Plaintiffs were required only to plead *facts* underpinning their legal theories. In *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014), the Supreme Court, in a per curiam opinion, reiterated the well-established principle that federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.". In that case the district court had granted summary judgment for failure to invoke section 1983, and the Fifth Circuit affirmed. *Id*. at 10-11. In reversing, the high court held that the plaintiffs' failure to invoke section 1983 in their complaint would not support the grant of summary judgment. *Id*. at 10. The court noted that the plaintiffs had pleaded "simply, concisely, and directly events that . . . entitled them to damages from" the municipality. *Id*. at 11. "Having informed the [municipality] of the factual basis for their complaint, they were required to do no

more to stave off threshold dismissal for want of an adequate statement of their claim." *Id*. In that connection, courts may not apply a heightened pleading standard to *Monell* claims. *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 284 (5th Cir. 2020) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.")). Even if the district court had concluded that the plaintiffs' complaint was deficient in this regard, the appropriate remedy would be to allow the plaintiffs to amend their complaint, not to grant summary judgment based on the plaintiffs' failure to invoke the legal theory underpinning their *Monell* claims. *See City of Shelby*, 574 U.S. at 11 ("For clarification and to ward off further insistence on a punctiliously stated 'theory of the pleadings,' petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to § 1983." (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1219, at 277–278 (3d ed. 2004) ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief."), and Fed. Rule Civ. Proc. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.")).

Additionally, the same facts may support both an episodic claim and a conditions of confinement claim. *See Sanchez v. Young Cnty., Texas*, 866 F.3d 274, 279 & n.3 (5th Cir. 2017) (*Young Cnty. I*) ("Plaintiffs' § 1983 case invokes

alternative theories for the County's liability for the death of Mrs. Simpson: the unconstitutional "conditions of confinement" at the Young County Jail, or the "episodic acts and omissions" of jailers."). This is the case here. As stated in Appellants' main brief, the jail's conditions restricting detainee hospitalization apply to all detainees needing hospitalization and are therefore pervasive general conditions and practices applied to pretrial detainees. Therefore these facts properly raise a conditions of confinement claim. *See Young Cnty. II*, 956 F.3d at 791; *see also Bell*, 441 U.S. at 535, 99 S.Ct. 1861; *Hare v. City of Corinth*, 74 F.3d 633, 644-45 (5th Cir. 1996) (en banc). The County's policy of delaying constitutionally required medical care clearly is not reasonably related to any legitimate government objective. Therefore, it constitutes impermissible punishment.

Plaintiffs, moreover, are not required to present evidence of deliberate indifference in support of their conditions of confinement claims. "The 'unconstitutional conditions' theory rests on the idea that the County has imposed what amounts to punishment in advance of trial on pretrial detainees, and it requires no showing of specific intent on the part of the County." *Young Cnty. I*, 866 F.3d at 279. The elements of a conditions of confinement claim are "a condition—a 'rule,' a 'restriction,' an 'identifiable intended condition or practice,' or 'sufficiently extended or pervasive' 'acts or omissions' of jail officials—that is not reasonably related to a legitimate government objective and that caused the constitutional

violation." *Young Cnty. II*, 956 F.3d at 791. Consequently, a showing of deliberate indifference is not required. *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 454-55 (5th Cir. 2009); *see also Bell v. Wolfish*, 441 U.S. 520, 538 (1979) (noting "a showing of an expressed intent to punish on the part of detention facility officials" is not required because "that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it") (cleaned up); *Young Cnty. I*, 866 F.3d at 279 ("The 'unconstitutional conditions' theory rests on the idea that the County has imposed what amounts to punishment in advance of trial on pretrial detainees, and it requires no showing of specific intent on the part of the County."); *Hare*, 74 F.3d at 644-45 ("[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices."). In requiring Plaintiffs to present evidence of deliberate indifference, the Court thus held Plaintiffs to a higher standard than required to raise fact questions in support of their conditions claims.

