# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2024

Lyle W. Cayce
Clerk

————————

No. 22-40559

————————

Amber Ford; Regan Kimbrough; Donald Newsome,

*Plaintiffs—Appellants,*

*versus*

Anderson County, Texas; Taket Holdings, L.L.C.; Adam Corley; Timothy Green; Greg Taylor; Robin Jones; Jonathan Strong; Jessica Carpenter; Alicia Wilson; Matthew Wickersham; Travis Wesson; Dakota Hughes; Todd Choate,

*Defendants—Appellees.*

————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:19-CV-384

————————————————————

Before King, Willett, and Douglas, *Circuit Judges*.

Per Curiam:

Our prior panel opinion, *Ford v. Anderson County*, 90 F.4th 736 (5th Cir. 2024), is WITHDRAWN. The following panel opinion is SUBSTITUTED:

On June 15, 2018, pretrial detainee Rhonda Newsome died in Anderson County Jail due to complications from Addison's disease.

No. 22-40559

Newsome's family members filed a lawsuit under 42 U.S.C. § 1983 against Anderson County, Sheriff Greg Taylor, Dr. Adam Corley, Nurse Timothy Green, and several jailers. Plaintiffs allege that Defendants violated Newsome's Fourteenth Amendment rights as a pretrial detainee by failing to treat her chronic illness, resulting in a preventable death. The district court granted summary judgment for all Defendants and dismissed Plaintiffs' lawsuit with prejudice. After reviewing the record, we find that Plaintiffs have established genuine disputes of material fact regarding whether several Defendants violated Newsome's clearly established constitutional rights. We accordingly REVERSE the district court's grant of summary judgment for Defendants Timothy Green, Todd Choate, Jonathan Strong, Robin Jones, Matthew Wickersham, Jessica Carpenter, and Dakota Hughes, but we AFFIRM the district court's grant of summary judgment for Defendants Alicia Wilson, Travis Wesson, and TAKET Holdings, L.L.C. We AFFIRM IN PART the district court's grant of summary judgment for Adam Corley as related to Plaintiffs' supervisory claim against him, but we REVERSE the district court's grant of summary judgment for Dr. Corley as related to Plaintiffs' nonsupervisory claim. We also AFFIRM IN PART the district court's grant of summary judgment for Defendants Anderson County and Greg Taylor, but we VACATE the district court's denial of Plaintiffs' motion for leave to file a third amended complaint and REMAND with instructions to grant Plaintiffs leave to amend their pleadings to include additional supervisory and municipal liability claims. Finally, we AFFIRM the district court's denial of Plaintiffs' motion for sanctions.

## I.

### A.

This case involves the death of pretrial detainee Rhonda Newsome while in the custody of Anderson County Jail. Newsome had a history of

No. 22-40559

several chronic conditions, including Addison's disease, an uncommon illness that occurs when the adrenal glands do not produce enough of certain hormones. If left untreated, Addison's disease can accelerate into an "Addisonian crisis," which requires immediate medical intervention. Early indicators of an Addisonian crisis may include severe weakness, pain in the lower back or legs, abdominal pain, vomiting, and low blood pressure. Addison's disease requires lifelong treatment, which is primarily accomplished through administering steroid medications. When Addison's disease patients are unmedicated for even brief periods of time, they can be at a high risk of experiencing an Addisonian crisis.

During Newsome's detainment, Anderson County contracted with Dr. Adam Corley, a private physician who provided medical care for detainees. Dr. Corley held the title of medical director of the jail. The County also employed Timothy Green, a registered nurse who worked at the jail part-time.

Anderson County Jail's health services plan states that medical care is to be provided to detainees twenty-four hours a day, and detainees are to be medically screened upon admission. Detainees with chronic illnesses are to undergo a medical assessment, and the jail physician is tasked with instituting a treatment regimen.

**B.**

Unless otherwise noted, the following facts are undisputed. Rhonda Newsome, age fifty, was arrested on March 9, 2018, following a domestic disturbance in which she allegedly chased her adult daughter with a pair of scissors. Newsome was charged with aggravated assault with a deadly weapon. After being treated at Palestine Regional Medical Center for back issues, Newsome was taken to Anderson County Jail on March 10, 2018, for pretrial detention.

No. 22-40559

According to her jail intake form, Newsome suffered from several medical conditions, including Addison's disease, fibromyalgia, seizures, joint or disc disease, spinal stenosis, and osteoarthritis. The form also indicates that Newsome was taking ten prescription medications at the time.

On March 11, Nurse Green examined Newsome. According to Green's deposition testimony, Green and Newsome discussed her medical history and medications, and Green instituted a verbal treatment plan to "continue the medications that [Newsome] was on." Green stated that this verbal treatment plan involved asking the jail staff to monitor Newsome and notifying Dr. Corley of any changes in her condition.

During the months of March, April, and May, Newsome had periodic medical issues. On April 4, Newsome accidentally took an extra dose of blood pressure medication. Nurse Green treated her with a liter of saline solution, placed her on medical observation with repeated blood pressure readings, and reexamined her the next day. Green noted in Newsome's medical activity log on April 5 that he would "attempt to obtain medical records."

On April 16 and April 18, Newsome complained of acid reflux, and jailers provided her with over-the-counter medication. On April 20, Nurse Green personally examined Newsome again and noted low blood pressure and bilateral leg swelling. Newsome was placed on medical observation, in which jailers logged her actions every fifteen minutes. Nurse Green further indicated that he would draw blood and report lab results to Dr. Corley, but it is disputed whether this blood draw occurred.

On May 11, about two months into Newsome's detention, Dr. Corley personally examined Newsome for the first and only time at the jail. Dr. Corley's notes indicate that Newsome was in "no distress" during the examination, and that her "chief complaint" was gas. Dr. Corley

No. 22-40559

acknowledged that Newsome suffered from Addison's disease, and he made a note to follow up on medical records requests.

Plaintiffs allege that Newsome was never prescribed or systematically provided with steroids—the primary treatment for Addison's disease—during her ninety-seven-day detention. They also allege that Newsome did not have her blood drawn for monitoring until June 15, the day of her death.

On the evening of June 14, Newsome began vomiting and experiencing pain in her stomach and right flank area. After she complained to jail staff, Nurse Green visited the jail around midnight to personally examine her.[1] Green claims that he consulted with Dr. Corley by phone, and that per Dr. Corley's instructions he administered one liter of saline and fifty milligrams of Phenergan for nausea treatment. Green testified that Newsome complained of "some mild nausea and some vomiting," but that she had stable vital signs and appeared alert and oriented. Green also claims that he asked Newsome if she wanted to go to the hospital, but Newsome declined.

After Green purportedly treated Newsome late on June 14, Newsome was placed on medical observation and jail staff were instructed to move her into a holding cell where she could be observed through the night. Video footage indicates that jail staff checked on Newsome thirty-one times during the seventeen-hour period between midnight on June 14 and her death in the afternoon of June 15.

---

[1] Plaintiffs claim that there is a factual dispute regarding whether Nurse Green made this midnight visit to Newsome. We express no view on whether Plaintiffs have presented sufficient evidence to support a justifiable inference that Nurse Green fabricated this visit. Even if we accepted as true Green's claim that he treated Newsome that night, we would still hold that the district court erred in granting him summary judgment due to the events that transpired on June 15.

No. 22-40559

Plaintiffs have presented affidavit evidence from other detainees in nearby cells on the night of June 14 through June 15 indicating that during this seventeen-hour period, Newsome was in grave distress from a severe Addisonian crisis. Detainee Edward Jimenez, who was in a cell adjacent to Newsome's cell, testified that Newsome repeatedly cried and screamed during the night, repeating phrases such as "help-help," "I'm hurting bad," "please help," "Lord help me," "take me to the hospital," and "I need a doctor." Jimenez reports being unable to sleep due to the noise. He also claims that nearby jailers appeared to be ignoring Newsome's cries and pleas for help.

Detainee Ashley Lyons, who was in a cell adjacent to Newsome's cell on June 15, testified that she repeatedly heard Newsome groaning and saying that she needed to go to the hospital. Lyons reports that Newsome's cries for help were loud enough to wake her up on several occasions.

Detainee Charles Patrick Sweet, who was near Newsome's holding cell, testified that during the middle of the night he heard "a female voice coming from the processing area repeatedly crying out loudly that she needed [a] doctor and that she needed to go to the hospital."

Around 1:30 a.m. on June 15, A'rhonda Kelli Schuckers, an inmate and trustee at Anderson County Jail, assisted in removing Newsome from her cell for a shower. Newsome was unable to walk on her own; she had to be supported on both sides by a trustee and a jailer. While cleaning Newsome's cell during the shower, Schuckers noticed that Newsome had vomited a black substance into a cup. After Newsome returned to her cell, Jailer-Defendant Robin Jones took Newsome's blood pressure and yelled out that it was 80/40.

At approximately 7:40 a.m. on June 15, Nurse Green examined Newsome. Newsome's medical activity log indicates that she was nauseated,

"had thrown up brown colored fluid but was still able to tolerate water," and was complaining of "right flank area pain." Green drew a blood sample and gave Newsome Phenergan and Tylenol #4. Green claims that he asked Newsome if she wanted to go to the hospital, and that she declined. Green's notes indicate that upon receiving the results of Newsome's blood work, Dr. Corley might order a CT scan and send Newsome to the hospital for further evaluation. Following this visit, Green took Newsome's blood sample to Palestine Regional Medical Center for testing.