It was the County's burden on summary judgment to conclusively demonstrate that Plaintiffs could not establish *Monell* liability. Additionally, as determined in *Young Cnty. I*, it was the duty of the district court to consider a conditions-of-confinement theory raised by the evidence. 866 F.3d at 279, 281

(remanding for consideration of conditions of confinement theory raised by the evidence). Because Plaintiffs' evidence raises fact issues as to both episodic and conditions of confinement theories, Anderson County has failed to demonstrate that it is entitled to summary judgment, and the District Court's failure to consider a conditions of confinement theory was error.

C.    The constitutional violations of the individual defendants are clearly established.

It has been clearly established long before the events at issue that a custodial or medical officer acts with deliberate indifference to a detainee's serious medical needs if the officer refuses treatment, ignores the detainee's complaints, intentionally treats him incorrectly, or engages in any similar conduct that clearly evinces a wanton disregard for any serious medical needs. *Sims*, 35 F.4th at 951 (citing, *inter alia*, *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (per curiam)); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

*Sims* presents remarkably similar facts to the conduct of the Jailer-Defendants in the present case. As here, the summary judgment evidence in *Sims* showed that the detainee was sick and vomiting, and cried out for medical assistance throughout the night. Various jailers either ignored the detainee altogether or made perfunctory observations which wholly failed to address the detainee's serious medical needs. The result was that the detainee was found dead in his cell the next morning. This

Court held that the *Easter* decision in 2006,[3] holding that officers act with deliberate indifference to a detainee's serious medical needs by refusing treatment, ignoring the detainee's complaints, intentionally treating him incorrectly, or engaging in any similar conduct, provided fair notice to the defendants that their conduct was unconstitutional. *Sims*, 35 F.4th at 951. It likewise provides fair notice to Defendants here. To be clear, Appellants do not cite *Sims* as establishing new law, but only to demonstrate how this Circuit has applied clearly established law.

Furthermore, as discussed *supra*, Fifth Circuit precedent clearly establishes that delays in treatment, marked by plainly unresponsive care of the type provided by Green and Corley, rise to the level of deliberate indifference. *See Spikes*, 8 F.4th at 436 n.32, 438 & n.36; *Galvan*, 719 F. App'x at 374–75; *Rodrigue*, 557 F. App'x at 342, 346; *Austin*, 328 F.3d at 210; *Harris*, 198 F.3d at 159–60; *Ledesma*, 1997 WL 811746, at *1.

In light of the foregoing, Corley and Green had fair warning that their failure to treat Rhonda's Addison's disease and their failure to provide life-saving emergency assistance in response to her deadly Addisonian crisis and critical lab results violated Rhonda Newsome's constitutional right that her serious medical needs must not be met with deliberate indifference. Accordingly, neither the Medical Defendants nor Jailer Defendants are entitled to qualified immunity.

---

[3] *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006).

D.    The district court erred in denying leave to amend.

When a court denies leave to amend for futility of amendment, this Court's analysis mimics that of a motion to dismiss. *Ariyan, Inc. v. Sewage & Water Bd. of New Orleans*, 29 F.4th 226, 229 (5th Cir. 2022). "If the complaint, as amended, would be subject to dismissal, then amendment is futile and the district court was within its discretion to deny leave to amend." *Id*. This Court's review is *de novo*. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016).

The facts alleged in Plaintiffs' proffered third amended complaint, which Plaintiffs supported with summary judgment evidence, were more than sufficient to withstand a motion to dismiss. The amendment explains the reasons for Defendants' failure to provide emergency aid to Rhonda by specifically pleading the fact that Anderson County jail officials routinely attempt to release rather than treat critically ill detainees, as admitted by Captain Choate.

Nonetheless, no amendment should have been required. There exists no heightened pleading standard for Section 1983 claims which requires the plaintiff to plead all evidentiary facts with specificity. *E.g., Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023). Defendants' failure to respond to Rhonda's serious medical needs would be unconstitutional regardless of their motivation. Captain Choate's admission that the jail always seeks to release detainees in need of hospitalization merely explains Defendants' motivation for the delay, and refutes Defendants'

assertions that they did not know Rhonda needed to be hospitalized and did not fail to respond to her serious medical needs. Consequently, it should not have been necessary for Plaintiffs to plead these additional facts obtained during discovery to rely on them in Plaintiffs' summary judgment response supporting Plaintiffs' claim that Defendants failed to respond Rhonda Newsome's serious medical needs. Additionally, the fact that all Defendants behaved in the same way, i.e., delaying responding to Rhonda's emergency condition, is evidence that the delay was a product of County policy. Choate's admission merely confirmed what Plaintiffs had already alleged.