The parties dispute whether Nurse Green learned of Newsome's blood test results that morning, or later that afternoon when Newsome was found unresponsive. The test results indicate that Newsome's blood urea nitrogen level was critically high, and her potassium level was critically low. The blood work report's notation indicates that lab technician Wesley Wood called Nurse Green at approximately 10:40 a.m. on June 15 and reported a "critical value," which indicates a medical emergency that requires immediate attention. The report further indicates that Nurse Green "read back" the critical value to confirm understanding. However, Wood could not recall in his deposition—taken over two years later—what values he read to Green. Green, on the other hand, has repeatedly testified that he does not recall being informed of any critical values on the morning of June 15. He states that had he received the critical values that morning, he would have immediately called Dr. Corley.

Plaintiffs highlight that shortly after this call discussing lab results, Nurse Green called Jail Captain Todd Choate. Throughout the day on June 15, Choate undertook efforts to call the district attorney's office and obtain a personal recognizance bond ("PR bond") for Newsome. Choate explained in his deposition that he requests PR bonds "[a]nytime that [jail staff] believe someone is going to go to the hospital." He also acknowledged that this practice exists because of staffing issues; when a detainee is admitted to the

hospital under a PR bond, the jail does not need staff to sit at the hospital with the detainee. This plan to secure a PR bond for Newsome had been discussed with Sheriff Greg Taylor, the undisputed policymaker at Anderson County Jail during Newsome's detainment. Furthermore, in an affidavit, former jailer Jacob P. Mobley testified that Nurse Green confided to him that Sheriff Taylor had limited Green's ability to send people to the hospital due to cost concerns. The request for a PR bond was canceled when Newsome was finally taken to the hospital in the afternoon.

At approximately 4:20 p.m. on June 15, Jailer-Defendants Jessica Carpenter, Matthew Wickersham, and Dakota Hughes assisted Newsome to the toilet. On the way to the toilet, Newsome grabbed the wall, fell, and vomited, and Carpenter retrieved a wheelchair for her. Wickersham told Newsome to let the jailers know when she was finished using the toilet, and he left the cell door open a crack. At around 5:00 p.m., Jailer-Defendant Wickersham checked on Newsome and found her unresponsive. As multiple Jailer Defendants began to locate emergency equipment, Wickersham called Nurse Green, who instructed him to notify emergency medical services ("EMS"). Green testified that he learned about Newsome's critical blood work results around the same time that Newsome was found unresponsive.

After Wickersham called Nurse Green, Carpenter wheeled Newsome into the processing area. Newsome was laid onto a mat, and Jailer-Defendants Alicia Wilson, Hughes, and Carpenter left to retrieve a defibrillator. Two Anderson County deputies took turns providing chest compressions to Newsome until EMS arrived.

Newsome was pronounced dead at the hospital at 5:37 p.m. Newsome's autopsy indicates that she died of "[c]omplications of Addison's disease, hypertensive and atherosclerotic cardiovascular disease, obesity, and pulmonary emphysema."

## C.

Plaintiffs-Appellants in this action are Amber Ford (Newsome's daughter), Regan Kimbrough (Newsome's son), and Donald Newsome (Newsome's father). Plaintiffs filed their first complaint in federal court on August 21, 2019. Defendants-Appellees are Anderson County, Texas; Greg Taylor, the Sheriff of Anderson County during the relevant period; jailers Robin Jones, Jonathan Strong, Jessica Carpenter, Alicia Wilson, Matthew Wickersham, Travis Wesson, Dakota Hughes, and Todd Choate (collectively, the "Jailer Defendants"); Nurse Timothy Green; Dr. Adam Corley; and TAKET Holdings, L.L.C., a medical services company formed by Dr. Corley and Nurse Green. Plaintiffs' lawsuit arises under 42 U.S.C. § 1983, and they claim that Defendants violated Newsome's Fourteenth Amendment due process rights as a pretrial detainee.

Plaintiffs sought leave to file a third amended complaint on January 13, 2021. They intended to add as a defendant Lieutenant Tia Pierson, another jailer who is alleged to have been aware of Newsome's critical condition. The proposed third amended complaint would also include allegations about a policy of delaying medical treatment to seek detainees' release on PR bonds.

On May 5, 2022, the district court granted summary judgment for all Defendants except for Anderson County, finding that these individual Defendants were entitled to qualified immunity. The district court first addressed the claims against Sheriff Taylor, who was not personally involved in Newsome's treatment, but who was alleged to have: (1) failed to train or supervise his staff; (2) implemented a policy prohibiting jail staff below the rank of sergeant from contacting EMS without permission from superiors; and (3) implemented a policy requiring staff to secure PR bonds when

detainees needed hospitalization.[2] The district court found that Plaintiffs' evidence was insufficient to show that Sheriff Taylor acted with the requisite level of deliberate indifference to establish a constitutional violation.

Turning to the Jailer Defendants, the district court found that each jailer lacked subjective knowledge of Newsome's dire medical situation, and that their responses to Newsome's medical issues were reasonable. The district court then addressed the Defendants responsible for Newsome's medical treatment. The district court found that, at best, Plaintiffs had shown that additional or different treatment may have prevented Newsome's death, but that they had not shown that Dr. Corley exhibited "deliberate indifference to a substantial risk of serious harm."[3] The district court similarly found that Nurse Green's actions, even if negligent, did not rise to the level of deliberate indifference required to find a constitutional violation. The district court also granted summary judgment for TAKET Holdings, L.L.C., because the company was not contracted with Anderson County at the time of Newsome's detainment and death.[4]

On July 29, 2022, the district court granted summary judgment for Anderson County, the last remaining Defendant in the case. The district court first found, as a threshold matter, that the municipality could not be

---

[2] The policy regarding PR bonds was not properly raised before the district court because it was not alleged in the operative second amended complaint. *See Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021). The district court nevertheless determined that even if the claim had been properly raised, Plaintiffs' evidence did not show that this policy contributed to Newsome's death or was implemented with deliberate indifference.

[3] As a threshold issue, the district court concluded that Dr. Corley was entitled to assert qualified immunity. Plaintiffs do not contest this determination on appeal.

[4] On appeal, Plaintiffs do not contest the grant of summary judgment for TAKET Holdings, L.L.C. We accordingly AFFIRM the district court's grant of summary judgment for this Defendant.

No. 22-40559

held liable when there was no finding of an underlying constitutional violation committed by an individual defendant, citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Then, addressing the two alleged policies of prohibiting jailers from calling EMS without approval and delaying hospitalization to request PR bonds, the district court found that there was insufficient evidence that these policies existed or contributed to Newsome's death. The district court issued a final judgment in favor of Defendants on July 29, 2022.

Plaintiffs' motion for leave to file a third amended complaint was denied as moot when the district court granted summary judgment for all individual Defendants. In its order denying Plaintiffs' motion to reconsider the granting of Defendants' motions for summary judgment, the district court clarified that there was insufficient evidence of the alleged PR bond policy, and that granting Plaintiffs' motion for leave to file a third amended complaint would have been futile.

## II.

### A.

We first address the district court's grant of summary judgment for each individual Defendant. This court reviews grants of summary judgment *de novo. Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 502 (5th Cir. 2022). Summary judgment is appropriate if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views all evidence and draws all justifiable inferences in favor of the nonmovant. *Moore*, 41 F.4th at 502.

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). To

No. 22-40559

overcome an official's qualified immunity defense, a plaintiff must establish: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although this does not mean that "a case directly on point" is required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The salient question is whether the state of the law gives the official "fair warning" that his or her conduct is unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment." *Est. of Henson v. Wichita County*, 795 F.3d 456, 462 (5th Cir. 2015). For claims related to the medical treatment of a pretrial detainee, this court will find a constitutional violation where an officer: (1) subjectively knew of a substantial risk of serious harm to the detainee; and (2) responded to that risk with "deliberate indifference." *Cope v. Cogdill*, 3 F.4th 198, 206–07 (5th Cir. 2021).[5]

---

[5] The Eighth Amendment prohibits deliberate indifference to a prisoner's medical needs, while the Fourteenth Amendment prohibits deliberate indifference to a pretrial detainee's medical needs. *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019). Because there is "no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care," *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001), case law related to a prisoner's Eighth Amendment right to medical care can clearly establish a pretrial detainee's Fourteenth Amendment right to medical care for the purposes of qualified immunity. *See, e.g.*, *Sims v. Griffin*, 35 F.4th 945, 951–52 (5th Cir. 2022) (finding that a pretrial detainee's Fourteenth Amendment right to medical care was

We have described deliberate indifference as "an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). A detainee can establish a jail official's deliberate indifference by showing that the official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *See Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Deliberate indifference can also be shown where a jail official knows that a detainee faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994). On the other hand, "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

## B.

We begin with Defendant Adam Corley. It is undisputed that Dr. Corley's first and only significant personal interaction with Newsome was on May 11, when he addressed her complaints of gas. During this interaction, Dr. Corley was aware that Newsome had Addison's disease, and he may have reviewed her medical activity log to find that Newsome had experienced low blood pressure and leg swelling on April 20. Based on this interaction, whether Dr. Corley committed a constitutional violation hinges on: (1) whether Dr. Corley's knowledge that Newsome had Addison's disease constituted subjective knowledge of a substantial risk of serious harm; and (2) whether Dr. Corley's failure to provide any follow-up treatment or

---

clearly established by *Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006), an Eighth Amendment case); *Kelson v. Clark*, 1 F.4th 411, 421 (5th Cir. 2021) (citing Eighth Amendment cases, including *Easter*, to find that a pretrial detainee's right to medical care was clearly established).