Nonetheless, Plaintiffs proffered the amendment in an effort to avoid any dispute as to whether the evidence was within the scope of Plaintiffs' pleading. If it were not already clear, the amendment further pleaded facts which clearly gave rise to a conditions of confinement theory. Plaintiffs timely proffered their amended complaint, and the addition of facts concerning the jail's PR bond policy could not have been a surprise to Defendants since they briefed these facts in their summary judgment motions. Because Plaintiffs' amended complaint was timely, did not present unfair surprise, and was not futile, the district court abused its discretion in denying leave to amend. As in *Sanchez v. Young County*, Plaintiffs should be permitted on remand to plead additional county policies which invoke both episodic and conditions of confinement theories. *See Young Cnty. I*, 866 F.3d at 279, 281

(remanding for consideration of conditions of confinement theory raised by facts but not addressed by district court); *Young Cnty. II*, 956 F.3d at 789-96) (noting amendment on remand pleading multiple policies and concluding that policies interacted to raise viable conditions of confinement claim).

The argument by the Medical Defendants that Appellants in some manner waived the district court's error as to them makes little sense. A claim of error on appeal is directed to an error of the district court, not that of a party. Appellants' brief appropriately addresses why the district court erred in denying leave to amend. Nothing further is required. There is no briefing waiver, at least by Appellants.

E.     The Defendants' evidentiary objections lack merit.

1.     Defendants' evidentiary objections should be deemed waived for insufficient briefing.

Defendants assert various evidentiary objections to portions of Plaintiffs' summary judgment evidence. Defendants do not address any rulings on their objections. Although the Court did not rule on all of Defendants' objections on the merits, it did deny all objections not specifically ruled on as moot. (ROA.4206) Other objections, discussed below, the court denied on the merits.

Defendants' objections should not be considered because Appellees have made no effort to brief each of their evidentiary objections, and in particular they fail to demonstrate, or even address, how sustaining any objection would alter the outcome on appeal. *Accord U.S. v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) ("A

party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it.").

Anderson County and the Jailer-Defendants provide no briefing whatsoever on their objections on appeal, but merely refer to their objections globally in a footnote. (Anderson County Brief at 42, n. 3) This is insufficient to provide either this Court or Appellants with any basis to explain how its objections below are potentially relevant to the issues on appeal. It is also an improper attempt by these appellees to avoid the word limit for their brief by seeking to have the Court review additional briefing below that is not included in their brief on appeal.

Corley does little more. Like Anderson County, he references his evidentiary objections globally in a single footnote (Corley Brief at 21, n. 2), then generally complains of hearsay without identifying the alleged hearsay or offering any argument as to why any of the objections would be determinative of any issue on appeal.

Green provides slightly more argument concerning his objections (Green Brief at 34-36), but again does not attempt to argue how the objections are potentially dispositive as to any issue on appeal. The Defendants' credibility alone raises issues of fact for trial. "Summary judgment is not appropriate when questions about the credibility of key witnesses loom . . . and the evidence could permit the trier-of-fact to treat their testimony with skeptical scrutiny." *Pena*, 2020 WL 3053964 at *6 n.

11 (quoting *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (internal quotation and citation omitted), and citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("Summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses.")); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155-51 (2000). Because the Defendants' credibility and the balance of the evidence to which Defendants did not object raise issues of fact which defeat summary judgment, Defendants' evidentiary objections are a red herring that have not been shown to effect the outcome on appeal. This Court has no reason to address periphery issues that are not dispositive on appeal.

In the event this Court chooses to address Defendants' evidentiary objections, Appellants respond further below.