No. 22-40559

monitoring until the date of Newsome's death constituted deliberate indifference. We find that both questions can be answered in the affirmative.

Plaintiffs have presented a genuine dispute of material fact regarding whether Dr. Corley had subjective knowledge of a substantial risk of serious harm to Newsome. It is undisputed that Dr. Corley subjectively knew that Newsome had Addison's disease, and it is undisputed that Dr. Corley had basic knowledge about Addison's disease. A reasonable jury could therefore find that Dr. Corley subjectively knew that Newsome suffered from a chronic illness that could become life-threatening if left untreated. This should suffice to establish Dr. Corley's subjective knowledge of a substantial risk of serious harm.[6]

Plaintiffs have also presented a genuine dispute of material fact regarding whether Dr. Corley's failure to treat or monitor Newsome's Addison's disease constituted deliberate indifference. Had Dr. Corley simply mistreated Newsome's Addison's disease or made negligent treatment decisions, that would not constitute deliberate indifference. *See Gobert*, 463 F.3d at 346. But Plaintiffs have presented evidence that Dr. Corley did not monitor or treat Newsome's Addison's disease *whatsoever*.[7] Accordingly,

---

[6] We note that a patient does not need to be experiencing an acute medical crisis requiring emergency intervention to be facing a substantial risk of serious harm—suffering from a known chronic issue that requires ongoing or long-term treatment may also suffice. *See, e.g.*, *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002) (finding a sufficient risk of harm for a deliberate indifference claim where jail medical staff were on notice that an inmate had ulcers that required diligent day-to-day treatment); *Delaughter v. Woodall*, 909 F.3d 130, 138–41 (5th Cir. 2018) (finding that an inmate in need of a hip replacement and reconstructive surgery stated a deliberate indifference claim that should have survived a summary judgment challenge); *Dauzat v. Carter*, 670 F. App'x 297, 298 (5th Cir. 2016) (affirming that a prisoner with a "serious medical need for physical therapy" stated a valid deliberate indifference claim).

[7] While Dr. Corley did treat Newsome's immediate symptom of gas with anti-gas medication, Plaintiffs have presented evidence that he did not treat Newsome for

No. 22-40559

Plaintiffs have presented a factual dispute regarding whether Dr. Corley responded to Newsome's potentially life-threatening illness with deliberate indifference by failing to provide *any* treatment.

Dr. Corley counters Plaintiffs' allegation of deliberate indifference by referencing the well-established principle that questions regarding proper diagnosis and treatment are "classic example[s] of . . . matter[s] for medical judgment," and not bases for finding a constitutional violation. *See Estelle v. Gamble*, 429 U.S. 97, 107–08 (1976). But treating Addison's disease is not particularly complex—as Plaintiffs point out, typical treatment involves administering common steroids such as hydrocortisone. A reasonable jury could conclude that failing to provide steroid medications to an Addison's disease patient is not a legitimate exercise of "medical judgment." *See Delaughter*, 909 F.3d at 138 (reversing summary judgment for a defendant where it was "not clear" that the cancellation of the plaintiff's surgery and a medical center's refusal to accept the plaintiff as a patient were "medical-judgment decisions").

In summary, Plaintiffs have presented facts indicating that Dr. Corley: (1) subjectively knew that Newsome had Addison's disease—a potentially fatal but eminently treatable condition; and (2) did nothing to treat this

---

Addison's disease. Responding to a serious medical issue with such a cursory level of care may still constitute deliberate indifference. *See Austin v. Johnson*, 328 F.3d 204, 206, 210 (5th Cir. 2003) (finding that a nearly two-hour delay in calling an ambulance could constitute deliberate indifference, even though a defendant had administered first aid); *Ledesma v. Swartz*, 134 F.3d 369, 1997 WL 811746, at *1 (5th Cir. 1997) (finding that treating complaints of a broken jaw with only over-the-counter pain medication and a liquid diet could constitute deliberate indifference); *see also Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.").

No. 22-40559

chronic illness. A jury considering these facts could find that Dr. Corley violated Newsome's Fourteenth Amendment rights.

Dr. Corley has invoked qualified immunity. Under our case law, Plaintiffs must show that Newsome's rights "were clearly established at the time of the violation." *Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021). In *Easter v. Powell*, 467 F.3d at 465, we held that the law is clearly established that a prisoner's rights are violated if "a prison official 'refuse[s] to treat him, ignore[s] his complaints, intentionally treat[s] him incorrectly, or engage[s] in any similar conduct that . . . clearly evince[s] a wanton disregard for any serious medical needs.'" (quoting *Domino*, 239 F.3d at 756). And in *Sims v. Griffin*, 35 F.4th at 951, we reiterated that *Easter* illustrates circumstances where a detainee "can show [that] his clearly established rights . . . were violated." In *Easter*, the plaintiff prisoner had chronic heart problems and visited the prison infirmary complaining of severe chest pain. *Easter*, 467 F.3d at 461. The prison nurse, who knew of the prisoner's heart problems, denied the prisoner's request for medicine after learning that the prison pharmacy was closed. *Id.* at 461, 463–64. We held that the nurse was not entitled to summary judgment based on qualified immunity because her actions may have violated the prisoner's clearly established constitutional rights. *Id.* at 465.

Like the nurse in *Easter*, Dr. Corley knew that an inmate had a serious medical condition but failed to treat her for that condition. We recognize that the prisoner in *Easter* was denied treatment during an acute period, while Dr. Corley denied Newsome ongoing, day-to-day treatment for her known chronic condition—Addison's disease. But our case law clearly establishes that refusal to treat in both types of circumstances is a violation of an inmate's constitutional rights. In *Lawson v. Dallas County*, 286 F.3d at 260, a paraplegic inmate developed decubitus ulcers (bed sores) while

No. 22-40559

incarcerated.[8] The inmate's doctor provided mandatory medical orders to the jail's medical staff. *Id.* The medical staff knew that the inmate had a serious ailment but "did not provide the prescribed treatments, seek alternative placement for [the inmate], or monitor the progression of his wounds." *Id.* at 261. We determined that the medical staff's refusal to provide the inmate with ongoing treatment, "despite their actual knowledge of the seriousness of [the inmate's] condition," could constitute deliberate indifference. *Id.* at 263.[9]

--------

[8] While Plaintiffs themselves do not cite to *Lawson*, in a qualified immunity inquiry "we needn't limit our analysis to the cases cited by Plaintiffs." *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 338 (5th Cir. 2020); *Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("A court engaging in review of a qualified immunity judgment should . . . use its 'full knowledge of its own [and other relevant] precedents.'" (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984))).

[9] Several of our unpublished opinions are also worth highlighting. This court's unpublished opinions cannot clearly establish the law for the purposes of qualified immunity, but they nevertheless may "aptly illustrate[] the established right." *Cooper v. Brown*, 844 F.3d 517, 525 n.8 (5th Cir. 2016). Of particular relevance is this court's decision in *Dauzat v. Carter*, 670 F. App'x at 298, where we affirmed that a prisoner stated a valid deliberate indifference claim in alleging that a doctor ignored his "serious medical need for physical therapy" by only providing a wellness program conducted by inmates. We further held that the prisoner's constitutional rights were clearly established by *Easter* and *Lawson*. Here, we similarly hold that Newsome's right to not be denied, by deliberate indifference, treatment for her chronic condition was clearly established by *Easter* and *Lawson*.

Furthermore, in several other unpublished opinions, we have recognized that an official is deliberately indifferent to an inmate's serious medical needs when he or she delays treatment or provides only cursory care. *See, e.g.*, *Loosier v. Unknown Med. Dr.*, 435 F. App'x 302, 306 (5th Cir. 2010) (finding that a prisoner stated a deliberate indifference claim where a doctor knew that the prisoner had injured his neck but "chose not to provide him any treatment or medication for his injury"); *Ledesma*, 1997 WL 811746, at *1 (finding that an inmate stated a deliberate indifference claim where a doctor treated complaints of a broken jaw with nothing more than Motrin and a liquid diet); *Vasquez v. Dretke*, 226 F. App'x 338, 340 (5th Cir. 2007) (finding that a prisoner stated a deliberate indifference claim where dentists knew that the prisoner needed dentures but refused to provide care).