2.    Plaintiffs properly relied on expert testimony.

Green's argument that expert testimony is prohibited by *Carswell* is nonsensical. *Carswell* requires that the district court rule on any motion to dismiss asserting qualified immunity before allowing discovery. *Carswell*, 54 F.4th at 311. This rule has no application to summary judgment motions. There exists no federal rule or caselaw, nor any court order in this case, which prohibits Plaintiffs from relying on expert testimony in response to the defendants' several summary judgment motions. Indeed, had Plaintiffs not obtained expert testimony, the medical

defendants would no doubt have claimed that Plaintiffs had no competent evidence to controvert Corley and Green's self-serving testimony as to what they claim was their medical judgment. Plaintiffs' expert testimony confirms that Green and Corley were not exercising medical judgment in failing to provide any care or treatment for Rhonda's Addison's disease. They also opine that Green did not administer fluids during the night of the 14th as he claimed, and that Corley and Green's decision to drug Rhonda during the morning of the 15th, rather than obtain emergency treatment for her Addisonian crisis, was gravely injurious to Rhonda's health and likely hastened her death. The same is true with regard to Green and Corley's failure to act on the critical values reported to Green on the morning of the 15th and likely relayed by Green to Corley. Additionally, Plaintiffs' experts opine that Corley and Green's conduct was actually illegal because Corley effectively allowed Green to practice medicine without a license, including illegally administering a narcotic to Rhonda without a written prescription. And finally, they opine that Rhonda's death was completely preventable. These are all important issues that are appropriately matters of expert opinion and raise fact issues as to Defendants' deliberate indifference to Rhonda Newsome's serious medical needs.

Nor are Defendants' hearsay objections to Plaintiffs' expert testimony well taken. *See, e.g., Soden v. Freightliner Corp.*, 714 F.2d 498, 502-03 (5th Cir. 1983). Plaintiffs' experts clearly rely on material, such as Rhonda Newsome's jail medical

records, witness statements of her condition, and video evidence, which is of the type the medical professionals would ordinarily rely upon.

Defendants form objections are likewise unavailing. Pursuant to Rule 56, as amended in 2010, material relied on for summary judgment purposes need not be presented in admissible form, provided the substance or content of the evidence can be reduced to admissible form at trial. *See, e.g., Lee v. Offshore Logistical and Transport*, L.L.C., 859 F.3d 353, 354-55 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c)(1) & Advisory Comm. Note (2010)); *see also Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3rd Cir. 2016). The *Fraternal Order of Police* decision specifically addresses hearsay evidence in the context of what is "capable of being admissible at trial." The court concluded, "Here, Plaintiffs identified the third-party declarants, and nothing suggests that those declarants would be unavailable to testify at trial. That is all that was required to survive that aspect of Defendants' motion for summary judgment." 842 F.3d at 238. Appellees do not suggest that Plaintiffs' experts would be unavailable at trial. The same evidence as set forth in the experts' reports can easily be reduced to admissible form merely by having the individuals testify live at trial, as Plaintiffs intend to do.

Notwithstanding the foregoing, as discussed *infra*, Plaintiffs did in fact submit sworn declarations for both experts properly authenticating their reports and opinions. (ROA.3612-3613 [Osborne]; ROA.3636-3636 [Sands])

3.     The District Court correctly overruled Defendants' objections to the detainee affidavits and Green's statements to Ranger Baggett.

Although not referenced in Defendants' briefing, the District Court did expressly overrule Defendants' objections to the affidavits of detainees Lyons, Sweet, Jimenez, and Schuckers. (ROA.4160) The court correctly determined that personal knowledge can be inferred from the affidavits themselves. (ROA.4160 [citing *Campbell v. PBL*, 744 F. App'x 192, 198 (5th Cir. 2018)]). Clearly this is correct, as each affidavit describes what the detainee personally observed. Defendants fail to provide any briefing to explain how the court's ruling was incorrect.

The district court also correctly overruled objections to Green's statements to the Ranger Baggett because they are statements of a party opponent. (ROA.4163 [citing Fed. R. Evd. 801(d)(2)]) Again, Defendants do not address the court's ruling.

4.     Plaintiffs' responded to Defendants' objections below and demonstrated they were without merit.

(a)     *Response to Corley's evidentiary objections.*

Plaintiffs response to Corley's objections is contained in a surreply at ROA.3854, which states in substance the following.