No. 22-40559

We also note that several of our sister circuits have found that failing to provide treatment for a chronic illness may constitute deliberate indifference. In *Egebergh v. Nicholson*, 272 F.3d 925, 927–28 (7th Cir. 2001), the Seventh Circuit held that a jury could find that two jail officials were deliberately indifferent for failing to provide a diabetic detainee with a morning insulin shot. In *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999), the Eighth Circuit reversed the grant of summary judgment for a deputy sheriff who was accused of denying diabetes medication to an inmate. The Sixth Circuit and Fourth Circuit have held that jail officials could be held liable for overseeing medical systems that denied treatment to inmates with chronic conditions. *See Young ex rel. Est. of Young v. Martin*, 51 F. App'x 509, 515 (6th Cir. 2002) (finding that a jail director was not entitled to qualified immunity for implementing a policy that provided minimal care to inmates with chronic illnesses); *Gordon v. Schilling*, 937 F.3d 348, 360–61 (4th Cir. 2019) (finding that a chief physician could be held liable for implementing policies that denied treatment to inmates with the hepatitis C virus).

Considering the foregoing authorities, we find that Dr. Corley's alleged failure to provide *any* treatment to a detainee with a chronic illness that can become life-threatening if left untreated may have violated Newsome's clearly established constitutional rights. A jury may ultimately find that the absence in the record of Newsome affirmatively requesting Addison's disease medication weighs against Plaintiffs' case, or they may find that Newsome's medication list—which contained a long list of medications but not steroid medications—ultimately did not provide Dr. Corley with clear enough notice that Newsome was not being treated for Addison's disease. However, construing the evidence in Plaintiffs' favor, a jury could also reasonably conclude that a patient with untreated Addison's disease presents a serious, obvious risk that is in line with our prior cases finding deliberate indifference for failing to provide medical care. We find

that these factual issues regarding Dr. Corley's notice of the risk facing Newsome and his actions following his encounter with Newsome preclude summary judgment.

We briefly note that Plaintiffs' second amended complaint appears to plead a supervisory claim against Dr. Corley. However, as Dr. Corley correctly points out, Plaintiffs have abandoned their supervisory claim against him by failing to raise the issue on appeal. *See United States v. Ogle*, 415 F.3d 382, 383 (5th Cir. 2005). We accordingly AFFIRM IN PART the district court's grant of summary judgment for Dr. Corley as related to Plaintiffs' supervisory claim, but we REVERSE the district court's grant of summary judgment for Dr. Corley as related to Plaintiffs' nonsupervisory deliberate indifference claim.

## C.

We next address Defendant Timothy Green. In opposing Nurse Green's motion for summary judgment, Plaintiffs centered on Nurse Green's conduct on June 14 and June 15, the dates on which Newsome exhibited symptoms of an acute Addisonian crisis. We find that Plaintiffs have presented sufficient evidence for a reasonable jury to conclude that Nurse Green's actions on June 15, the day of Newsome's death, constituted a violation of Newsome's Fourteenth Amendment rights.

To establish that Nurse Green subjectively knew of a substantial risk of serious harm to Newsome, Plaintiffs have presented evidence indicating that the results of Newsome's blood work put Nurse Green on notice that Newsome needed emergency care. In his deposition, lab technician Wesley Wood acknowledged that a lab report of Newsome's blood work indicates that: (1) Newsome's blood work revealed "critical values"; (2) Wood called Nurse Green on the morning of June 15 to notify him of these results; and (3) Nurse Green "understood those results and read them back." We find that

No. 22-40559

the call that occurred between Wood and Nurse Green around 10:40 a.m. on June 15 establishes a genuine dispute of material fact regarding Nurse Green's subjective knowledge that Newsome was at risk of an Addisonian crisis.

Additionally, Plaintiffs have presented evidence indicating that Nurse Green's response to this information was deliberately indifferent, not merely negligent or inadequate. Immediately after getting off the phone with Wood, Nurse Green called Jail Captain Todd Choate, who worked on June 15 to release Newsome via a PR bond. Rather than attempt to provide any medical assistance to Newsome, Nurse Green purportedly delayed care for over six hours, up until Newsome's death.

Viewing this evidence in Plaintiffs' favor, a reasonable jury could determine that on the morning of June 15, Nurse Green: (1) knew that Newsome had vomited "brown colored fluid" and was in a serious enough condition to warrant blood work and potential hospitalization; (2) received lab results indicating that Newsome was in a critical condition and needed emergency care; and (3) delayed the provision of care for over six hours.[10]

---

[10] The affidavit of former jailer Jacob Mobley suggests that Nurse Green deliberately delayed sending Newsome to the hospital due to restrictions placed upon him by Sheriff Taylor. If it is the case that Nurse Green delayed sending Newsome to the hospital because of the PR bond policy, the fact that Green acted pursuant to municipal policy may aid in Green's defense. *See Arenas v. Calhoun*, 922 F.3d 616, 626 (5th Cir. 2019) ("Although an officer's compliance with prison policy by no means immunizes his actions from liability under § 1983, it militates against a finding of deliberate indifference."); *Cope*, 3 F.4th at 208 (holding that a jailer did not act with deliberate indifference by failing to immediately enter a cell where a detainee had strangled himself, since the jailer was following the jail's policy that jailers not enter a cell until backup arrives). We note, however, that asserting an "I was following orders" defense may not be viable if those orders are "facially outrageous," which, considering the purported cost-saving rationale for the PR bond policy and the significant delay in addressing Newsome's medical emergency, may be the case here. *See Cope*, 3 F.4th at 208 (quoting *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 398 (5th Cir. 2000)) (noting that "jailers who follow policies

No. 22-40559

These factual conclusions could support a finding that Nurse Green violated Newsome's Fourteenth Amendment rights as a pretrial detainee by responding to a substantial risk of serious harm to Newsome with deliberate indifference.

Turning to the second prong of our qualified immunity inquiry, we find that Newsome's Fourteenth Amendment rights were clearly established at the time of Nurse Green's alleged constitutional violation. There is ample case law in this circuit indicating that denying or unreasonably delaying medical treatment to someone in need of immediate medical assistance constitutes deliberate indifference. We again reference *Easter*, where we found that a nurse's refusal to provide any treatment to a prisoner in need of medication could constitute a clearly established violation of the prisoner's constitutional rights. *Easter*, 467 F.3d at 464–65.

Additionally, in *Austin v. Johnson*, 328 F.3d at 210, this court held that the plaintiffs had stated a deliberate indifference claim sufficient to survive a motion for summary judgment when there was a one-hour and forty-two-minute delay in calling an ambulance for a heat stroke victim who was unconscious and vomiting. Even though a defendant at the court-ordered boot camp had administered first aid, *id.* at 206, the extensive delay in calling an ambulance rose to the level of deliberate indifference, *id.* at 210.

Here, there is a genuine dispute of material fact regarding whether Nurse Green learned of Newsome's critical blood work results and failed to act on this information for over six hours until Newsome's death. A jury

---

*aimed at protecting the jailer* should not be considered deliberately indifferent to an inmate's medical need" (emphasis added)). Furthermore, details regarding the nature of the PR bond policy—i.e., a top-down policy promulgated by Sheriff Taylor that employees were bound to follow versus a widespread practice that was more akin to a custom—may impact how a jury views Nurse Green's reasonableness in following the policy in this instance.

No. 22-40559

could conclude that Nurse Green's failure to act in light of this critical information was a total refusal of care to a patient known to be suffering from chronic, serious medical issues, as in *Easter*. Alternatively, a jury could conclude that Nurse Green's failure to act for over six hours when presented with indications of a medical emergency constituted deliberate indifference like the delay alleged in *Austin*.

We conclude that there is a genuine dispute of material fact over when Nurse Green knew of the critical values, and thus whether he acted with deliberate indifference. We further conclude that under *Easter* and *Austin*, Nurse Green was on notice that deliberate indifference to a detainee's serious medical needs is a Fourteenth Amendment violation. We accordingly REVERSE the district court's grant of summary judgment for Nurse Green.

## D.

We next address the district court's grant of summary judgment for Jailer-Defendants Jonathan Strong, Robin Jones, Matthew Wickersham, Jessica Carpenter, Dakota Hughes, Todd Choate, Alicia Wilson, and Travis Wesson.

### 1.    Jailer-Defendants Jonathan Strong and Robin Jones

Jailer-Defendant Jonathan Strong was working during the night of June 14 through June 15, and he used a wheelchair to place Newsome into a holding cell near midnight for medical observation. Jailer-Defendant Robin Jones was also working during the night of June 14 through June 15, and she took Newsome's blood pressure around 2:00 a.m. Furthermore, video evidence indicates that Strong and Jones were in close proximity to—and entered—Newsome's cell throughout the evening. Plaintiffs have presented evidence that during that evening, Newsome: (1) repeatedly cried out that she needed to go to the hospital; (2) vomited a black or brown substance in

her cell; (3) had a blood pressure reading of 80/40, which was measured by Jailer-Defendant Jones; and (4) was unable to ambulate without assistance.

In granting summary judgment in favor of the Jailer Defendants, the district court primarily relied on two unpublished cases that it considered substantially similar to the present case: *Trevino v. Hinz*, 751 F. App'x 551 (5th Cir. 2018), and *Rombach v. Culpepper*, No. 20-30554, 2021 WL 2944809 (5th Cir. July 13, 2021). In *Trevino*, an arrestee died after she surreptitiously ingested methamphetamine during a traffic stop. *Trevino*, 751 F. App'x at 552. While the arrestee was sitting on the curb waiting for an officer to complete paperwork, the arrestee started vomiting, shaking, and dry heaving. *Id.* The arrestee claimed to be having a seizure, but the officers on the scene thought that she was faking her symptoms to avoid jail. *Id.* at 552–53. Once it became clear to the officers that the distress was genuine, they called an ambulance. *Id.* at 553. This court found that the officers did not act with deliberate indifference when initially failing to take the arrestee's symptoms seriously, since they were not unreasonable in initially believing that the arrestee's "ambiguous" symptoms did not require immediate medical attention. *Id.* at 556.