Both the report of Linda M. Osborne, Ph. D. (Osborne) and the report of Michael Sands, D.O., (Sands) are accompanied with sworn declarations that the reports are of their own preparation. (ROA.3612-3613 [Osborne]; ROA.3636-3636

[Sands]) "For purposes of Federal Rule of Civil Procedure 56(c)(4) there is no meaningful distinction between an expert report accompanied by a sworn declaration and an expert report that is itself sworn." *Am. Fed'n of Musicians of U.S. & Can. v. Paramount Pictures Corp*., 903 F.3d 968, 976-977 (9th Cir. 2018). As to the authenticity of the reports of Osborne and Sands the accompanying sworn declarations meet the authentication requirement under Fed. R. Evd. 902(8) pursuant to 28 U.S.C. § 1746.

As to Defendants' contention that the reports in Plaintiffs are outside the scope of discovery, Plaintiffs contend that there is nothing in the Court's Orders that prohibited expert disclosure and always have been obligated to disclose any expert testimony that Plaintiffs intend to use.

Additionally, Defendants objections fail to identify the portions of the reports that they contend contain hearsay and hearsay within hearsay with enough specificity for Plaintiffs to respond.

(b)    *Response to Green's evidentiary objections*.

Plaintiffs response to Green's objections is contained in a surreply at ROA.3740-3742, which states in substance the following.

**1. Plaintiffs' Exhibit C [Transcript of Recordings of Witnesses made to Ranger Baggett] –** As noted in the Sworn Declaration of Charles W. Nichols (ROA.2728-2729), Exhibit C (ROA.2855-2974) contains computerized transcripts of audio

recordings produced to Plaintiffs by the Anderson County Defendants of Texas Ranger interviews with Defendants Green and Choate and Wesley Wood. The computerized transcripts were done via an online service named Rev.com. Plaintiffs offered these as an *aide* to the Court to use in conjunction with Plaintiffs' Exhibit L, discussed below.

**2. Plaintiffs' Exhibit L [Audio Recordings of Witnesses made to Ranger Baggett]** – As noted in the Sworn Declaration of Charles W. Nichols (ROA. 2728-2729), Exhibit L (ROA.3082) contains audio recordings produced to the Plaintiffs by the Anderson County Defendants as the result of Deposition on written question to the Texas Department of Public Safety regarding documents held by them in the investigation of the custodial death of Rhonda Newsome on June 15, 2018. (ROA.2729) Included with Plaintiffs' summary judgment response is the sworn answers of Texas Ranger Christopher Baggett in response to the deposition that fulfills the requirements as to an exception to the hearsay rule under Federal Rules of Evidence 803(6). (ROA.2762-2763 [Ex. B, AC0006-AC0007]) Plaintiffs need only to show that the evidence can be presented in admissible form at trial for purposes of the Court's consideration. *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc*., 790 F.3d 532, 539-539 (4th Cir. 2015); *see also Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). The use of the sworn answers of

Texas Ranger Christopher Baggett referred to above and/or actual testimony of Texas Ranger Christopher Baggett would make Exhibit L admissible at trial.

**3. Plaintiffs' Exhibit T [Summary of Telephone Records]** - As noted in the Sworn Declaration of Charles W. Nichols (ROA.2728-2729), Exhibit T is a summary prepared by trial counsel's office of the relevant telephone calls and texts referred to in Plaintiffs' response with the times converted from UTC to CDT and was submitted as an ***aide*** to the Court to use in conjunction with telephone records produced as part of Exhibit B (ROA.2819-2851 [AC0439-AC0471]) To the extent Defendant's objection to Exhibit T is also an objection to Exhibit B (ROA.2756-2854), included with Plaintiffs' summary judgment response is the sworn answers of Texas Ranger Christopher Baggett in response to the deposition that fulfills the requirements as to an exception to the hearsay rule under Fed. R. Evd. 803(6) and as further explained in the Sworn Declaration of Charles W. Nichols (ROA.2728-2729) these documents were obtained via the same deposition of Texas Ranger Christopher Baggett referred to above. (ROA. 2762-2763 [Ex. B, AC0006-AC0007]).