In *Rombach*, the plaintiffs provided evidence that the decedent detainee told a group of jailers that he needed to go to the hospital because he was vomiting and going through drug withdrawal. *Rombach*, 2021 WL 2944809, at *5. One guard allegedly told the detainee that he would have to suffer through his symptoms, while another guard provided the detainee with castor oil for his constipation. *Id.* A few days later, the detainee passed away due to a perforated duodenal ulcer (stomach ulcer). *Id.* at *1. This court found that the jailers were not deliberately indifferent because, among other things: the detainee had written in his medical information sheet that he did not regularly take drugs; the detainee later told the officers that "he was fine"

No. 22-40559

when they followed up with him about his withdrawal symptoms; and no jail personnel were aware of the detainee's undiscovered ulcer issue. *Id.* at *6.

This case is materially distinguishable from *Trevino* and *Rombach*. Perhaps most significantly, Newsome was on medical observation at the jail. Unlike the officers in *Trevino*, the Jailer Defendants had no reason to believe that Newsome's pleas for help or symptoms were not genuine; because she was placed on medical observation, the jailers were on notice that Newsome might be at risk of experiencing a medical emergency. Furthermore, *Trevino* involved a *delay* in care where the officers had reason to believe that there was not an emergency health situation; once they realized that there was a genuine emergency, they sought help. Here, there were many reasons to think that there was an emergency health situation—Newsome's pleas for help, that she was on medical observation, and her alarming symptoms. Despite these indicators, Jailer-Defendants Strong and Jones did not seek emergency medical assistance.

Furthermore, viewing the evidence in their favor, Plaintiffs' case is distinguishable from that of the plaintiffs in *Rombach*. In *Rombach*, the decedent told his jailers that he was experiencing withdrawal from heroin, and the warden had testified that a nearby hospital "routinely explained to the jail facility . . . that there is no real treatment of withdrawal symptoms and it is sufficient for the jail to observe the inmate in withdrawal and provide plenty of hydration, aspirin, and malox-type [sic] products to assist the inmate." *Rombach*, 2021 WL 2944809, at *1. Here, Newsome's pleas for help, vomiting of a black or brown substance, inability to ambulate without assistance, and medical observation status present distinguishable facts indicating that hospitalization was necessary.

Plaintiffs argue that *Sims v. Griffin*, 35 F.4th 945, presents a more comparable fact pattern. In *Sims*, a pretrial detainee who may have ingested

No. 22-40559

a bag full of drugs cried out for medical attention over the course of several hours, and he vomited a "dark black liquid" that he smeared all over the floor and his face. *Id.* at 948. The jailers consciously decided to not call EMS, and one guard made disparaging comments about the detainee's condition. *Id.* After hours of vomiting black liquid and crying out with no response from jailers, the detainee died. *Id.* This court determined that the guards' refusal of care was comparable to the nurse's refusal of care in *Easter v. Powell*, 467 F.3d at 465, which was cited as the case law that clearly established the detainee's constitutional rights. *Sims*, 35 F.4th at 951–52.

Plaintiffs are correct that there are some significant similarities between *Sims* and the present case. Like the detainee in *Sims*, Newsome died a slow, seemingly preventable death. She vomited a dark substance, and evidence indicates that she cried out for help and begged to go to the hospital. Granted, Plaintiffs have not presented evidence of the Jailer Defendants directly admitting that they were subjectively aware of Newsome's cries or her dark-colored vomit. However, summary judgment evidence indicates that Newsome cried out for several hours in an area that Strong and Jones patrolled throughout the evening. Summary judgment evidence further indicates that the Jailer Defendants entered Newsome's cell in several instances. Accordingly, at this summary judgment stage, we find that Plaintiffs have presented a genuine dispute of material fact regarding whether Jailer-Defendants Strong and Jones heard Newsome's cries and saw the dark-colored vomit. If a jury concludes that Strong and Jones heard these repeated cries for help and did nothing to assist Newsome, they could reasonably find that this conduct constituted deliberate indifference because they "refused to treat [her], ignored [her] complaints," and evinced "a wanton disregard for [her] serious medical needs." *Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756).

No. 22-40559

We also find that Newsome's constitutional rights were clearly established by *Easter*.[11] Plaintiffs have presented evidence that, like the nurse in *Easter*, Jailer-Defendants Strong and Jones ignored an inmate's complaints and refused to provide any medical assistance. *See id.* at 461. Furthermore, because Newsome was on medical observation, a reasonable jury could infer that Strong and Jones knew that Newsome faced a substantial risk of serious harm if they were unresponsive to her medical needs.

While Plaintiffs have failed to provide a direct admission from Jailer-Defendants Strong and Jones that they heard Newsome's cries for help, we agree with Plaintiffs that they have raised legitimate "fact issues as to each jailer's knowledge of [Newsome's] emergency condition in the . . . hours prior to her death." Because of these disputed fact issues, we REVERSE the district court's grant of summary judgment for Jailer-Defendants Jonathan Strong and Robin Jones.

### 2.  Jailer-Defendants Matthew Wickersham, Jessica Carpenter, and Dakota Hughes

Jailer-Defendants Matthew Wickersham, Jessica Carpenter, and Dakota Hughes all assisted Newsome to the toilet in her cell on June 15. Plaintiffs have presented evidence that during this trip to the toilet,

---

[11] Our conclusion is bolstered by a line of prior cases in which we found that officials may have exhibited deliberate indifference by ignoring or providing only a cursory response to medical complaints. *See, e.g.*, *Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346–47 (5th Cir. 2014) (finding deliberate indifference where a nurse responded to complaints of nausea, vomiting, and severe abdominal pain with nausea medicine and an enema); *Galvan v. Calhoun County*, 719 F. App'x 372, 374–75 (5th Cir. 2018) (finding that an inmate stated a deliberate indifference claim where prison officials responded to his complaints of excruciating stomach pain by providing Pepto-Bismol and a home remedy); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999) (finding that a prisoner stated a deliberate indifference claim where prison officials ignored his repeated complaints of excruciating pain after his jaw broke); *Ledesma*, 134 F.3d 369, 1997 WL 811746, at *1.

No. 22-40559

Newsome was unable to walk, collapsed, and vomited upon collapsing. For instance, Hughes relayed in an incident report that after Newsome fell, Hughes "rolled her on her side and [Newsome] was puking."[12] Despite these signs of a medical emergency, Wickersham, Carpenter, and Hughes did not seek medical assistance or closely monitor Newsome. Instead, they left her alone on the toilet for about thirty minutes, where Newsome experienced her final moments of consciousness.

While Wickersham, Carpenter, and Hughes lacked the benefit of hindsight when they assisted Newsome to the toilet, the fact that Newsome would be found unresponsive thirty minutes later raises factual issues regarding what kind of condition Newsome was in at the time. Based on the evidence that Plaintiffs have presented, a reasonable jury could conclude that Newsome's collapse and vomiting episode indicated that she faced a substantial risk of serious harm, and that Jailer-Defendants Wickersham, Carpenter, and Hughes's failure to monitor Newsome or provide immediate medical assistance constituted deliberate indifference.

We find that Newsome's rights were clearly established, especially considering the parallels between the present case and *Austin v. Johnson*, in which boot-camp personnel potentially exhibited deliberate indifference in their delay to call an ambulance after the plaintiff collapsed and vomited. *Austin*, 328 F.3d at 210.[13] Because fact issues exist regarding Newsome's

---

[12] Hughes's recollection that Newsome fell, was rolled to her side, and vomited is conspicuously not corroborated by the other two Jailer Defendants. Carpenter, for instance, testified that Newsome "lost her footing," but never fell. The lack of consistency across the Jailer Defendants' testimony raises credibility issues that are best addressed by a jury.

[13] In addition to *Austin*, several of our prior cases support our conclusion that a jail official exhibits deliberate indifference by failing to provide care when an inmate faces a serious medical emergency. *See, e.g.*, *Loosier*, 435 F. App'x at 306; *Perez v. Anderson*, 350 F. App'x 959, 962–63 (5th Cir. 2009) (finding that a prisoner stated a deliberate indifference

medical condition during her collapse, and because the Jailer Defendants responded to Newsome's potentially serious condition by failing to seek immediate medical assistance, we REVERSE the district court's grant of summary judgment for Jailer-Defendants Matthew Wickersham, Jessica Carpenter, and Dakota Hughes.