**4. <u>Plaintiffs' Exhibit V [Unverified Interrogatory Responses]</u>** – Defendant Adam Corley submitted objections and responses to interrogatories that Plaintiffs propounded on him on March 12, 2021 and inadvertently failed to verify the responses. Plaintiffs were served with Amended answers to the interrogatories on

May 11, 2021, that were verified.  The verified responses are attached to Plaintiffs

sur-reply marked as a corrected Exhibit V (ROA.3749-3758) Plaintiffs requested

that the district court to substitute the Plaintiffs' original Exhibit V with the

Exhibit V attached to Plaintiffs' surreply.

**5.** **Plaintiffs' Exhibit W [Corley's Admissions used against Green]** – Plaintiffs

withdrew their Exhibit W from their response.

**6.** **Plaintiffs' Exhibit BB [Green's License Suspension]** –As to Defendant's

hearsay objection, the document meets the Public Records exception under Fed. R.

Evd. 803(8).  As to Defendant's authenticity objection, the document is a public

record that may be authenticated by evidence that it was recorded or filed in a public

office authorized by law.  *See* Fed. R. Evd. 901(b)(7).  The Texas Board of Nursing

is a "Public Office," and Exhibit BB clearly contains a certification it is a complete,

accurate, and true copy of the document which is on file with the Texas Board

of Nursing which is signed by the Executive Director of the Board. (ROA.3164-

3174 [Ex. BB, FORD – 001525-34]).

**7. Exhibit DD [Osborne Expert Report]** – Plaintiffs contend that there is nothing

in the Court's Orders that prohibit expert disclosure and have at all times been

obligated to disclose any expert testimony that Plaintiffs intend to use. Defendant

contends that the disclosure has not been properly authenticated because the

declaration accompanying it does not "specifically verify the expert report or the

matters stated therein." (ROA.3677 [Doc. No. 222 at 3 n. 4]). The declaration specifically refers to "Attachment 1" which is the expert report submitted with the disclosure. (ROA.3179, 3183-3191 [Ex. DD, Attachment 1]). Defendant objects that Exhibit DD contains hearsay and hearsay within hearsay in violation of Federal Rules of Evidence 802 without providing the specific portions with sufficiency to allow Plaintiffs to respond.

**8. Exhibit EE [Sands Expert Report]** – Plaintiffs contend that there is nothing in the Court's Orders that prohibit expert disclosure and have at all times been obligated to disclose any expert testimony that Plaintiffs intend to use. Defendant contends that the disclosure has not been properly authenticated because the declaration accompanying it does not "specifically verify the expert report or the matters stated therein." (ROA.3676 [Doc. No. 222 at 3 n. 6]). The declaration specifically refers to "Attachment 1" which is the expert report submitted with the disclosure. (ROA.3203, 3207-3213 [Ex. EE, Attachment 1 - Doc. No. 214-32 at 2 and 7-19]). Defendant objects that Exhibit EE contains hearsay and hearsay within hearsay in violation of Federal Rules of Evidence 802 without providing the specific portions with sufficiency to allow Plaintiffs to respond.

(c)     *Response to County and Jailer-Defendants' evidentiary objections.*

Plaintiffs response to the County and Jailer-Defendants objections is contained in a surreply at ROA.3761-3764, which states in substance the following.

## A. **Plaintiffs' Exhibits E, F, G, H and I (Detainee Affidavits)**

Defendants contend that affiant, Ashely Lyons (Lyons), in Exhibit E does not provide a "factual basis" for her knowledge of the "exact times" she was "incarcerated." (ROA.3421 [Doc. No. 225 at 2]). Lyons provides an estimate of the time she arrived at the jail and it is no doubt within her personal knowledge as the time she arrived, and Defendants' argument is without merit. Defendants further contend that Lyons statement that Ms. Newsome acted "as if in pain" is made with no factual basis to support it is also without merit. Lyons states that Ms. Newsome was "moaning and groaning" and simply states her perception of what she heard. (ROA.3428 [Ex. E, Affidavit of Ashley Lyons]).