### 3.    Jail Captain Todd Choate

Plaintiffs argue that "[b]ecause a jury could conclude [Captain] Choate improperly denied and delayed emergency medical care for Newsome for non-medical reasons, fact issues exist as to whether Choate was deliberately indifferent to Newsome's serious medical needs." Their argument has merit. Plaintiffs have presented evidence that Nurse Green contacted Captain Choate shortly after receiving Newsome's blood work results. It is also undisputed that Captain Choate attempted to secure Newsome's release via a PR bond on June 15. When asked in his deposition what the purpose of his call to the district attorney on June 15 was, Choate replied that "[a]nytime that we believe someone is going to go to the hospital, we will call the DA's office, [to] see if they will entertain a PR bond." Choate also suggested that Anderson County Jail seeks these PR bond releases due to staffing concerns—a non-medical reason.[14]

Defendants offer an alternative explanation for Captain Choate's actions. Relying on Choate's affidavit, they claim that Choate believed that

---

claim by alleging that jail officials failed to provide him with pain relief or x-rays until several months after an attack by other prisoners); *Hughes v. Noble*, 295 F.2d 495, 496 (5th Cir. 1961) (holding that a pretrial detainee with dislocated and fractured vertebrae stated a valid claim for relief where officials provided him with no medical attention).

[14] As we noted in our discussion of Nurse Green's liability, if it is found that Captain Choate delayed care pursuant to official policy, that may factor into an analysis of whether he exhibited deliberate indifference. *See supra* note 10.

Newsome may have been suffering from a stomach bug, and that Choate seeks releases on PR bonds for detainees who "ha[ve] a history of medical issues and [are] not feeling well."

As Plaintiffs point out, Captain Choate's "stomach bug" explanation is contradicted by his deposition testimony, which indicates that Choate knew that Newsome needed hospitalization. This inference is strengthened by the fact that Choate spoke with Nurse Green directly after Green learned of Newsome's blood work results. A jury could therefore conclude that Choate indeed knew that Newsome needed to go to the hospital and that she had a "history of medical issues," and thus that he had subjective knowledge that she faced a substantial risk of serious harm. Furthermore, a jury could find that delaying the provision of emergency medical care for a detainee in need of hospitalization to secure her release on a PR bond was a "refus[al] to treat" Newsome or a "wanton disregard for [her] serious medical needs" that would constitute deliberate indifference. *See Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238). While a jury may ultimately credit the explanation contained in Captain Choate's affidavit, we find that Plaintiffs have presented a genuine dispute of material fact regarding whether Choate subjectively knew of Newsome's critical condition and responded with deliberate indifference.

Furthermore, as discussed in our analysis of Nurse Green's potential liability, it is clearly established that delaying care for a detainee in need of emergency medical intervention may constitute a Fourteenth Amendment violation. A jury could conclude that Captain Choate's failure to order emergency medical care for a detainee in need of hospitalization constituted a refusal of care, *see Easter*, 467 F.3d at 465, or that he exhibited deliberate

No. 22-40559

indifference by delaying emergency medical care for over six hours, *see Austin*, 328 F.3d at 210.[15]

Because Plaintiffs have submitted evidence establishing genuine disputes of material fact regarding Choate's liability, we REVERSE the district court's grant of summary judgment for Jail Captain Todd Choate.

### 4.    Jailer-Defendant Alicia Wilson

Plaintiffs allege that Jailer-Defendant Alicia Wilson denied Newsome's request to see a doctor for "severe stomach pain" on June 12, three days before Newsome's death. Even accepting this allegation as true, we find that Plaintiffs have presented insufficient evidence for a jury to conclude that Wilson's singular denial of a request to see a doctor amounted to deliberate indifference. "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001). To prevail under a deliberate indifference theory, a plaintiff must show that the defendant official "was aware of facts from which an inference of substantial risk of serious harm could be drawn," and that "the official actually drew that inference." *Id.* at 458–59.

---

[15] Additionally, as we noted in *Delaughter*, 909 F.3d at 138 n.7, "We have previously suggested that a non-medical reason for delay in treatment constitutes deliberate indifference, and several of our sister circuits have held so explicitly." *See Thibodeaux v. Thomas*, 548 F. App'x 174, 175 (5th Cir. 2013) (finding that a claimant stated a colorable Eighth Amendment claim where prison officials allegedly delayed a surgery by sending him to the wrong facility and failing to file appropriate paperwork); *Reed v. Cameron*, 380 F. App'x 160, 163 (3d Cir. 2010) ("[Plaintiff's] allegations raise an inference that prison officials were deliberately indifferent to his suffering and delayed medical care for non-medical reasons."); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004) ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity.").

Plaintiffs have alleged that Jailer-Defendant Wilson denied Newsome's request to see a doctor, but they have not supported this allegation with sufficient evidentiary detail to allow a jury to conclude that Wilson was subjectively aware that Newsome faced a substantial risk of serious harm at that moment. A singular denial of a request to see a doctor—absent more details that would unambiguously indicate a medical crisis—does not amount to deliberate indifference. *See Rombach*, 2021 WL 2944809, at *5. Because Plaintiffs' evidence is insufficient to establish that Jailer-Defendant Wilson exhibited deliberate indifference, we AFFIRM the district court's grant of summary judgment for Alicia Wilson.

### 5.　Jailer-Defendant Travis Wesson

On appeal, Plaintiffs' only allegation against Jailer-Defendant Travis Wesson is that he failed to adequately aid the other jailers after Newsome was found unresponsive. Wesson was asked to assist in an emergency situation that he seemingly had no knowledge of, and his alleged failure to meaningfully contribute while other jailers offered assistance does not constitute deliberate indifference. Moreover, because Newsome was already unresponsive when Wesson arrived, there is insufficient evidence to conclude that Wesson's actions "result[ed] in substantial harm." *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). We accordingly AFFIRM the district court's grant of summary judgment for Travis Wesson.

### III.

In arguing that the district court erred by granting summary judgment for Defendants Greg Taylor and Anderson County, Plaintiffs primarily reference the alleged policy of attempting to secure PR bonds when detainees require hospitalization. However, Plaintiffs' allegations regarding this PR bond policy are not contained in the operative second amended complaint.

No. 22-40559

Instead, these allegations were raised for the first time in response to Defendants' motions for summary judgment, and thus they were not properly raised before the district court. *See Jackson*, 3 F.4th at 188 ("[A] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." (quoting *Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005))). Plaintiffs attempted to add allegations related to the PR bond policy by filing a motion for leave to file a third amended complaint, but the district court denied this motion as moot, and alternatively denied it as futile. Because the alleged PR bond policy is central to Plaintiffs' claims against Defendants Greg Taylor and Anderson County, we address the district court's denial of Plaintiffs' motion for leave to file a third amended complaint before turning to the grants of summary judgment for these Defendants.

A district court's decision to deny a motion for leave to amend pleadings is reviewed for an abuse of discretion. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003). When a denial of a motion for leave to amend a complaint is based on the futility of the amendment, the court applies "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Ariyan, Inc. v. Sewerage & Water Bd. of New Orleans*, 29 F.4th 226, 229 (5th Cir. 2022) (quoting *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000)). The question therefore is whether in the light most favorable to Plaintiffs the amended complaint states any valid claim for relief. *See Stripling*, 234 F.3d at 873.

Plaintiffs' proposed third amended complaint makes two substantive additions to their pleadings: (1) it adds Lieutenant Tia Pierson as a Jailer Defendant; and (2) it adds allegations of the purported PR bond policy.

No. 22-40559

We first address Plaintiffs' attempt to add Lieutenant Pierson as a defendant, which faces a statute of limitations issue. In Texas, the statute of limitations for 42 U.S.C. § 1983 claims is two years. *Shelby v. City of El Paso*, 577 F. App'x 327, 330–31 (5th Cir. 2014). Newsome died on June 15, 2018, so a § 1983 claim related to this incident became untimely in June 2020. Plaintiffs filed their motion for leave to file a third amended complaint on January 13, 2021.

When a plaintiff adds a defendant after the limitations period has run, Rule 15(c) of the Federal Rules of Civil Procedure permits the plaintiff to relate the claims filed against the new defendant back to the date of the original filing. *Winzer v. Kaufman County*, 916 F.3d 464, 470 (5th Cir. 2019). But Rule 15(c) is intended to correct a *mistake* concerning the identity of a defendant; it does not permit adding a new defendant when the plaintiff did not originally know of that defendant's identity. *Id.* In this case, Plaintiffs sought to add Lieutenant Pierson as a new defendant based on facts that they learned during discovery. This is not a case of "a mistake concerning the proper party's identity," and thus the claim against Pierson is time-barred. *See* Fed. R. Civ. P. 15(c)(1)(C)(ii).

Even if Plaintiffs' claim against Pierson was not time-barred, we would still find that the district court did not abuse its discretion in determining that adding Pierson as a defendant would be futile. The only non-conclusory information related to Pierson in Plaintiffs' proposed third amended complaint is a brief allegation that on June 15, Pierson exchanged text messages with Nurse Green. Even accepting these facts as true, these allegations do not "properly set[] forth a claim of a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States caused by persons acting under color of state law." *Ariyan*, 29 F.4th at 229 (quoting *S. Christian Leadership Conf. v. Supreme Ct. of State of La.*, 252 F.3d 781, 786 (5th Cir. 2001)). Plaintiffs' claim against Pierson would not

No. 22-40559

survive a Rule 12(b)(6) motion to dismiss, and thus the district court did not abuse its discretion in denying Plaintiffs leave to amend to add Pierson as a defendant.

Turning to Plaintiffs' proposed claims of municipal liability against Anderson County and supervisory liability against Sheriff Taylor, we find that the district court abused its discretion in determining that pleading these claims would be futile.