Defendants contend that the affiant, Charles Sweet (Sweet), in Ex. F (ROA.3429) provides no factual basis for the times included in his affidavit. (ROA.3722 [Doc. No. 225 at 3]). Again, Defendants' contention is based on their conclusion that he could not know what time it was because he was incarcerated. *Id*. Just because someone is incarcerated in no way shows that they are unable to know what day or what time an incident occurred, and Defendants' argument thus lacks merit.

Defendants contend that the affiant, Edward Jimenez, in Ex. G (ROA.3430) provides no factual basis of how he knew the times stated in his affidavit. (ROA.3722 [Doc. No. 225 at 3]). Again, Defendants' contention is based on their

conclusion that he could not know what time it was because he was incarcerated. *Id*. Just because someone is incarcerated in no way shows that they are unable to know what day or what time an incident occurred, and Defendants' argument thus lacks merit. Defendants contend that Jimenez provides no factual basis for his knowledge that Ms. Newsome was in the cell next to him and that it was her cries and screams for help that he heard. *Id*. Personal knowledge and competence may be inferred from the contents of affidavits themselves. *Barthelemy v. Air Lines Pilots Ass'n*, 987 F.2d 999, 1018 (9th Cir. 1990). It can be inferred from Jimenez's affidavit, Ex. G, that from being next to Ms. Newsome's cell he learned her identity and he certainly can testify as to what he heard and where it was coming from. Defendants' arguments as to these points also lack merit.

Defendants contend that the affidavit of affiant, Jacob Mobley (Mobley) (ROA.3431 [Ex. H]), contains hearsay within hearsay and that could not be within his personal knowledge. The statements in Mobley's affidavit are by definition not hearsay under Fed. R. Evd. 801(d)(2)(D). The statement was a statement of Defendant Green who was at the time the statement was made was an employee of Defendants Anderson County, Texas, and Greg Taylor on a matter within the scope of Defendant Green's relationship with Anderson County and Taylor. (*See* ROA.2975 [Ex. D, Green W-2 Statement from Anderson County])

Defendants contend that the affidavit of affiant, Kelli Schuckers (Schuckers), Ex. I (ROA.3432) contains "hearsay within hearsay, conclusory statements and statements not within Ms. Schuckers personal knowledge." (ROA.3722 [Doc. 225 at 3]). Defendants contend that Schuckers provides no factual basis of how she knew the times stated in her affidavit. *Id*. Again, Defendants' contention is based on their conclusion that he could not know what time it was because he was incarcerated. *Id*. Just because someone is incarcerated in no way shows that they are unable to know what day or what time an incident occurred, and Defendants' argument thus lacks merit. Defendants contend that Schuckers provides no factual basis for her knowledge that Ms. Newsome was in the processing area for "medical observation.". *Id*. Personal knowledge and competence may be inferred from the contents of affidavits themselves and from the affiant's participation in the matters asserted in the affidavit. *Barthelemy v. Air Lines Pilots Ass'n*, 987 F.2d 999, 1018 (9th Cir. 1990). Clearly Ms. Schuckers' knowledge that Ms. Newsome was on "medical observation" from the contents of the affidavit and her participation in the matters asserted therein. Ex. I. Schuckers' affidavit provides plenty of detail about her involvement in the events that occurred in her affidavit. *Id*. Defendants contend that since Ms. Schuckers does not identify the person who assigned her to help care for Ms. Newsome, that her statement is hearsay. (ROA.3422-3723 [Doc. No. 225 at 3-4]). This argument is completely without merit. Defendants' argument

amounts to asserting that a Wal-Mart employee can't say that they were cleaning up aisle 2 because they have not identified the person that called over the intercom for the "cleanup on aisle 2. Defendants contend that Schuckers provides no factual basis for her assertion the Ms. Newsome "had to be assisted as she was unable to walk on her own" or that she was throwing up in a cup. (ROA.3723 [Doc. No. 225 at 4]). The contents of Schuckers' affidavit clearly show that she was very involved in the events described in her affidavit and is able to testify about her personal observations. See *Barthelemy*, 987 F.2d at 1018. Defendants contend that Schuckers' statement that Defendant Jones "hollered out that Ms. Newsome's blood pressure was "80/40" are inadmissible hearsay and hearsay within hearsay. Schuckers' statement is not hearsay because it is a statement that is offered against an opposing party and was made by the party in an individual or representative capacity. Federal Rules of Evidence 801(d)(2)(A).