We begin with Plaintiffs' municipal liability claim against Anderson County. To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must show: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)). Generally, a plaintiff must show that the policy was implemented with "deliberate indifference" to the "known or obvious consequences" that a constitutional violation would result.[16] *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S.

---

[16] On appeal, Plaintiffs claim that they have pleaded facts that raise a "conditions-of-confinement" theory of liability. Under this theory of liability, a plaintiff challenges the "general conditions, practices, rules, or restrictions of pretrial confinement." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996)). A plaintiff challenging a condition of confinement is "relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish." *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009). Because Plaintiffs never raised a conditions-of-confinement theory of liability below, we cannot say that the district court erred in failing to consider it. We leave the door open for Plaintiffs to raise this theory of liability on remand, and for the district court to address the viability of this theory in the first instance. *See Browning v. Kramer*, 931 F.2d 340, 345 (5th Cir. 1991) ("As a court for review of errors, we are not to decide facts or make legal conclusions in the first instance. Our task is to review the actions of a trial court for claimed errors.").

No. 22-40559

397, 407 (1997)). Proving deliberate indifference in a municipal liability action generally requires showing that a policy caused a pattern of constitutional violations, and proving deliberate indifference based on a single incident requires showing that the injury suffered was a "highly predictable" consequence of the policy. *See Valle v. City of Houston*, 613 F.3d 536, 547, 549 (5th Cir. 2010).

Plaintiffs' proposed third amended complaint properly pleads a municipal liability claim against Anderson County for its alleged policy of requesting PR bonds for detainees requiring hospitalization. The district court abused its discretion in deciding that Plaintiffs' evidence of the PR bond policy was so inadequate that it would be futile for Plaintiffs to amend their complaint. Jail Captain Choate admitted that Anderson County Jail seeks PR bonds "[a]nytime that [jail staff] believe someone is going to go to the hospital." Furthermore, Choate admitted that this practice was carried out due to jail staffing concerns, and Nurse Green allegedly admitted that his ability to send detainees to the hospital was curtailed by Sheriff Taylor. Sheriff Taylor also admitted to participating in the process of coordinating a PR bond for Newsome. Because Plaintiffs have presented evidence that this policy existed, that Sheriff Taylor seemingly knew of the policy, and that the delay caused by the policy contributed to Newsome's death, Plaintiffs' attempt to state a municipal liability claim against Anderson County should not have been considered futile.

Furthermore, Plaintiffs' proposed third amended complaint states that the PR bond policy applied "anytime an inmate/detainee was experiencing a serious medical need," including "emergency situations such as Rhonda Newsome's." Plaintiffs have not pleaded a pattern of prior constitutional violations, as is typically required to establish that a municipal policy was implemented with deliberate indifference. However, given our prior cases indicating that a delay in medical care to a critically ill detainee

can constitute deliberate indifference, *see, e.g.*, *Austin*, 328 F.3d at 210, we find that a constitutional violation would be a "highly predictable" consequence of a policy that purposefully delays emergency care to detainees requiring hospitalization.

We note that at this stage in the litigation, we decline to determine whether Plaintiffs' evidence of the alleged PR bond policy is sufficient to overcome a motion for summary judgment. For Plaintiffs to establish that this policy was implemented with deliberate indifference and prevail on their municipal liability claim based on a single incident, they will have to show that the PR bond policy indeed was a blanket practice that applied even to emergency situations. Alternatively, they could establish deliberate indifference by showing a pattern of prior constitutional violations. At this juncture, however, Plaintiffs simply need to plead allegations that are sufficient to survive a Rule 12(b)(6) motion to dismiss. *Ariyan*, 29 F.4th at 229. They have done so. Because Plaintiffs have presented evidence indicating that their allegations related to the PR bond policy are not the products of pure speculation, we find that the district court abused its discretion in denying Plaintiffs the opportunity to properly plead these allegations against Anderson County.

A similar analysis applies to Plaintiffs' proposed supervisory liability claim against Sheriff Taylor. *See Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997) (noting "the close relationship between the elements of municipal liability and an individual supervisor's liability"). Liability under the doctrine of *respondeat superior* is not cognizable in actions brought pursuant to 42 U.S.C. § 1983. *Cozzo v. Tangipahoa Par. Council-President Gov't*, 279 F.3d 273, 286 (5th Cir. 2002). "Rather, a plaintiff must show either [that] the supervisor personally was involved in the constitutional violation or that there is a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation." *Brown v. Taylor*, 911

No. 22-40559

F.3d 235, 245 (5th Cir. 2018) (quoting *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003)). Liability may be found where "supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985)). Furthermore, "[i]n order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

Based on the evidence of the alleged PR bond policy outlined above, Plaintiffs can plead a colorable supervisory liability claim against Sheriff Taylor, who is the undisputed policymaker in this case. Plaintiffs' proposed third amended complaint contains allegations that Sheriff Taylor implemented the policy of delaying care for detainees with serious medical needs, and that he was personally involved in Newsome's delay of care on the date of her death. While we decline at this stage to address whether Plaintiffs have presented sufficient evidence for their supervisory liability claim to survive a summary judgment challenge, we find that Plaintiffs, at the very least, have shown that amending their pleadings would not be futile.

Furthermore, we find that Plaintiffs' allegations against Sheriff Taylor are sufficient to overcome his defense of qualified immunity at the motion to dismiss stage. Newsome had a clearly established right to not be denied, by deliberate indifference, attention to her serious medical needs under the Fourteenth Amendment. *See Austin*, 328 F.3d at 210; *Easter*, 467 F.3d at 464–65. Additionally, "[t]his court has interpreted 'clearly established law' on the subject of policy promulgation to require 'an intentional choice'"

where it is "obvious that the likely consequences . . . will be a deprivation of civil rights." *Brown*, 623 F.3d at 257 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992)). Because our prior case law makes clear to a reasonable officer that a delay in medical care may constitute a Fourteenth Amendment violation, and because an unconstitutional delay in care is a highly predictable consequence of Sheriff Taylor's alleged policy of delaying medical care for critically ill detainees, we find that Plaintiffs' pleadings are sufficient to overcome Taylor's qualified immunity defense at the motion to dismiss stage.

\*        \*        \*

In summary, we find that the district court abused its discretion in determining that granting Plaintiffs leave to file a third amended complaint would be futile. As discussed above, Plaintiffs have presented evidence that Anderson County Jail seeks PR bonds for detainees who may need hospitalization. Whether Plaintiffs' municipal and supervisory liability claims related to this alleged PR bond policy would survive a summary judgment challenge is a question we decline to answer at this time; we simply hold that Plaintiffs' pleadings are sufficient to survive a 12(b)(6) motion to dismiss. On the other hand, we find that the district court did not abuse its discretion in determining that adding Lieutenant Tia Pierson as a defendant would be futile. We accordingly VACATE the district court's denial of Plaintiffs' motion for leave to file a third amended complaint, and REMAND with instructions to permit the addition of municipal and supervisory claims related to the alleged PR bond policy.

## IV.

Having addressed Plaintiffs' unpled claims relating to the alleged PR bond policy, we turn to the district court's grant of summary judgment for Sheriff Taylor in his supervisory capacity. In their second amended

No. 22-40559

complaint, Plaintiffs allege that Sheriff Taylor failed to adequately train jail staff and implemented a policy prohibiting lower-ranking jail staff from contacting EMS. On appeal, the only claim that Plaintiffs specifically raise against Sheriff Taylor in his individual capacity is their allegation that Taylor implemented the PR bond policy. We find that Plaintiffs' fleeting reference to other "associated policies" is insufficient to preserve their failure-to-train claim and permission-to-contact-EMS policy claim against Sheriff Taylor. Because Plaintiffs did not "address the district court's analysis and explain how it erred" by granting summary judgment for Sheriff Taylor on these issues, we consider these claims abandoned on appeal due to inadequate briefing. *See Sec. & Exch. Comm'n v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022) (quoting *Rollins v. Home Depot USA*, 8 F.4th 393, 397 n.1 (5th Cir. 2021)).

Thus, while Plaintiffs should be permitted to properly plead their PR bond policy claim against Sheriff Taylor, the supervisory claims against Sheriff Taylor that were pleaded in their second amended complaint have been abandoned on appeal. We accordingly AFFIRM IN PART the district court's grant of summary judgment for Sheriff Taylor for the supervisory claims pleaded in the operative second amended complaint.

## V.

We reach a similar conclusion in addressing the district court's grant of summary judgment for Anderson County in its municipal capacity. To hold a municipality liable under § 1983, a plaintiff must establish that a deprivation of rights protected by the Constitution or federal law is inflicted pursuant to "official policy," which may include "duly promulgated policy statements, ordinances or regulations," or "a persistent, widespread practice of [municipal] officials or employees, which . . . is so common and well-settled as to constitute a custom that fairly represents municipal policy."

No. 22-40559

*Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)).

On appeal, Plaintiffs contend that, in addition to the PR bond policy, Anderson County had other "policies restricting hospitalization and thereby delaying critical care," including the permission-to-contact-EMS policy, as well as a policy of delaying immediate medical care by calling medical staff to ask for instructions. While we agree with Plaintiffs that they should be permitted to properly plead their PR bond policy claim against Anderson County, we find unavailing Plaintiffs' other policy-based claims.