## B. <u>Plaintiffs' Exhibit M (Series of letters written from Ms. Newsome to her mother)</u>

Not at issue on appeal.

## C. <u>Plaintiffs' Exhibit R (summary of telephone calls)</u>

As noted in the Sworn Declaration of Charles W. Nichols (ROA.3254-3255), Exhibit R (ROA.3539) is a summary prepared by trial counsel's office of the relevant telephone calls and texts referred to in Plaintiffs' response with the times

converted from UTC to CDT and was submitted as an **aide** to the Court to use in conjunction with Exhibit B (ROA.2819-2851 [AC0439-AC0471])

**D.  Plaintiffs' Exhibit U (Schuckers witness statement)**

Plaintiffs' Ex. U is a written witness statement of Kelli Schuckers that can be authenticated by her identification of her own writing that contains a highlighted statement that is not hearsay because it is a statement that is offered against an opposing party and was made by the party in an individual or representative capacity.  Federal Rules of Evidence 801(d)(2)(A).

**E.  Plaintiffs' Exhibits J, P, and V ( h i g h l i g h t e d   t r a n s c r i p t s )**

Exhibit J (ROA.3433-3453) is a highlighted transcript of Defendant Taylor that Plaintiffs inadvertently failed to cite at page 15 of their summary judgment response, which should cite to Ex. J, Taylor Dep. 12:14-18 at the end of the first full paragraph.  Exhibit P (ROA.3527-3528) is a highlighted written statement of Defendant Hughes that Plaintiffs intended to cite as Ex. P, AC0275 on page 13 of their response at the end of the last paragraph.  Plaintiffs requested that the district court consider this admissible evidence pursuant to  Fed. R. Civ. P. 56(c)(3).

Ex. V (ROA.3577) is cited in Plaintiffs' response in the table at the beginning of page 11 of their summary judgment response.

Based on the forgoing, Defendants objections lack merit. Summaries are supported by the records they summarize; all evidence is properly authenticated; and

any hearsay is subject to an exception. Accordingly, Defendants' objections do not alter either Appellants' argument or the outcome of the appeal.

## CONCLUSION

To the extent not addressed herein, Appellants believe that Appellees' arguments were anticipated and sufficiently addressed in Appellants' main brief, and therefore need not be addressed further. Appellants pray that the district court's rulings be reversed and the case remanded for further proceedings.

Respectfully submitted,

/s/ Bruce K. Thomas
Bruce K. Thomas
State Bar No. 19844300
Law Office of Bruce K. Thomas
12900 Preston Rd., Suite 590
Dallas, Texas  75230
Phone/Fax:  214/296-9650
bthomas@bthomaslaw.com

Charles W. Nichols
Texas Bar No 14994200
Email:  cnichols@charleswnicholslaw.com
Donald J. Larkin
Texas Bar No 24057702
Email:  donald@charleswnicholslaw.com
617 E. Lacy St.
Palestine, TX 75801
Tel. (903) 729-5104
Fax. (903) 729-0347

**ATTORNEYS FOR PLAINTIFFS-APPELLANTS**

## CERTIFICATE OF SERVICE

I certify that on July 5, 2023, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users:

**Ms. Lee Ina Correa**
**Mr. Robert Scott Davis**
**Mr. James A. Evans III**
**Mr. David Ryan Herring Iglesias**
**Mr. Douglas Edward Markham**
**Ms. Diana Melissa Navarro**
**Mr. Joel Randal Sprott**

*Counsel for Defendants-Appellees*

/s/ Bruce K. Thomas
Bruce K. Thomas

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) as enlarged by the Court's order of June 21, 2023, expanding the word limit to no more than 15,440 words, because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 13,301 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced

typeface using Microsoft Word for Microsoft Office 365 (Version 2205) in Times New Roman 14-point font, and 12-point font for footnotes.

/s/ Bruce K. Thomas
Bruce K. Thomas