Regarding the permission-to-contact-EMS policy, the only evidence that Plaintiffs have provided of such a policy existing is a single statement from Jailer-Defendant Alicia Wilson, who testified that she lacked the independent authority to call 911 because she "wasn't a sergeant, just a regular jailer." The district court did not err in determining that this statement was insufficient evidence of a municipal policy, especially considering consistent testimony from other Defendants that no such policy existed. Moreover, even if we were convinced that such a policy existed, Plaintiffs have not sufficiently shown that this policy was a "moving force" behind the violation of Newsome's constitutional rights. *See Piotrowski*, 237 F.3d at 578. While Plaintiffs have presented evidence that the Jailer Defendants may have ignored Newsome's cries for help or failed to provide emergency medical assistance, they have not presented enough evidence that a Jailer Defendant sought to assist Newsome but was delayed in doing so by a policy preventing him or her from contacting EMS to create a genuine dispute of material fact.

Plaintiffs' claim that Anderson County had a policy of seeking instructions from medical staff before administering emergency aid fares no better. For starters, Jailer-Defendant Matthew Wickersham did not exhibit

deliberate indifference by deciding to call Nurse Green for instructions after finding Newsome unresponsive in her cell, and we do not hold municipalities liable under § 1983 absent an underlying violation of the Constitution or federal law. *See Heller*, 475 U.S. at 799; *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) ("Because [Plaintiff] has alleged no constitutional injury attributable to the [o]fficers, [Plaintiff] has failed to state a claim that a [c]ity policy was the moving force behind a violation of his constitutional rights."). Moreover, Plaintiffs have provided insufficient evidence for a reasonable jury to determine that Wickersham's decision to call Nurse Green for instructions reflected "official policy" or "a persistent, widespread practice" of Anderson County.

The only alleged municipal policy that Plaintiffs sufficiently pressed on appeal is the PR bond policy. The municipal policies alleged in Plaintiffs' second amended complaint, on the other hand, are either unsupported by Plaintiffs' evidence or abandoned on appeal for inadequate briefing. *See Hallam*, 42 F.4th at 327. Therefore, while we will permit Plaintiffs to plead their PR bond policy claim against Anderson County, we AFFIRM IN PART the district court's grant of summary judgment for Anderson County for the municipal claims pleaded in the operative second amended complaint.

## VI.

In addition to contesting the district court's grant of summary judgment for Defendants on appeal, Plaintiffs also raise on appeal the issue of Defendants' alleged spoliation of electronic data. Specifically, Plaintiffs highlight that a series of text messages between Nurse Green, Captain Choate, and Lieutenant Pierson sent on June 15 are unavailable. Plaintiffs moved for discovery sanctions under Federal Rule of Civil Procedure 37(e), which the district court addressed and denied in its order granting summary judgment for the individual Defendants.

A trial court's decision on a motion for sanctions for spoliation of evidence is reviewed for an abuse of discretion. *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). This court permits an adverse inference or sanctions against the spoliator only upon a showing of "bad faith" or "bad conduct." *Id.* (quoting *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005)). A party seeking an adverse inference—i.e., a presumption that "the lost information was unfavorable to the [spoliating] party"—must establish that "the [spoliating] party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

Because the Texas Rangers conducted an investigation following Newsome's death, it may be reasonable to conclude that Defendants had a duty to preserve electronically stored information. It also seems likely that the text messages at issue contained information related to Newsome. Nevertheless, Plaintiffs are unable to effectively rebut Defendants' explanation that they purchased new phones and, as a result, lost access to these text messages. While it may be true that Defendants intended to "frustrate future discovery by destroying incriminating evidence," we find that the district court did not abuse its discretion by concluding that Plaintiffs have failed to present evidence of bad faith sufficient to warrant spoliation sanctions. We AFFIRM the district court's denial of Plaintiffs' motion for sanctions.

## VII.

We conclude by addressing Defendants' evidentiary objections that are preserved on appeal. "Properly preserved evidentiary objections are reviewed for an abuse of discretion." *United States v. Curtis*, 635 F.3d 704, 716 (5th Cir. 2011).

Defendant Timothy Green objects to Plaintiffs' citations to recorded interviews conducted by a Texas Ranger, as well as a transcript of those

interviews. We need not rely on these interviews, however, because the record contains deposition excerpts from the Ranger's interviewees that corroborate the pertinent information contained in the Ranger's interviews. Because our conclusions would be the same regardless of the admissibility of these interviews, we need not address the merits of Defendant Green's evidentiary objections. *See United States v. Wells*, 525 F.2d 974, 976 (5th Cir. 1976) (declining to decide whether the district court erred in admitting testimony, noting that "inasmuch as the testimony was merely cumulative and in light of the record taken as a whole, any error was harmless"); *Weaver v. U.S. Coast Guard*, 53 F.3d 1282, 1995 WL 295978, at *2 (5th Cir. 1995) (declining to determine whether certain statements were hearsay where admission of these statements would have no bearing on the case's ultimate disposition); *East v. Walgreen Co.*, 860 F. App'x 367, 369 n.1 (5th Cir. 2021) (declining to address a hearsay issue where the admission of a contested statement would not affect the outcome of summary judgment).

Defendant Green also objects to a chart created by Plaintiffs' counsel that purports to reflect Green's telephone calls. We need not rely on this chart, however, because Plaintiffs have provided the underlying phone records. We leave it to the district court to determine in the first instance whether Plaintiffs' evidentiary aids are appropriate. We also need not rely on an order issued by the Texas Board of Nursing suspending Defendant Green's nursing license, which Green objects to on hearsay and authentication grounds, since the facts contained in this order are cumulative of information contained elsewhere in the record.[17]

---

[17] We also note that we do not deem the Texas Board of Nursing's conclusions of law that Defendant Green violated state regulations relevant to our analysis of Green's alleged violation of Newsome's constitutional rights. *See Davis*, 468 U.S. at 194 ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Gagne v. City of Galveston*,

No. 22-40559

Defendant Green and Defendant Adam Corley both preserve their objections to Plaintiffs' use of sworn expert reports, but we find these objections unpersuasive. Defendant Green argues that the expert reports were outside the scope of the district court's discovery order, which limited discovery to the issue of qualified immunity. But the district court's discovery order made no mention of prohibiting expert disclosure, and Plaintiffs' experts' reports are relevant to the issue of qualified immunity because they help explain the substantial risk that Addison's disease patients face when their condition is left untreated. The district court's several cites to the expert reports in its order granting summary judgment for the individual Defendants bolsters Plaintiffs' argument that their inclusion of expert reports did not violate the district court's discovery order.

Defendants Green and Corley also object to the expert reports as containing hearsay and hearsay within hearsay. Defendants' broad hearsay objections are arguably too "loosely formulated and imprecise" to be considered preserved on appeal, since Defendants did not point the district court to the portions of the extensive expert reports that they find objectionable. *See United States v. Lewis*, 796 F.3d 543, 546 (5th Cir. 2015) (quoting *United States v. Polasek*, 162 F.3d 878, 885 (5th Cir. 1998)). Furthermore, evidence may be considered on summary judgment provided "[its] contents can be presented in admissible form at trial," *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019), and Plaintiffs have properly submitted sworn declarations from their experts pursuant to Federal Rule of Civil Procedure 26(a)(2) indicating that Plaintiffs intend to rely on their experts' testimony at trial. Defendants have made no effort to specify which

---

805 F.2d 558, 560 (5th Cir. 1986) ("[A]llegations about the breach of a statute or regulation are simply irrelevant to the question of an official's eligibility for qualified immunity in a suit over the deprivation of a constitutional right.").

portions of the experts' reports fall outside the scope of permissible expert testimony under the Federal Rules of Evidence.

Finally, in a one-sentence footnote, Anderson County and the Jailer Defendants attempt to reassert their objections to Plaintiffs' affidavit evidence. The district court overruled these objections in its order granting summary judgment for the individual Defendants, finding that personal knowledge could be inferred from each affidavit itself. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005). Because Defendants undertook no effort to address the district court's analysis and explain how it abused its discretion in overruling Defendants' evidentiary objections, we consider these objections forfeited on appeal. *See Hallam*, 42 F.4th at 327.

## VIII.

For the foregoing reasons, we REVERSE the district court's grant of summary judgment for Defendants Timothy Green, Todd Choate, Jonathan Strong, Robin Jones, Matthew Wickersham, Jessica Carpenter, and Dakota Hughes. We AFFIRM the district court's grant of summary judgment for Defendants Alicia Wilson, Travis Wesson, and TAKET Holdings, L.L.C. We AFFIRM IN PART the district court's grant of summary judgment for Defendant Adam Corley as related to Plaintiffs' supervisory claim against him, but we REVERSE the district court's grant of summary judgment for Dr. Corley as related to Plaintiffs' nonsupervisory claim. We also AFFIRM IN PART the district court's grant of summary judgment for Defendants Anderson County and Greg Taylor for the claims alleged in Plaintiffs' second amended complaint, and we VACATE the district court's denial of Plaintiffs' motion for leave to file a third amended complaint and REMAND with instructions to grant Plaintiffs leave to amend their pleadings to include additional supervisory and municipal liability claims based on the alleged

No. 22-40559

policy of delaying treatment to obtain PR bonds. Finally, we AFFIRM the district court's denial of Plaintiffs' motion for sanctions.